UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

PRO SE PRISONER CIVIL RIGHTS
AMENDED COMPLAINT

CASE NO. 3:13-CV-01465 (SRU)

PLAINTIFF(S) [Write the name(s) of the person(s) complaining]

Richard Reynolds

vs.

DEFENDANT(S) [Write the name(s) of every person you are suing. If
you do not know a name, write "John Doe" or "Jane Doe." Include the
defendant's rank or title and place of employment if you know it.]

Leo Arnone, Commissioner CT Dept of Corrections
Angel Quiros, Regional Warden
Edward Maldonado, Warden N.C.I Somers
Gerard Ganye, Psychiatrist N.C.I Somers
Mark Frayne, Psychologist N.C.I Somers
John/Jane Does, CT Dept of Corr Staff (To be named during discove

All Defendants sued in official & individual capacity
Official capacity for injunctive Relief
Individual capacity (where Applicable) for compensatory/punitive
Damages

Rev. 6/19/13

Please complete every section and SIGN THE LAST PAGE.

## A.   JURISDICTION

Because federal courts cannot hear every kind of claim, you must identify the law that says this court can hear your claim. There are two possibilities.  Check **one**.

I can bring my complaint in federal court because I am suing:

1. _____X_____   State, county or city employees for violating my federal rights under 42 U.S.C. Sec. 1983; OR

2. _____   Federal employees for violating my federal rights under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) and 28 U.S.C. Sec. 1331.

## B.   PLAINTIFF(S)   (THE PERSON(S) FILING THIS COMPLAINT)

If there are more than two plaintiffs, attach additional pages. Provide items a, b, and c for each additional plaintiff.

1. First Plaintiff
   a.   Full Name: Richard Reynolds
   b.   Inmate Number: #219460
   c.   Correctional facility: Northern Corr Inst, Somers. CT.

2. Second Plaintiff
   a.   Full Name:
   b.   Inmate Number:
   c.   Correctional facility:

C.   DEFENDANT(S) (THE PERSON(S) WHOSE ACTIONS YOU ARE COMPLAINING
     ABOUT)

Do not include any defendants who the Court has already dismissed
from your case.

1.   <u>First Defendant</u>

     a.   Full Name: Leo ARNONE

     b.   Rank or Title: Commissioner

     c.   Workplace: CT Dept. of Corrections

2.   <u>Second Defendant</u>

     a.   Full Name: Angel Quiros

     b.   Rank or Title: Regional Warden

     c.   Workplace:

3.   <u>Third Defendant</u>

     a.   Full Name: Edward Maldonado

     b.   Rank or Title: Warden

     c.   Workplace: N.C.I Somers, CT

4.   <u>Fourth Defendant</u>

     a.   Full Name: Gerard Granye

     b.   Rank or Title: Psychiatrist

     c.   Workplace: N.C.I

5.   <u>Fifth Defendant</u>

     a.   Full Name: Mark Frayne

     b.   Rank or Title: Psychologist

     c.   Workplace: N.C.I

6.   <u>Sixth Defendant</u>

     a.   Full Name: John/Jane Doe's

     b.   Rank or Title: Dept of Corr staff members

     c.   Workplace: To be named during discovery As their
          roles become clear.

D.   PREVIOUS LAWSUITS

Tell the Court if any plaintiff has filed other state or federal
lawsuits involving these defendants or events. If you need more
space, attach additional pages. **Provide items a-d for each case.**

1.   First Lawsuit

   a.   Court and Date filed: District Court of CT (E-filed) 3/4/13

   b.   Caption and Docket No.: Reynolds V. Murphy et Al  3:13-CV-00316(SR

   c.   Briefly, what was this lawsuit about?
   Unlawful prolonged use of Restraints, Collective punishment, Retaliation
   Denial of equal protection, due process.

   d.   Did you win or lose? If you lost, did you appeal? If you
        appealed, what did the appeals court say?
   Case is still pending

2.   Second Lawsuit

   a.   Court and Date filed: District Court of CT (E-Filed) 3/20/13

   b.   Caption and Docket No.: Reynolds V. Arnone et al  3:13-CV-00388 (SRU)

   c.   Briefly, what was this lawsuit about?
   The unconstitutional ban on pornographic material, The constitutionality
   of a portion of CT Dept of Corr Administrative Directive 10.7, And a
   writ of mandamus finding on defendants for Administrative policy contrary
   to Regulations of Connecticut State Agency.
   d.   Did you win or lose? If you lost, did you appeal? If you
        appealed, what did the appeals court say?
   Case is still pending

3.   Third Lawsuit

   a.   Court and Date filed: District Court of CT (E-filed) 3/21/13

   b.   Caption and Docket No.: Reynolds V. Maldonado et al  3:13  (AVC
                                                         3:13-CV-00401

   c.   Briefly, what was this lawsuit about?
   Defective Razor, deep laceration on head, Negligence.

   d.   Did you win or lose? If you lost, did you appeal? If you
        appealed, what did the appeals court say?
   Case dismissed/closed 7/24/13

## Nature of Case

This case concerns the plaintiffs conditions of confinement that are ongoing and continue to cause psychological harm, inadequate mental health treatment, denial of Religion, freedom from restraints and other issues listed under complaint with Jury Demand.

## Complaint With Jury Demand

1) This is a civil Rights action filed by Richard Reynolds a state prisoner, for damages and injunctive relief under 42 U.S.C § 1983 Alleging denial of Due process in violation of the Fourteenth Amendment to the Constitution and solitary confinement in segregation for 18 yrs in violation of the due process clause of the Fourteenth Amendment to the Constitution.
The plaintiff also alleges Denial of Equal Protection in violation of the Fourteenth Amendment to the Constitution. The plaintiff alleges Invidious Discrimination in violation of the Fourteenth Amendment to the Constitution.
The plaintiff alleges violation of the Ex post facto law in violation of the Fourteenth Amendment to the Constitution.

2) The plaintiff alleges Denial of Religion in violation of the First Amendment to the Constitution.

3) The plaintiff alleges Denial of Mental health treatment, The housing of mentally ILL prisoners in isolation/Solitary Confinement under strict punitive conditions in violation of the Eighth Amendment to the Constitution.

## _Factual Statement_

4) On March   1995 the plaintiff was moved from Hartford Correction Center to Northern Correctional Institute Super max to begin a sentence of death.

5) Northern Correctional Institute will hereafter be referred to as NCI Supermax.

6) NCI Supermax houses, Administrative Segregation, Death Row, Security Risk Group (SRG), Special needs and Chronic Discipline.

7) From its opening NCI Supermax was designed for punishment far above and beyond that of Normal prison life (see Attachment A).

8) It's design was contributed to by a psychiatrist , not only to break and deter the inmates but to also drive a wedge between inmates and their family from visiting their loved ones.

9) Behavior modification at Northern consists of a manifold of several techniques: Dr Heims brainwashing methodology, Skinnerian Operand Conditioning, Dr. Heims sensory deprivation design (I.E, Control unit) drug therapy, along with several other techniques.

10) The plaintiff alleges these techniques, the way they are disguised behind pseudonyms and under philosophical rhetoric of correction and even their modus Operandi, violate the Nuremberg Code, the United Nation's Standard of treat for offenders, the Department of Health Education

cont
And Welfare's policy on human experimentation and the
1st, 6th And 8th Amendments of the U.S. Constitution.

11) The plaintiff has no recourse to leave N.C.I's Supermax
while under a sentence of death.

12) From 1995 to date plaintiff has been living in Administ.
rative Segregation among inmates whom come And go back
to general population.

13) Plaintiff now suffers from psychological and emotional
problems due to the coming And going of other Admini.
strative Segregated, special needs ect going back to
general population or home.

14) Plaintiff has remained idle and confined to his    small
cell for 23 hours a day, day after day for  18 yrs.

15) Plaintiffs cell is entirely too small to confine any individual
for so long a time, with only one hour departure.

16) The temperature in plaintiffs cell vary excessively,
when its hot outside theres oppressive heat inside And
when its cold outside the heats non existing inside.

17) In plaintiffs 18 yrs on death Row At N.C.I Supermax there
has never been a fire drill.

18) Defendants largely ignore the emotional And physical well
being of plaintiff.

Cont

19) Plaintiffs interaction with other human beings is not sufficient exasperating his P.T.S.D.

20) There are No educational or work programs available at N.C.I Supermax in violation of CT state law C.G.S. 18-10A

21) The plaintiff is not permitted access to dining Room.

22) The plaintiff has not been permitted access to use the Gymnasium in his 18 yrs at N.C.I Supermax.

23) The plaintiff exercise opportunities are minimal, once a week for 1 hr, wednesdays rain snow sleet or shine outside, when gym equiptment is brought down.

24) The plaintiff went 12 straight yrs without tickets until defendants used/issued them as form of retaliation for another inmates behavioral problem with Captn (see rot # ).

25) The plaintiff is being deprived access to clergy of his faith 7th day Adventist (see Attment B Requests/Grievance)

26) The plaintiff is not allowed the opportunity for congregated religious services a punishment reserved for Administrative Segregation Status inmates. (see Att B)

27) The plaintiff is being denied full access to commissary items. Privileges lost without due process. Now plaintiffs restricted, a punishment reserved for Administrative Segregation Status inmates.

Cont

28) The plaintiff is being denied contact visits. Contact visits were Allowed while death Row was housed at Somers prison (Now called Osbourne). A right lost when death row moved to N.C.I. Supermax without any due process. While at Somers/Osbourne death row was housed under Non-punative Segregation. The move to N.C.I Supermax clearly changed that to punative Segregation. Creating AN 'Ex post facto' violation.

29) Plaintiff was sentenced to death, only. Not a sentence of death And psycological torment And solitary Confinement.

30) The plaintiff alleges theres No issue whether placement in a punative Level 5 Supermax designed for punishment above And beyond Normal prison life deprives him of his liberty interest, since the court can infer that the disciplinary rules themselves create a liberty interest; DoC prison rulebook says, in effect, "If you dont break these rules, we wont punish you." see Gilbert v. Frazier, 931 F.2d 1581, 1582 (7th Cir. 1991) Green v. Ferrell, 801 F.2d 765, 768-69 (5th Cir. 1986) holding that punishment always implicates a liberty interest because the require of guilt is a substantive limit on official discretion.

31) The plaintiffs Segregation/Solitary Confinement for a very long period of time will be found to be protected by due process under the constitution itself because of the psychological harm that can result from

Cont
prolonged isolated confinement.

32) The plaintiffs condition of confinement taken as a whole imposes an atypical and significant hardship within any correctional context.

33) The Supreme Courts recognition that states can create a protected liberty interest in freedom from restricted confinement. The Supreme Courts decesion in Sandin makes clear that a prisoners restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration of the prisoners confinement imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. The word "Atypical" describes restricted confinement that imposes both Atypical and Significant hardship.

   Davenport v. De Robertis, 844 F.2d 1310, 1313, 1316 (7th Cir 1988)
   "The record shows, what anyway seems pretty obvious, that isolating a human being from other human beings for years after year or even month after month can cause substantial psychological damage, even if the isolation is not total.

34) Plaintiff believes both conditions and durations need be considered, since especially harsh endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be

<u>Cont</u>
Atypical  Welch, 196 F.3d at 392-93

35) Solitary Confinement in normal SHU conditions for 365 days is beyond a sufficient departure from the ordinary incidents of prison life to require procedural due process protection under Sandin. There is no percise calipers to measure the severity of plaintiff hardship, but the court should believe that wherever the duration line is ultimately drawn, Anything over 365 days satisfies the standard.

36) The plaintiff has been incarcerated at N.C.I Supermax in solitary confinement for over 18 yrs from March 1995 to date.

37) The plaintiff accuses said defendants of deliberate indifference, first by violation his right to be free from excessive noise. The day room Adjacent to cell 225-223 & 125-123 makes a constant droning noise that comes from the vents/fire traps (not sure what its called) 24/7 which created his insomnia depriving him of sleep as well as drives plaintiff crazy. This psychological torture due to the excessive noise inflicts pain without penological justification in violation of plaintiffs 8th Amendment rights. (See Att. L)

38) The plaintiff accuses defendants of deliberate indifference, Second by ignoring their own unit directive for over 18 yrs (See Attachment C  Unit directives 9.4.1)
PG 20.21

Cont

39) The Plaintiff suffers from PTSD. It should shock the courts conscience to believe prisoners on death row housed in solitary confinement would not posess some mental illness and that 22 hrs a day confinement and lack of any real social interaction wouldn't exacerbate that mental illness.

40) The plaintiff has witnessed one volunteer execution and numerous other death row inmates mental deterioration. Namely just recently August 13th 2013 at 2:30am Sedrick Cobb cell #223. I'm in 225 The man mentally snapped & had to be brought down to medical. He returned on the 14th (next day) and was out of his mind again on the 15th August 2013 And to date has not returned from MHU mental health unit. And this was the third break down I witnessed.

41) The defendants violated published professional standards of care or the prisons own procedures for medical care their own standards/procedures provide circumstantial evidence that the prison health care gate keepers defendants Gerrard Ganye, Mark Frank, John & Jane Doe's (names to be added in discovery) Knew of a substantial risk of serious harm to those incarcerated at N.C.I. Level 5 Super Max for long periods of time. (see attachment C )

42) The plaintiff alleges the defendants failed to follow professional standards as well as prison medical care protocols clearly demonstrating deliberate indifference. Their own standards and protocol are evidence

Cont

of the defendants/practioners knowledge of the
risk posed by particular symptons or conditions
(Unit Directives 9.4.1 pg 20-21 Restrictive/
Death Row status Review (D)
"When an inmate remains on Restrictive housing
beyond 30 days, A psychologist or psychiatrist
shall conduct a personal interview with the
inmate And document the inmates mental
status in the inmates health record. if conf-
nement continues for an extended period of
time, the Aformentioned psychological assessm-
ent shall be made every three (3) months or
as clinically necessary ect.

43) Plaintiff sites FARMER V. BRENNAN. 511 U.S. At 845
"You can sue under the 8th Amendment for
harm that is not "impending"; Farmer said
that serious damage to prisoners future
health is actionable.
The harm does not have to be "easily preven-
table"; Farmer holds that prison officials must
do what is reasonable, not what is easy.

44) The plaintiff has been incarcerated for over 18 yrs
on N.C.I death Row Solitary confinement and has
Never, not once, been seen by any mental health
staff other than them passing by his cell door
if they were to see me outside of the prison
they wouldn't know who I was.

Cont

45) In this case the plaintiff believes the focus should be on the institutions historical indifference rather than the state of knowledge and the response (or lack their of) a particular individual.

46) The plaintiff alleges over the past 18 yrs numerous Administrations have demonstrated a clear wanton and reckless disregard of plaintiffs rights, physical and mental deterioration and psychological damage years of solitary confinement would inflect on plaintiff.

47) Plaintiffs conditions of confinement created an adverse Action, "A decision or event that unfavorably effects a person, entity, or association."
Judge Posner in <u>Bart V. Telford 677 F.2d 622, 625 (7th Cir. 1982)</u> That an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

48) Plaintiff alleges numerous defendants kept stringing him along into believing that they were looking into making changes for the better while actually only buying time until the next defendants/Administrator took over. In which plaintiff would have to start building a new relationship with the new Administration see Attachment D) demonstrating years of trying to better my conditions.

<u>Cont</u>

49) Plaintiff alleges that stringing him along was the adverse action that kept him from pursuing any legal action as well as the retaliation and collective punishment suffered by the plaintiff over the years created an adverse action.

50) On February 22nd 1997 Death Row started group work assignment

51) On May 14th 1997 Death Row started group recreation.

52) On or about May 14th 1997 death Row started group meals in adjacent day room for lunch and dinner.

53) On November 1st 1998 inmate Michael Ross attempted suicide in his cell, alone on 3rd shift sometime after 11:00pm. The next day all group activities stopped.

54) On November 10th 1998 Warden Gomez told plaintiff (during his tour of facility) that, "things will go back to Normal soon."

55) On November 18th 1998 plaintiff was informed by Major Krajviak that were losing our group rec and that we can thank Ross for that.

56) On December 8th 1998 Group rec. was split into 2 groups of 3 due to Ross's suicide attempt. A clear showing of collective punishment.

cont

57) On December 9th 1998 plaintiff again spoke to Warden during his tour of facility and was told by Warden Gomez And Major Mcdonald to, "wait for 6 months till things go back to Normal the political climate will be better (due to Ross's suicide Attempt).

58) On Feburary 1st 1999 approximately 2 months after conversing with the Warden that Gomez And Major Mcdonald a New Warden took over Warden Larry Myers

59) On Feburary 7th 1999 Inmate Daniel Webb was accused by Warden Larry Myers And Commissioner John J. Armstrong of plotting an escape. Inmate allegedly gave a letter to his lawyer.

60) On March 11th 1999 plaintiff spoke to Major Thomas Coates And Major Michael Lajoie And was assured, "were Not losing anything due to Inmate Webb's Actions.

61) Within a week of said conversation with both majors death Row was stripped of its group dining group rec in both the Rec yard and day room And group work Assignment. Clearly collective punishment And No due process.

62) From 1999 to date plaintiff continues to be treated as an punative segregative inmate in Solitary confinement

Cont
Cont

63) Plaintiff has no means of being able to gain release from these conditions. Even with exemp-lary behavior his condition of confinement wont change short of judicial intervention.
Even though defendant Maldonado states in a letter to Jennifer L. Bourn Assistant Public Defender for inmate Steven Hayes # 97425 And I quote "Northern C.I. provides a highly structured, secure and humane enviorment while affording inmates an opportunity through positive behavior to attain the same privileges as those inmates in less restrictive facilities."
(See Attachment E)

64) Plaintiff was ticket free from 1999 to 2010 and Nothing changed for him and other have and are ticket free even to date.

65) N.C.I was built purely for punative reasons to house Security Risk Group (SRG), Special Needs, Chronic Discipline And Administrative Segregation inmates whom have violate or broken one or more of Connecticuts D.O.C Rules, policy directives or protocol in one form or another to justify their placement in this Level 5 Supermax.
Said inmates are then given due process hearing to prove if their placement is justified and if it's so they then have the opportunity through positive behavior to be returned to general popu-lation within one calender year.

Con't

66) The guidlines for N.C.I is for inmates to spent one (1) year in solitary confinement in which they work their way out with privileges are retrieved during the course of that year.

67) Plaintiff believes that the psychological effects of isolation and sensory deprivation in N.C.I Supermax Control unit is far riskier on his and other's sanity than normal prison life. The U.S. Supreme Court states in _Hewitt v. Helms at 459 U.S. 477, note 9_, "Of course. Administrative Segregation may _Not_ be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of inmates in Administrative Seg." Sostre v. McGinniss 312 F.supp 863, People who are confined in these conditions are at risks for developing serious psychological problem.

68) On only needs to see whats been copy on on California's Supermax (recently on ABC News) to understand why plaintiff's have been complaining about his conditions of confinement for 18 years by writing numerous letters to warden (s) since 1995. All claim to look into it to no avail (See Att D)                    & theres still many more.

Cont

69) The Equal Protection of the 14th Amendment provis
ion requiring the states to give similary situated
persons or classes similar treatment under the
law. Guaranteeing that the goverment must treat
a person or class of persons the same as it trea
ts other persons or classes in like circumstances.

70) The plaintiff believes that means inmates on death
row are not housed at N.C.I Supermax for any
D.O.C violations and should there for be treated
as any other level 4 inmates within Connecticut
D.O.C which was how death row was treated
prior to its removal from Somers prison, (Now
Called Osbourne).

71) The plaintiff believes the removal of death Row from Somers
to N.C.I was & is illegal. Connecticut General Statues
Title 18 statues stem from Public Act 152 (1967) An act
establishing a dept. of corr Sec. 14, 15 of Public Act 152
create 18-86 inmate transfers
It is clear from the "Title History" found in C.G.S vol 6
that this was created to transfer from Wethersfield to New
Somers. It clearly states facilities with statutory or
Judicial Authority. In 1967 the only prisons with this
were state prisons. No Punitive Solitary Confinement
prison existed in 1967. If it had it would have been
exempted since the transfer to such a prison would
have Automatically inflicted an additional punishment to
the sentence of death. The new law of 2012 clearly
shows the Legislators agree by exempting us from
Solitary by law.

Cont

72) The plaintiff alleges the then Commissioner used 18-81 Commissioners duties, specifically Classification to move us. While the administrative directives must obtain approval from the Legislative Review Committee, Classification decisions do Not. Only two directives mention death Row, A.D. 6.15 Administration of Capitol Punishment and 9.2 Classification. In 9.2 Death Row is inappropiately found in only one Section. Sec 12 A/S (Administrative Segregation) Level 5 Risk.

73) The plaintiffs placement in this Category Lays the foundation for ex post facto and is being challenged since its his sentence that places him in a institutional violence Category.

74) The plaintiff alleges that it was from here that the then Commissioner (to be named with discovery) acted with malice and fore thought. In 1995 he had a choice of Numerous Level 4's and two Level 5 facilities to choose from, Walker High Risk prisoners and N.C.I Punitive Segregation/Solitary confinement. He purposely chose the worst automatically adding punitive A/S and Solitary confinement to the punishment of death.

75) The plaintiff alleges this action is illegal. We already know 18-86 would preclude the N.C.I move of Death Row and the Classification system "Shall" not be used to discriminate (which it does for us) or add ex-post facto punishment (which it does for us). But when you look at A.D. 6.15 there are I believe 6 statues that control the administration of Capitol Punishment. However 54-100 specifically puts death Row at Somers. NO Statue

Cont

75) in any Volume puts death Row at N.C.I. In fact in the "Title History" P.A. 73-116 Passes a law that moves the Judicial District from Hartford (Wethersfield) to Tolland (Somers).

76) The plaintiff Alleges the 1995 move of death Row is a ex post facto violation which stripped him of his Rights and privileges afforded him and Liberty interest in violation of his due process clause his 5th Amendment and 14th Amendment rights.

77) The plaintiff alleges that from 1995 to date, due to being housed at N.C.I Supermax he's suffered invidious discrimination, due process violations, deliberate indifference, Loss of liberty interest, cruel and unusual punishment, mental deterioration all due to his placement in a prison designed for extreme punishment far and above that of Normal prison life.

78) The plaintiff alleges that from 2001 (exact date unknown) defendants (to be named) removed him from Level 2 pay to Level 1 without any notice or due process.

79) Plaintiff was paid $1.25 a day x 7 days = $8.75 a week x's 4 weeks = $35.00 a month x 12 months = $420.00 a year for the first six yrs 1995 to 2001

80) Plaintiff has been paid $15.00 a month x's 12 month = $180.00 a year for the past 12 years to date. In the past 12 yrs plaintiff would have made $5,040 instead of his earned $2,160.00 a difference of $2,880.00

Cont.

81) The plaintiff states he's owed over $2880.00 for 12 yrs of back pay in accordance with 9.4.1 Unit Directives Work Assignment and Administrative Directive 10.1 Inmate Assignment and pay plan (see Attachment C & D)

82) The plaintiff alleges that for 18 yrs he's been denied to participate in D.O.C's picture program. The program is not used at N.C.I. Supermax (it was for death Row at Somers) for punitive reasons. The plaintiff's not housed at N.C.I Supermax for the same reasons that A/S inmate are.

83) The plaintiff lack of Access to all commissary items creates atypical and significant hardship in relation to ordinary incidents of prison life.
He cannot purchase hygeine items such as hair grease (im African American) Pompade, Pink moisturizing hair oil, dental floss sticks, Doo Rag, hair brush, afro picks ect. It would be one thing to have to do without said items for the 1 yr phase A/S program, but indefinitely is absurd.

84) Plaintiff is a prisoner who suffers from P.T.S.D. And was diagnosed as having PTSD by Robert A. Fox on or about 2011 for my habeas trial.

85) Plaintiff alleges he was intentionally discriminated against by medical Service, a prison program due to having P.T.S.D. Per the OPA-V-Choinski 3:03-CV-1352 settlement Agreement "All prisoners will be screened thru Psych. Eval To exempt those with Axis 1 disorders from placement at N.C.I (PTSD is an Axis 1 disorder).

Cont

86) Plaintiff has never had a psychiatrist evaluation at N.C.I by their staff doctors, never diagnosed, never received treatment, therapy or medication for any mental health. Yet according to Unit Directives 9.4.1 #16 D Restrictive /Death Row status review Health Assessment. Their suppose to see if my conditions are contraindicated if inmates remain on restrictive housing status beyond 30 days. I've been on Death Row Restrictive housing status now for over 18 yrs And I've never been pulled out for any mental health review.

87) The plaintiff alleges the Refusal to treat is done as discrimination since medical/mental health service is a prison program enjoyed by all prisoners.
The intentional oversight to do a full psych Eval (in accordance with OPA-v-Choinski 3:03-cv-1352) And properly diagnose my PTSD meets the "Disparate Treatmen" prong (according to ps 96 Prisoners Self Help Litigation Manual).

88) The plaintiff alleges No treatment, therapy or medication (which is the program) meets the "Failure to make Reasonable Accomodations prong (According to ps 96 Prisoners Self Help Litigation Manual). Denial of Access to prison program.

89) The plaintiff alleges #85 & 87 Shows how the denial amounts to exclusion (discrimination due to P.T.SD) Kimen v N.H.D.O.C. 451 F.3d (2006)

90) The plaintiff alleges had he been accurately assed as having PTSD, The effects of Long term solitary confinement at N.C.I, would have exempted him

cont

from continued housing at N.C.I. So to keep plainti-
ff/death Row at N.C.I mental Health deliberately exc-
ludes plaintiff and other on death Row from proper
psychiatric evaluation.

## REMEDY EXHAUSTION

91) Attached hereto is documentation (inmate Grievance
forms level 1 and 2) to demonstrate plaintiffs complian-
ce with exhaustion rule as articulated in RICHARD
v. COMMISSIONER, et al, 87 Conn. App. 46; 863 A2d
754 (2005)

## CLAIMS FOR RELIEF
### Conditions of Confinement 8th Amendment Rights

A) The Actions Leo Arnone, Commissioner, Angel Quiros
Regional Warden, Edward Maldonado-Warden, Gerard
Ganye-psychiaterist, Mark Frayne-psychologist, John/Jane
Doe's of Dept of Corr Staff (to be named). from 1995
to date have shown a deliberate indifference to
plaintiffs well being, a violation of plaintiffs 8th Amend
ment rights

B) Those identified in the above paragraph will hereafter
be reffered to as the defendants.

C) The Actions of the defendants created conditions of
confinement for over 18yrs that constitutes cruel
and unusual punishment and a wanton reckless
disregard of plaintiff on his rights.

Cout

D) The Defendants actions has caused plaintiff to suffer due to his conditions of confinement, continued isolation, lack of mental health care, causing irreparable mental and psychological damage from defendants cruel and unusual punishment.

## CLAIM FOR RELIEF
### Equal Protection 14th Amendment Rights

A) The failure of defendants to provide plaintiff with a 7th day Adventist Clergy is in violation of his 1st and 14th Amendment rights.

B) The failure of defendants to provide plaintiff his equal protection of the law by denying him congregated religious services in violation of his 1st and 14th Amendment rights.

C) The failure of the defendants has led to the plaintiff psychological and emotional problems due to being isolated, idle and confined for 23 hours a day for 18 yrs. Which created atypical and significant hardship on plaintiff in relation to the ordinary incidents of prison life.

D) The failure of defendants to comply with the equal protection clause of the 14th Amendment clearly demonstrates insidious discrimination.

E) The failure of defendants to stop their discrimination on plaintiff due to his being on death Row by treating him as a A/S inmate when he's violated no D.O.C rules directives or policy to be placed on indefinite Administrative segregation status.

Cont

F) The failure of defendants to Return group rec, group Socialization and group dining due to the ~~actions~~ actions of others is a clear violation of plaintiffs Equal protection 14th Amendment Rights.

## CLAIMS FOR RELIEF
## Due Process 14th Amendment Rights

A) The defendants action over 18 yrs created a deprivation of the plaintiffs liberty interest.

B) The defendants actions constitutes cruel and unusual punishment by keeping plaintiff on indefinite Administrative Segregation punitive/solitary confinement and subjecting him to atypical and significant hardship for over 18 yrs without due process is in violation of his 8th and 14th Amendment rights.

C) The defendants denied plaintiff his due process rights, afforded him by not establishing why "his" group rec/dining was terminated. From March 1995 to date there's been no hearing. Plaintiff would like to know what he's done to justify their violating his 14th Amendment Rights.

D) The defendants futher deprive plaintiff of any means of coming off of Administrative Segregation status. Continuing to violate his due process and Equal ~~protecti~~ protection 8th and 14th Amendment Rights.

E) The defendants failure to follow their own Administrative directive Unit Policy 9.4.1 #16 D Restrictive/Death Row Status Review Health Assessment.

Cont

F) As a result of defendants moving death row from Somers to N.C.I Level 5 Supermax. It created an ex post facto violation without due process. And changed the nature of my sentence from a sentence of death to punitive Administrive Segregation/solitary confinement, psychological torture, invidious discrimination, deliberate indifference, loss of liberty interest, Atypical And significant hardship, mental deterioration, cruel and unusual punishment above and beyond the Original Sentence of death.

## RELIEF REQUESTED

Wherefore, plaintiff requests that the court grant the following

A) Issue A declaratory judgement stating that:
1- Defendants Knowingly violated the plaintiffs rights And continued to violate the plaintiffs rights under the Due Process Clause of the 14th Amendment to the United States Constitution.

2- Defendants Knowingly violated the plaintiffs rights by subjecting plaintiff to Invidious Discrimination in violation of the 14th Amendment to the United States Constitution.

3- Defendants Knowingly violated the plaintiffs rights by depriving him of Equal Protection under the 14th Amendment to the United States Constitution.

4- Defendants Knowingly violated the plaintiffs rights And

Cont

Continued to violate the plaintiffs rights for over 18 yrs with cruel and unusual conditions of confinement in violation of the 8th Amendment to the United States Constitution.

B) Issue an injunction ordering defendants to:

1- Release the plaintiff from punitive administrative Segregation/solitary confinement and place him on general population "status" with restoration of all rights and privileges immediately.

2- The return of all back wages to plaintiff earned from 2001 to date approx $2,880 + to date.

3- Provide 7th day Adventist Clergy and allow group religious services.

4- The return of group rec and meals in day room adjacent to death room

5- Access to N.C.I's gymnasium

6- Order Mental Health (MHU) to comply with N.C.I Unit Directives 9.4.1 Health Assement /And the Settlement Agreement with OPA V. Choinski 3:03-CV-1352 (RNC)

7- Unrestricted commissary privileges as we once had.

8- Contact family and friends visits. Like death Row enjoyed at Somers.

Cont

9- Provide a picture program at N.C.I for plaintiff and others not housed here for punitive reasons above that of normal prison life.

10- Removed from 23 hour a day confinement.

11- Return of group rec outside in rec yard.

12- Stop the discrimination against plaintiff & others

13- Anything short of this, this plaintiff contends that his continued confinement at N.C.I Supermax would continue to.
   A) Deprive him of his liberty interest without due process of law.
   B) Continue to subject him to cruel and unusual punishment.
   C) Deny him equal protection of the law.
   D) Deny his freedom of speech and religion.
   E) Cause him to suffer psychological damage.
   F) Exacerbate his known mental illness.

14. If relief cannot be met due to N.C.I directives protocols, ect. Then removal of death Row to another institution that can accommodate Level 4 guidelines would be appropriate.

C) Award compensatory damages in the following amounts.
   1- Any and all relief that this honourable court deems just and proper and equitable for 18yrs of cruel and unusual punishment. And civil

Cont
  Rights violation.

D) Award punitive damages in the following amounts.
  1· Any and all financial relief that this honourable
    court deems just for 18 yrs thats proper and
    equitable

E). A jury trial on all issues triable by jury.

F) Plaintiffs cost in this court.

G) Attorney fees

H) Any and all additional relief that this honourable
  court deems just, proper and equitable.


            Richard Reynolds

            Respectfully submitted

            Richard Reynolds #219460
            Northern Corr Inst
            287 Bilton Road
            Somers, CT 06071

Cont

# VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true.

I certify under penalty of perjury that the foregoing is true and correct.

Executed at Northern Corr Inst.
287 Bilton Road,
P.O. Box 665
Somers, CT 06071
On this 11th of November of 2013

Richard Reynolds
#219460

pg 1

# Attachments

A) psych report on Northern Corr Inst. 3pgs

B) Grievances on 7th day Adventist & other related ACLU corre spondence & N.C.I Deacon Bernd    8pgs

C) N.C.I unit directives 9.4.1 pg 20-21 To show their non compliance with mental health protocol pertaining to plaintiff 25pgs.

D) Correspondences between plaintiff & numerous administr ations from 1995 to date. To show plaintiff has complained about conditions for 18 yrs. Numerous complaints missing due to non response from staff or missing due to shake downs. 38 pgs.

E) Correspondence from Warden Maldonado (defendant) to Jennifer L. Bourn Assistant Public Defender inmate Steven Hayes lawyer. To show how administration lies & strings along inmates on death row. Plaintiff went 12 yrs without ticket so he knows theres no opportunity through positive behavior to attain the "_same_" privileges as those inmates in "_less_" restric tive facilities. 2pgs.

Removed ⊗ → F) Attachments from Reynolds v. Murphy et al  Grievances, prop erty receipts (seized property), tickets  16 pgs.

Removed ⊗ → G) Requests, magazines taken during said incident (F) for no other reason but retaliation. Ban on magazine wasn't till 2yrs later ~~8pgs~~

H) Directives 10.1 pg 6 shows pay level  6 pgs

I) Grievances on "conditions of confinement" exhausted 27pgs

J) Request asking for the return of hair pompade Hygenic product 3 pgs.

K) Northern CI male property matrix clearly shows only special needs are exempt from hair grease. updated matrix 2010  2pgs.

PG 2

Cont   Attachments

L) Request to Warden Maldonado about excessive Noise Doc
   staff has Known about problem since 2010. 2 pgs.

M) Request to Medical about excessive Noise from day room vents
   no medical help was provided for sleep deprivation. 1 pg

N) DR Stuart Grossian, M.D report on Psychiatric Effects
   of Solitary Confinement. 32 pgs

O) ACLU, A death before dying, solitary confinement on
   death Row. 4 pgs

P) ACLU, Out of Sight Out of Mind  warehousing of mentally
   ill prisoners in solitary confinement. ~~11 pgs~~ 13 pgs

Q) Page from plaintiff's habeas proceeding showing he
   suffers from PTSD. 1 pg

R) Plaintiffs ticket history from 1995 to date on death Row.
   #2 pgs   show No tickets from 9/18/1998 to 3/31/2010
   12 yrs.

Attachment A
3 PGS

Ⓐ

Northern

TERRY KUPERS M.D.
N5 3 WILDWOOD
OAKLAND, Ca 94610

Upon first glance Northern differed radically in its appearance from what one would believe from the horrid myths. The Ominous Sword of Damocles over the prison system appeared to be no threat. But the human eye can be deceived by what is contracted on the phenomenal level. A vague but bleak sensation invades a man's being when he passes through the grill doors into the prison's interior. Each electronically controlled door seems to alienate him more and more from his freedom, even the hope of freedom. A sense of finality, of being buried alive is raised to the supra-level of his consciousness. He tries to suppress it, but the clanging of each door leaves an indelible imprint on his psyche. This is the first evidence that Northern is more than a physical star chamber. It is a modern behavior modification laboratory. Behavior modification at Northern consists of a manifold of several techniques: Dr. Heim's brainwashing methodology, Skinnerian operand conditioning, Dr. Heim's sensory deprivation design (i.e., control unit) drug therapy, along with several other techniques. And, as I will point out, the use of these techniques, the way they are disguised behind pseudonyms and under philosophical rhetoric of correction, and even their modus operandi, violate the Nuremberg Code, the United Nation's standard of treatment for offenders, the Department of Health Education and Welfare's policy on human experimentation and the 1st, 6th and 8th amendments of the U. S. Constitution. The constructs of the prison are somewhat peculiar, and some not so outstanding features do not make the least economical sense, and are often totally out of physiological order. But these features, when viewed from a psychological angle, begin to take on new meaning. For example, the prison is minced into small sections and subsections, divided by a system of electronic and mechanical steep doors all strategically placed. Conceivably the population can be sectioned off quickly in times of uprising; but even for the sake of security, the prison is laced with too many doors. Every few feet, a prisoner is confronted by one, so he must wait to be let in or out. A man becomes peeved. But this is augmented by the constant clanging which bombards his brain so many times a day until his nervous system becomes knotted. The persistent reverberation tends to resurrect and reinforce the same sensation, the same bleak feeling which introduced the individual to the Northern CI environment. It is no coincidence. This system is designed with conscious intent. In behavioral psychology, this process is called learned helplessness, a derivative of Skinnerian operand conditioning (which are commonly called learning techniques). In essence, a prisoner is taught to be helpless, dependent on his overseer. He is taught to accept without question the overseer's power to control him. Such a notion rebels against human consciousness. So some prisoners seek some means of resistance. Others try to circumnavigate the omnipotent force. Nothing escapes Northern's elaborate network of eyes. Between TV monitors, prisoner spies and collaborators, as well as prison officials, every crevice of the prison is overlaid by a constant watch. Front line officers specially trained in the cold, calculated art of observation, watch prisoners' movements with a particular meticulousness, scrutinizing little details in behavior patterns then recording them in the log book. This data provides the staff with keys on how to manipulate certain individuals' behavior. It is feasible to calculate a prisoner's level of sensitivity from the information, so his vulnerability can be tested with a degree of precision. Some behavior modification experts call these tests

Attachment A 3 PGS

Page 2

stress assessment. Prisoners call it harassment. In some cases, selected prisoners are singled out for one or several of these differential treatment tactics. He could have his mail turned back or accidentally discarded of. He could become the object of regular shakedowns, etc. But discernment into this sophisticated system is the furthest thing from a prisoner's imagination or even his comprehension. It is impossible for him to conceive the total essence of his being, his human worth and dignity being reduced in the eyesight of humanity to the level of an amoebae and placed under a microscope. He can't understand why he feels the strange sensation of being watched, why it seems that eyes follow him around everywhere. He fears his sanity is in jeopardy. The pervasive eyes at Northern are not without the complement of ears. Besides the officers eavesdropping and the inside spies trying to collect enough intelligence to make parole, there are also listening devices out of view. The loudspeakers for example are also receivers capable of picking up loose conversation on the tier. The administration is noted for collecting an enormous amount of information on prisoners, some of which could only be gathered from such eavesdropping methods. Sometimes a prisoner is confronted with the information in order to arouse suspicion about the people he has talked with. At other times, the information is kept secret among officials and traps are set. Most sacred of all is a man's ideas. It is a standing rule among the prisoners—never let the enemy know what you are thinking. A man's ideas, his private thoughts, are his most vulnerable point of entry. At Northern, a man is labeled by his ideas and his differential treatment is plotted accordingly. Thus if a man's expressed ideas are at variance with the ideas and perception of the prison administration, behavior modification is used on him to reconcile the difference. What life boils down to is an essay of psychological warfare. An unsuspecting, unequipped prisoner, a prisoner unable to adjust and readjust psychologically and even develop adequate defense mechanisms can be taken off stride and wind up another one of Northern's statistics. Prison officials and employees come well prepared, well trained, pre-conditioned, and well aware of the fact that a war is being waged behind the walls. However, a new phenomena is taking shape within the prison confines, and an age old myth is being dispelled. No longer can prisoners be characterized as mindless imbeciles needing someone (on a superior level) to define right and wrong for them or to chaperone them so they won't kill each other off. The old theory of sociopathology (supposedly the prisoner's mode of action) is carrying the behavioral school of psychology to ruins. The school is based on the premise that the empirical world determines a man's course of action, that a man is only capable of reacting to the stimuli of his environment, and since he is only a higher form of animal and essentially there is no qualitative difference between the two, he is like a sheep following his animalistic instincts and that over a period of time of reacting in the same way to the same stimuli all the time, his behavior becomes habitual and sociopathic. This all would be true if man were not a thinking, cognitive being. However, through his cognition and rationalization, he can not only transform his environment into something new, but also transform himself into something new, into a different social being. Prisoner's are making this transformation. This situation has led to a reverse in social polarity between prisoners and prison authority. The disorder and perversions which do

Page 3

exist at Northern are largely spawned by the abnormal conditions in the prison system. Ironically nurtured by it. This reinforces the need for paternal authority. In essence, it legitimizes it. On the other hand, the clandestine socialistic influences in the prison, which advocate a change away from the perversions and abnormalities, are deemed a threat to the existing order. So they are repressed and/or modified into conformity. Segregation is the punitive aspect of the behavior modification program. It is euphemistically referred to as "aversive conditioning". In short, prisoners are conditioned to avoid solitary confinement, and to do this (avoid solitary, that is) requires some degree of conformity and cooperation. But the "hole" remains open for what prison authorities and Dr. Heim calls natural leaders. These prisoners can be pulled from population on "investigation" and held in solitary confinement until the so-called investigation is over. During the whole ordeal, he is not told what the inquiry is about unless he is finally charged with an infraction of the rules set by the prison system. If the administration thinks the behavior modification techniques will eventually work on the prisoner, he is placed on administrative segregation. The control unit is the end of the line in the prison system. Since there is no lower place in society, it is the end of the line for society also. Just as the threat of imprisonment controls society, so is Northern the control mechanism for the prison system. Ultimately the control unit controls Northern. Prisoners in the unit can feel the heaviness of this burden, knowing that it is a long way back to the top. The monotony makes thoughts hard to separate and capsulate. The eyes grow weary of the scene and shadows appear around the periphery causing sudden reflexive action. Essentially, the content of a man's mind is the only defense in terms of his sanity and dignity. There is no longer intercommunication between sense organs and the brain. The nervous system has carried so many pain impulses to the brain until obviously the brain refuses to accept any more signals. Feelings become indistinct, emotions unpredictable. In several instances Northern (control units) has been used to silence religious leaders and prison critics. It has been used to silence economic and philosophical dissidents. The purpose of the Northern Control Unit is to control revolutionary attitudes in the prison system and in society at large.



March 25, 2009

**LEGAL MAIL**

Richard Reynolds # 219460
Northern C.I.
287 Bilton Road
Somers, CT 06071

Dear Mr. Reynolds:

Thank you for getting me the grievances. They look great. I have included an updated grievance summary. Please keep close track of the days and record the dates when you file grievances/receive responses. Please pass this message on to the others.

I talked with your mother about getting you a Seventh Day Adventist. Unfortunately, her church was not able to find someone. I am working on finding an appropriate religious leader for you in Connecticut.

I truly appreciate your patience and calming influence. Please call me if you have any questions.

Sincerely,

David J. McGuire
*Staff Attorney*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF CONNECTICUT
2074 PARK STREET
SUITE L
HARTFORD, CT 06106
T/860.523.9146
F/860.586.8900
WWW.ACLUCT.ORG

Attachment
B

16 PGS



# Inmate Request Form
## Connecticut Department of Correction

Inmate name: Richard Reynolds   Inmate number: 219460

Facility/Unit: N.C.I.   Housing unit: 1-East 121   Date: 3/29/09

Submitted to: Deacon Bernd

Request: I would like to have the use of office South so I can have a peaceful meeting with Clergy. As opposed to the usual day Room's that are constantly noisey & provide no privacy. Thank you R Reynolds

APR 02 2009

*continue on back if necessary*

Previous action taken:

*continue on back if necessary*

Acted on by (print name): _____ Title: _____

Action taken and/or response: The administration determines where we can meet when you are out of cell. I am forwarding your request to Deputy Warden Light, Director of Treatment and Programs.

*continue on back if necessary*

Staff signature: Deacon Bernd   Date: 4/6/09

# Inmate Request Form
## Connecticut Department of Correction

REV 1-1999

Inmate name: Richard Reynolds          Inmate number: 219460

Facility/Unit: N.C.I          Housing unit: 1-East 121          Date: 3/29/09

Submitted to: Deacon Bernd

Request: I would like to be able to observe holy days in a proper & dignified way in accordance with my church & our belief. Thank you. R Reynolds

continue on back if necessary

APR 02 2009

Previous action taken:

continue on back if necessary

Acted on by (print name):          Title:

Action taken and/or response: I am referring your request to Chaplain Faccinto, she is the Chaplain for Protestant Services

continue on back if necessary

Staff signature: Deacon Bernd          Date: 4/6/09



October 14, 2009

Richard Reynolds  #219460
Northern Correctional institution
287 Bilton Road
Somers, CT 06071

Dear Mr. Reynolds:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF CONNECTICUT
2074 PARK STREET
SUITE L
HARTFORD, CT 06106
T/860.523.9146
F/860.586.8900
WWW.ACLUCT.ORG

I hope this letter finds you well.  I spoke with Reverend Bernd last week.  I told him that you need to see Mr. Guerrier.  Bernd and Guerrier spoke and discussed the professional clergy visits.

I also corresponded with Warden Quiros.  He seems receptive to change.  I have attached his letter.  Please let the others know that I have started a dialog with Quiros.

I have attached the case law on meals in a cell.  Unfortunately, there is almost no law on the issue.  I researched it thoroughly and spoke with prison law experts.  I have attached the two most relevant cases.  Note that they are not from our circuit and are fairly dated.

Keep me updated on your religious visits with Guerrier.  Stay positive.

Sincerely,

David J. McGuire
Staff Attorney

DJM/scs

Enclosure