UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD REYNOLDS, | : | |
| | : | SECOND AMENDED COMPLAINT |
| Plaintiff | : | |
| | : | |
| v. | : | 13CV1465 (SRU) |
| | : | |
| LEO ARNONE, et al., | : | |
| | : | |
| Defendants | : | June 28, 2017 |

## <u>INTRODUCTION</u>

1.     Plaintiff Richard Reynolds has been held in solitary confinement that is both severe and harmful for 22 years at Northern Correctional Institution ("NCI").  During that time, he has always lived in an austere cell that is roughly the size of a burial plot. It has concrete walls, metal furniture, fluorescent lighting, and a 3 inch wide window that affords little natural light. The building was designed and intended to be harsh and to impose conditions that were far more punitive than those of typical prison life on people who could not live lawfully in other prisons. It is constructed from material that amplifies rather than absorbs sound and that creates an environment where it is impossible to control internal temperatures. A cacophony of noise -- including the banging of metal doors and food slots, and the screaming of individuals with unmet special needs -- echoes and reverberates. Mr. Reynolds never has more than one hour a day of fresh air and exposure to sunlight; many days he has none at all. It is now clear that Defendants intend to confine him in these conditions of extreme, debilitating and punitive isolation for the rest of his life.

2.      The conditions of his confinement constitute extreme social isolation that Defendants have made more severe in reaction to the conduct of other people in his housing unit, conduct in which Mr. Reynolds was not involved. For 22 years, he has been fed through a slot in the door and had recreation alone.  When he leaves his cell for infrequent legal or medical visits, he is in full restraints. Although other NCI residents were evaluated, reviewed and released, Defendants have never meaningfully reviewed Mr. Reynolds' classification or his conditions of confinement, despite prison administrative directives and policies that required such review. Defendants have also deprived Mr. Reynolds of social interaction and mental stimulation that is necessary for healthy adults.

3.      On April 25, 2012, Connecticut became an outlier, the first and only state to enact legislation that requires devastating and permanent solitary confinement for a clearly identified group of people. Legislators specifically identified Mr. Reynolds as a target of this vindictive statute that was designed to impose punishment on him in addition to that authorized at the time of his crime. Connecticut is alone in mandating permanent solitary confinement and extreme social isolation based solely on a previous crime and the identity of the inmate, rather than on his prison disciplinary history.

4.      Since Mr. Reynolds was re-sentenced on April 21, 2017, Defendants have unconstitutionally considered his conditions to be governed exclusively by C.G.S. § 18-10b, a statute that provides for permanent solitary confinement without any review of the severity of, or the security justifications for, conditions of extreme social isolation and sensory deprivation. Despite a virtually pristine disciplinary record, Mr. Reynolds is

subjected to at least 22 hours a day of complete isolation in conditions that are permanent and more punitive than those imposed on people who have killed while in custody.

5.      Defendants' permanent confinement of Mr. Reynolds in these severe conditions violates the United States Constitution.  First, these conditions present a known and scientifically documented risk of physical and mental harm that constitutes cruel and unusual punishment in violation of the Eighth Amendment. Second, the complete absence of meaningful review and assessment of these conditions violates the Due Process Clause of the Fourteenth Amendment. Third, the imposition of permanent solitary confinement on Mr. Reynolds when similarly situated individuals are treated differently lacks rational justification and violates the Equal Protection Clause of the Fourteenth Amendment. Fourth, the permanent nature of this extreme isolation constitutes additional punishment that was imposed legislatively in 2012, well after the crime for which Mr. Reynolds was convicted, in violation of the Ex Post Facto Clause. Fifth, the legislative enactment of permanent solitary confinement, which was vindictive and targeted both Mr. Reynolds and an identifiable group of people, constitutes an unconstitutional Bill of Attainder.

## JURISDICTION AND VENUE

6.      Plaintiff Richard Reynolds brings claims pursuant to 42 U.S.C. § 1983, Article 1, Section 10 of the United States Constitution, as well as the Eighth and Fourteenth Amendments to the United States Constitution.

7.      This Court has jurisdiction of Mr. Reynolds' claims that Defendants violated his constitutional rights pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper under 28 U.S.C. § 1321(d) because a substantial part of the events giving rise to these claims herein occurred in the District of Connecticut.

## PARTIES

9.      Richard Reynolds is a 48 year old Jamaican man who has a mother, two sisters, a brother, two sons, one daughter and two grandchildren.  He is a Seventh Day Adventist who has been held at NCI since March 30, 1995. Although originally sentenced to death, he was re-sentenced to life without release on April 21, 2017, pursuant to the decision in *State v. Santiago*, 318 Conn. 1, 10 (2015) which held that prospective repeal of the death penalty violated the Connecticut state constitution.

10.     Defendant Leo C. Arnone was Commissioner of Connecticut's Department of Correction ("DOC") from 2010-2013. At all relevant times, he acted under color of state law. He was personally involved in authorizing, and maintaining policies and customs challenged by Mr. Reynolds and is sued in his individual capacity for damages.

11.     Scott Semple is the current Commissioner of Correction and was automatically substituted as a defendant, pursuant to Fed. R. Civ. P. 25(d), on claims originally brought against Defendant Arnone in his official capacity. In this capacity, he is responsible for protecting the constitutional rights of all individuals in DOC custody, including Mr. Reynolds. Defendant Semple has final policy-making and supervisory authority within the DOC and has been personally involved in authorizing and maintaining policies and customs challenged by Mr. Reynolds. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

4

12.     Angel Quiros is the Regional Warden of NCI. He has final policy-making and supervisory authority within the region that includes NCI. He was and is personally involved in authorizing and maintaining policies and customs challenged by Mr. Reynolds. He repeatedly corresponded and met directly with Mr. Reynolds about conditions on Death Row. At all relevant times, he acted under color of state law. He is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

13.     Edward Maldonado was the warden of NCI from 2011 to 2014. At all relevant times, he acted under color of state law. He was personally involved in authorizing and maintaining policies and customs challenged by Mr. Reynolds, including Northern Correctional Unit Directive 9.4.1 (effective 9/01/2011), and received grievances directly from Mr. Reynolds about conditions on Death Row. He is sued in his individual capacity for damages.

14.     William Faneuff is the current warden of NCI and was automatically substituted as a defendant, pursuant to Fed. R. Civ. P. 25(d), on claims originally brought against Defendant Maldonado in his official capacity. Warden Faneuff has final policy-making and supervisory authority within NCI and is personally involved in authorizing and maintaining policies and customs challenged by Mr. Reynolds. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

15.     Gerard Gayne is the psychiatrist who has supervisory responsibility for mental health treatment and mental health care policy at NCI and is personally involved in

authorizing and maintaining policies and customs challenged by Mr. Reynolds. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

16.     Mark Frayne is a supervising psychologist who is responsible for assessing mental health needs, for delivering mental health treatment and for implementing mental health policy at NCI. He is personally involved in authorizing and maintaining policies and customs challenged by Mr. Reynolds. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

## FACTUAL BACKGROUND

17.     Defendants have classified and permanently placed Mr. Reynolds in "special circumstances high security" conditions at NCI, the only maximum security facility in Connecticut. An extensive body of scientific research and literature has documented the devastating effects of long term extreme social isolation and sensory deprivation. It causes neurological and physical damage. The unreviewable and permanent nature of the punitive conditions in which Defendants have confined and continue to confine Mr. Reynolds cannot be justified by any legitimate security concern.

### Death Row and Special Circumstances High Security Confinement at Northern Correctional Facility

18.     Shortly before it opened in January, 1995, NCI was described as Connecticut's only maximum security facility that would seal people for 23 hours a day inside cement cells. A slot in each solid metal door allows in-cell feeding.  Each cell measures 7 by 12 feet and has a metal bed, a metal toilet and sink, and a 36 x 18 inch stainless steel desk

with an attached metal stool. A window that is 3 inches wide and 34 inches long looks out at three layers of fencing.

19.     Death Row at NCI, where Mr. Reynolds has lived for 22 years, consists of two-tiered circular housing pods, visiting stalls with concrete stools for visitors, a cinder block and cement room for professional visits and phone calls, a day room with a monitored phone, metal tables and stools that are soldered to the floor, and a control room from which correctional staff manage the unit. Walls of reflective glass separate the control room and professional visit rooms from the housing area, causing visual disorientation.

20.     The hard cement, metal and glass surfaces reflect rather than absorb sound. A constant droning noise in the day room adjacent to the cells deprives Mr. Reynolds of sleep. The exterior cinder block walls make it impossible to regulate the heat. It is often so cold during both summer and winter that staff wear thick, winter jackets inside the units. At other times, it is excessively hot inside the cells. The plumbing is also frequently broken and causes excrement to back up into cell toilets. It has taken days to fix such plumbing issues.

21.     Mr. Reynolds has extremely limited access to commissary and is not able to buy products available to inmates who have acted out and been placed in Administrative Segregation. Defendants have denied him access to educational and other programming.

22.     Mr. Reynolds has never had more than one hour a day of outside recreation. He now spends that time alone in a small fenced cage within a concrete area. It is the only time that he has access to fresh air and sunlight. The space is too small to run and the filthy concrete floor is often coated with bird feces, urine and other unsanitary elements

precluding other forms of rigorous exercise. Defendants count time spent in the day room as "passive" recreation but that space is not designed or suitable for physical exercise.

23.     Mr. Reynolds has not had a contact visit with anyone other than a medical or legal professional for 22 years. He has not touched his mother or any other relative since 1995. Social visits at NCI take place by telephone through a plexiglass screen. The telephones do not work properly and visitors must sit on cement stools during the visit. Because there is no "picture program" at NCI, his family has not seen a picture of him in 22 years.

24.     Despite repeated requests by Mr. Reynolds and his counsel, he has been unable to practice his religion or develop his faith. Defendants have denied a confidential visit with a Seventh Day Adventist minister and have denied congregate religious services which are available to those in Administrative Segregation.

25.     Defendants have not given Mr. Reynolds a meaningful review of his classification or a hearing, as required by written DOC and NCI policy, during the 22 years that he has been in extreme isolation.

### *Defendants Punish Mr. Reynolds for the Conduct of Others*

26.     During the 22 years that Mr. Reynolds has been on Death Row at NCI, he has had very few disciplinary infractions and not one has involved violence. Nevertheless, Defendants have confined him in conditions that have only increased in severity and isolation, due to the conduct of others.

27.     In 1998, Michael Ross, another resident of death row, attempted suicide. Although subsequent investigation determined that he acted alone, Defendants limited recreation and imposed new levels of restraints on Mr. Reynolds. These restrictions

8

violated the standards Defendants had announced in governing policy set forth in the Death Row Handbook.

28.     In 1999, Daniel Webb, another resident of Death Row, was accused of planning an escape. Although there was no evidence that Mr. Reynolds knew of or had any involvement in this plan, Defendants increased Mr. Reynolds' social isolation and limited him to individual recreation.

29.     In reaction to these incidents and conduct of other Death Row residents, Defendants have deprived Mr. Reynolds of any meaningful social interaction, including group meals and recreation, for more than 17 years.

30.     In 2010, Mr. Webb had a physical altercation with correctional staff.  Although there was also no evidence that Mr. Reynolds knew of or had any involvement in that incident, and one of the officers involved in subduing Mr. Webb was disciplined, Defendants once again imposed additional restraints and more severe conditions on Mr. Reynolds. In addition, staff vindictively locked down and swept the entire housing unit, searched and unconstitutionally seized property from Mr. Reynolds. After vague, non-substantive responses, by Defendant Quiros and others, to extensive and repeated grievances for the return of his property, Defendants advised Mr. Reynolds that his property had not been inventoried, as policy required, and could not be found. As part of the aggressive response to this incident, Mr. Reynolds was given three minor disciplinary infractions, after a twelve-year period without one misconduct infraction.

31.     Following the misconduct of others, Defendants have subjected Mr. Reynolds to the restrictions imposed on inmates held on "high security" status as that term was defined by DOC Administrative Directive 9.4(14) (effective 1/1/2010), despite the fact

that he met none of the articulated criteria for placement on that status. Defendant Maldonado issued Northern Correctional Institution Unit Directive 9.4.1 (effective 9/01/2011) that explicitly established this policy for Death Row inmates, including Mr. Reynolds. That directive defined "High Security" as: "A designation which provides for increased supervision of inmates *who pose a threat to the safety and security of the facility, staff, inmates or the public*." A.D. 9.4.1 (3)(I) (emphasis added). Neither of these directives nor Defendants provided either notice or a hearing on the evidence that would justify Mr. Reynolds' placement on that status, nor did Defendants give him a decision stating the reasons for his placement. Defendants never reviewed his placement on that status despite the fact that DOC and NCI policy requires inmates placed on high security status to be reviewed every six (6) months. A.D. 9.4(14) (H); N.C.I. Unit Directive 9.4.1 (14).

32.     Mr. Reynolds has been unable to attend professional visits, move to the shower or recreation yard without being placed in restraints. Those restraints include ankle cuffs and handcuffs through a waist level belly chain every time he leaves the unit, including for professional visits. Requests to remove handcuffs were denied until 2015 when his hands were uncuffed during professional visits but Defendants began to tether his ankle cuffs to a metal flange in the floor during those visits. These restraints make it extremely difficult to review papers, have a thorough medical examination or concentrate for sustained periods of time. Tethering the sharp metal ankle cuffs has caused lacerations and scaring.

*Imposition of Additional Punishment after the Date of the Crime*

33.     The punitive conditions Defendants imposed on Mr. Reynolds after he was

resentenced constitute punishment in addition to that authorized on the date of the crime

for which he was convicted.

34.     Richard Reynolds was charged with one count of capital felony in violation of

Connecticut General Statutes (Rev. to 1991) § 53a–54b (1) and one count of murder in

violation of Connecticut General Statutes § 53a–54a (a) for killing William Walters on

December 18, 1992. He was found guilty of both counts in the fall of 1994 and sentenced

to death on April 13, 1995.

35.     The procedure for imposing a death sentence and the definition of the alternative

penalty of life without the possibility of release that governed Mr. Reynolds' sentence

were set forth in Public Act 85-366.  Section 3 provided, in relevant part:

> A sentence of imprisonment for life shall mean a definite sentence
> of sixty years, UNLESS THE SENTENCE IS LIFE IMPRISONMENT
> WITHOUT THE POSSIBILITY OF RELEASE, IMPOSED PURSUANT
> TO SUBSECTION (f) OF SECTION 53a-46a, AS AMENDED BY
> SECTION 1 OF THIS ACT, IN WHICH CASE THE SENTENCE SHALL
> BE IMPRISONMENT FOR THE REMAINDER OF THE DEFENDANT'S
> NATURAL LIFE.

That statute did not impose special circumstances high security status or any other

limitations on the conditions of confinement during a sentence of life imprisonment

without the possibility of release.

36.     The Connecticut Supreme Court affirmed both Mr. Reynolds' conviction and his

sentence of death. 264 Conn. 1 (2003).

37.     On March 11, 2004, Mr. Reynolds filed a state habeas petition challenging both

his conviction and the sentence of death. On June 28, 2011, that petition was denied in a

written decision. 2011 WL 3200300 (June 28, 2011). On August 8, 2011, Mr. Reynolds appealed that decision. While that appeal was pending, three significant events occurred that affected Mr. Reynolds and others sentenced to death for capital crimes committed in Connecticut before April 25, 2012.

38.     First, the Connecticut legislature enacted a prospective repeal of the death penalty, effective April 25, 2012. Public Act 12-5. Amendment A to that act, now codified as C.G.S. § 18-10b, imposed additional punishment in the form of new, mandatory and permanent conditions of extreme isolation on specific, identifiable people, including Mr. Reynolds, who had been convicted of a capital felony committed prior to April 25, 2012.

39.     In relevant part, Section 18-10b provides:

> (a) The Commissioner of Correction shall place an inmate on special
> circumstances high security status and house the
> inmate in administrative segregation until a reclassification process is
> completed under subsection (b) of this section, if
> . . .

> (2) the inmate is in the custody of the Commissioner of Correction
> for a capital felony committed prior to April 25, 2012, under the provisions
> of section 53a-54b in effect prior to April 25, 2012, for which a sentence of
> death is imposed in accordance with section 53a-46a and such inmate's
> sentence is (A) reduced to a sentence of life imprisonment without the
> possibility of release by a court of competent jurisdiction, or (B) commuted
> to a sentence of life imprisonment without the possibility of release.

> (b) The commissioner shall establish a reclassification process for the
> purposes of this section. The reclassification process shall include an
> assessment of the risk an inmate described in subsection (a) of this section
> poses to staff and other inmates, and an assessment of whether such risk
> requires the inmate's placement in administrative segregation or
> protective custody. If the commissioner places such inmate in administrative
> segregation pursuant to such assessment, the commissioner shall require the
> inmate to complete the administrative segregation program operated by the
> commissioner.

> (c) (1) The commissioner shall *place such inmate in a housing unit for the maximum security population* if, after completion of such reclassification process, the commissioner determines such placement is appropriate, *provided the commissioner (A) maintains the inmate on special circumstances high security status, (B) houses the inmate separate from inmates who are not on special circumstances high security status, and* (C) *imposes conditions of confinement on such inmate which shall include, but not be limited to, conditions that require (i) that the inmate's movements be escorted or monitored, (ii) movement of the inmate to a new cell at least every ninety days, (iii) at least two searches of the inmate's cell each week, (iv) that no contact be permitted during the inmate's social visits, (v) that the inmate be assigned to work assignments that are within the assigned housing unit, and (vi) that the inmate be allowed no more than two hours of recreational activity per day.*

C.G.S. § 18-10b (emphasis added). The minimum conditions set forth in the italicized language constitute solitary confinement and require extreme social isolation, elements that were not included as part of the statutory penalty when the crime occurred in 1992. The legislative history of the statute documents that legislators vindictively intended to impose additional "enhanced" punishment that was "tougher than administrative segregation" on a targeted and specific group of people. The new punishment was understood to be "different and harsher than existed on death row."

40.     On February 27, 2013, Mr. Reynolds filed a Motion for Permission to Address for the First Time on Appeal the Impact of Public Act 12-5 on Petitioner's Death Sentence or, in the Alternative For a Remand in his pending state habeas appeal. In that motion, counsel identified various constitutional challenges to the statute that he sought permission to argue in supplemental briefing.

41.     On April 18, 2013, the Court denied that motion without prejudice to renewal after a decision had been issued in *State v. Santiago*, a case in which the Connecticut Supreme Court reconsidered its remand of Eduardo Santiago's case for new penalty

phase proceedings, in light of his argument that prospective repeal of the death penalty authorized by Public Act 12-5 was unconstitutional.

42.     In June 2012, less than two months after Public Act 12-5 became effective, the Connecticut Supreme Court vacated Mr. Santiago's death sentence and remanded the case for new penalty phase proceedings. Shortly after the remand, Defendants transferred him from NCI to a lower security Connecticut prison, where he remains and is not subject to Special Circumstances High Security conditions.

43.     On information and belief, Defendants also transferred Terry Johnson from NCI to a lower security Connecticut prison following the invalidation of his death sentence by the Connecticut Supreme Court.

44.     Second, on August 25, 2015, the Connecticut Supreme Court held that "execution of those offenders who committed capital felonies prior to April 25, 2012, would violate the state constitutional prohibition against cruel and unusual punishment" in *State v. Santiago*, 318 Conn. 1, 10 (2015). The court reasoned that, "following its prospective abolition, this state's death penalty no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose. For these reasons, execution of those offenders who committed capital felonies prior to April 25, 2012, would violate the state constitutional prohibition against cruel and unusual punishment." *Id*. On March 8, 2016, that decision was reaffirmed in *State v. Peeler*, 321 Conn. 375 (2016).

45.     Third, on June 16, 2016, Defendant Semple approved Administrative Directive 9.4 governing Restrictive Status. Echoing and invoking C.G.S. § 18-10b, that directive identified a new "special circumstances status" category. Attachment B to that directive

is the revised Restrictive Housing Status Matrix. It documents the permanence of that status by noting that "approval authority for release" is "not applicable in accordance with CGS 18-10(b)" and that "authorized length of confinement" is "indefinite."

46.     On June 28, 2016, the Connecticut Supreme Court decided Mr. Reynolds' habeas appeal, rejecting the culpability phase issues and declining to address penalty phase issues in light of *Santiago* and *Peeler*. 321 Conn. 750 (2016).

47.     On July 8, 2016, Mr. Reynolds filed a Motion For Reconsideration asking the Court to decide the penalty phase issues raised in the habeas appeal, as resolution of those issues could place him in the same position as Mr. Santiago and other people whose death sentences had been invalidated, releasing them to general population. In the alternative, the motion requested remand to the trial court for an evidentiary hearing so that he could demonstrate how resolution of the penalty phase issues would affect how he would spend the rest of his life. The Court denied that motion.

48.     On January 25, 2017, counsel filed a Motion to Correct an Illegal Sentence with the sentencing court. The motion was brought in two parts. First, it sought to vacate the illegal sentence of death and to correct it to a sentence of life without the possibility of release. Second, it sought a finding by the court that the conditions articulated in C.G.S. § 18-10b are unconstitutional. On April 24, 2017, Judge Fasano re-sentenced Mr. Reynolds to life without possibility of release. He denied the second part of the motion, finding that he had no jurisdiction to decide those issues.

49.     On May 18, 2017, Defendants notified Mr. Reynolds that his "reclassification process" had determined that he did not pose a risk to staff and other inmates that would require placement in administrative segregation or punitive custody. He was further

notified that the "Commissioner has determined that you will be maintained on Special
Circumstances High Security status and managed in accordance with guidelines set forth
in CGS Sec. 18-10b (c) (1)." Defendants Semple and Faneuff received copies of that
notice which confirms that Defendants have imposed lifelong solitary confinement and
extreme social isolation on Mr. Reynolds.

50.     Defendants also posted a restraint policy dated June 1, 2017 on his cell door that
confirms he will be subject to handcuffed movement inside the unit; handcuffs, leg-irons
and tethering to the floor during legal visits; and full restraints any time he moves out of
the unit.

51.     Mr. Reynolds' new lifetime punishment of solitary confinement creates an
identifiable risk of rapid physical and psychological deterioration and irreversible harm.
Despite a documented history of Post-Traumatic Stress Disorder (PTSD) that was
presented in state habeas proceedings and is therefore known to Defendants, Mr.
Reynolds has never been treated for this disorder. Mr. Reynolds has witnessed the mental
deterioration and breakdown of other residents on Death Row. Such deterioration is
consistent with scientific literature that documents the devastating effect of extreme
isolation.

52.     Although relevant prison policy requires regular mental health evaluations, mental
health staff have never personally interviewed Mr. Reynolds or noted his mental health
status by creating a meaningful record. Defendants Frayne and Gayne pass by Mr.
Reynolds' cell door and ask if he is good.  Neither of them has ever conducted a
confidential interview or conducted psychological testing. It is impossible to have a
private conversation about mental health under these circumstances as other residents of

the housing unit can hear any words spoken by the psychologist and by Mr. Reynolds.

Defendants have not conducted a mental health evaluation of Mr. Reynolds in 22 years.

*Prolonged Solitary Confinement Causes Severe Harm*

53.     Prolonged solitary confinement indisputably causes painful, severe and at times irreversible harm. The physical and psychological harm of prolonged solitary confinement has been well-documented for decades. Indeed, there is a substantial body of literature that has documented distinctive and inescapable patterns of negative physiological and psychological harm when individuals are placed in long-term solitary confinement. Spanning as far back as the 1960s, studies on the effects of solitary confinement have reported observable negative effects among prisoners subject to such conditions.

54.     By definition, solitary confinement isolates prisoners from social interactions, restricts their environmental stimulation and affords them no control over their daily life. This combination of factors results in a series of harmful psychiatric effects, including hypersensitivity to external stimuli, perception distortions, claustrophobia, delusions, hallucinations and panic attacks. Minimal social and environmental stimulation has serious effects on an individual's mental functioning. Prisoners housed in solitary confinement report difficulty with thinking, concentration and memory, intrusive obsessional thoughts, increased anxiety and nervousness, overt paranoia, severe and chronic depression and problems with impulse control.

55.     Senior researchers at renowned institutes have found that physiological effects may be directly caused by the prisoners' physical state of confinement.  For example, lower levels of brain function as a result of solitary confinement, including a decline of

17

electroencephalogram activities after only seven days in solitary confinement, have been observed. Additionally, prisoners complain of abdominal pains, as well as muscle pains in the neck and back, which may be caused by the long periods of inactivity. Further, many researchers conclude that some adverse consequences of solitary confinement are a direct result of sensory deprivation. This sensory deprivation often leads to an increased oversensitivity to normal stimuli; for example, for someone experiencing this kind of deprivation, a closing door could be something that could lead to sleeping difficulties.

56.     Studies have also shown that depriving individuals of social interactions by placing them in solitary confinement over a long period of time can destroy their ability to function normally. Additionally, studies have found that many individuals in solitary confinement will suffer permanent harm as a result of their confinement, even upon its termination.

57.     Recognizing the dangers associated with prolonged solitary confinement, numerous major legal and medical organizations have issued statements opposing long-term solitary confinement. For example, the American Bar Association (ABA) mandates that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable." Similarly, a bipartisan Commission on Safety and Abuse in America's Prisons commissioned by the Vera Institute of Justice recommended that correctional facilities "[e]nd conditions of isolation," calling solitary confinement "expensive and soul-destroying." Members of the Commission included a former Chief Judge of the U.S. Court of Appeals for the Third Circuit, a former Attorney General of the United States, a former Director of the Southern Center for Human Rights, a former prisoner and a former federal prison warden.

18

### *Requiring Mr. Reynolds to be Housed in Solitary Confinement Does Not Promote Safety and Security and is Inconsistent with Correctional Best-Practices*

58.     The Special Circumstances High Security status described in C.G.S. § 18-10b, and that Defendants' policy and practice requires, guarantees that Mr. Reynolds will be held in solitary confinement for the rest of his life.

59.     As set forth above, placement in solitary confinement is due to Defendants' blanket policy rather than the result of disciplinary violations or individualized considerations of Mr. Reynolds' behavior.  At NCI, Death Row and Special Circumstances High Security prisoners are separately housed in solitary confinement merely because of the timing of their conviction and sentence.

60.     A 2016 report by the DOJ concerning the use of restrictive housing recommends that, "[c]orrectional systems should always be able to clearly articulate the specific reason(s) for an inmate's placement and retention in restrictive housing." The reason(s) should be supported by objective evidence. Additionally, the report observes that "[r]estrictive housing should always serve a specific penological purpose."

61.     Defendants' policy of housing all Death Row and Special Circumstances High Security prisoners in solitary confinement serves no penological purpose. A report by the National Institute of Justice of the DOJ found that "almost no literature documents the utility of [administrative segregation] or demonstrates that the use of [restrictive housing] has achieved specific aims in demonstrable ways . . . . [I]t is virtually impossible to find empirical evidence supporting its utility or efficacy."

62.     Defendants' blanket policy is inconsistent with accepted correctional practices. Studies show prisoners convicted of murder are not more violent and are no more of a security risk than prisoners convicted of other crimes. Additionally, their rates of violent

or assaultive rule infractions have been found below or near the mean for the entire
inmate cohort.

63.     Best correctional practices dictate that individualized assessment and
classification is appropriate rather than blanket assignment, due to the significant dangers
of solitary confinement. Corrections directors and administrators, including former
directors of several state prison systems around the country, have cited evidence showing
that individualized assessment and classification based on objective factors, such as age
and disciplinary history, is more predictive for security purposes than classifications
based on conviction status.  The premise of reclassification is that "errors" can be made at
the initial classification stage and should be fixed based on the prisoner's current
behavior.

64.     The Association of State Correctional Administrators issued a report calling
prolonged isolation of inmates in jails and prisons "a grave problem in the United States."
That report analyzes the use of solitary confinement across the country and notes
nationwide efforts to improve restrictive housing conditions, focusing specifically on
jurisdictions revising the criteria for being placed in solitary confinement.

  *Special Circumstances High Security Confinement Violates International Norms*

65.     The United States is a party to international conventions bearing on the issue of
prolonged solitary confinement. The United States has ratified the International Covenant
on Civil and Political Rights (ICCPR) (ratified by the United States in 1992) and the
Convention Against Torture (CAT) (ratified by the United States in 1994), both of which
prohibit torture and other cruel, inhumane, or degrading treatment or punishment. Both
have been interpreted to prohibit the use of prolonged solitary confinement.

66.     Article 10 of the ICCPR mandates that "the penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation." The United Nations Human Rights Committee (UNHRC) has clarified that the ICCPR's prohibition of torture and other cruel, inhumane or degrading treatment under international law includes physical as well as mental pain and asserted "that prolonged solitary confinement" may violate this prohibition.

67.     Article 1 of the CAT defines torture as: [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person has committed . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

68.     In a 2011 report to the General Assembly, the United Nations' (U.N.) Special Rapporteur on torture, Juan Mendez, stated that prolonged solitary confinement was prohibited by the ICCPR and CAT. He further concluded that the assessment of whether solitary confinement amounts to torture should be conducted in light of the totality of the circumstances and on a case-by-case basis. Mendez wrote, "No prisoner, including those serving life sentence and prisoners on death row, shall be held in solitary confinement merely because of the gravity of the crime."

69.     For special circumstances high security confinement at NCI, no factor other than the sentence of the prisoners is taken into consideration and the indefinite nature of their confinement is in direct violation of the ICCPR and CAT.

70.     Additionally, in 2015, the U.N. General Assembly adopted the U.N. Standard

Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules."
The Rules specifically prohibit the practice of solitary confinement that is "indefinite" or
"[p]rolonged," which they define as a "period in excess of [fifteen] consecutive days,"
and emphasize that solitary confinement should be used only as a last resort, for the
shortest amount of time possible and should be subject to independent review by a
competent authority.

71.     Solitary confinement is defined by the Nelson Mandela Rules as "confinement of
prisoners for hours or more a day without meaningful human contact," and "prolonged
solitary confinement" is defined as "a time period in excess of 15 consecutive days."

72.     Additionally, in its Periodic Report to the U.N. Committee Against Torture, the
United States confirmed that persons with a "serious mental illness" cannot be held in
solitary confinement because it violates the Eighth Amendment's right to be free from
cruel and unusual punishment. It further confirmed that subjecting a prisoner to solitary
confinement without an administrative hearing is a violation of the Fourteenth
Amendment's guarantee of due process.

73.     As a result, the Committee Against Torture has stated, "The [United States]
should . . . [l]imit the use of solitary confinement as a measure of last resort, for as short
[a] time as possible, under strict supervision and with the possibility of judicial review."

74.     Additionally, the IACHR has reiterated its concerns about the use of solitary
confinement by stating that "Member States must adopt strong, concrete measures to
eliminate the use of prolonged or indefinite isolation under all circumstances." The
Commission has specifically stated that the use of solitary confinement "should be

absolutely prohibited . . . for persons with mental disabilities, and for death row and life-sentenced prisoners by virtue of their sentence."

## CLAIMS FOR RELIEF

### First Cause of Action: Eighth and Fourteenth Amendment
### (Cruel and Unusual Punishment)

75.     Mr. Reynolds incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

76.     By their policies and practices described herein, Defendants have deprived and intend to continue indefinitely to deprive Mr. Reynolds of the minimum civilized measure of life's necessities, and have violated his basic human dignity and his right to be free from cruel and unusual punishment.

**A.  Deprivation of Basic Human Need**

77.     First, the cumulative effect of prolonged and now permanent confinement, along with denial of the possibility of re-classification or relocation from NCI, the deprivation of adequate medical and mental health care, the denial of sunlight and exercise, and the extreme social isolation at NCI constitute deprivation of basic human needs, including but not limited to, normal human contact, environmental and sensory stimulation, mental and physical health, adequate physical exercise, sleep and meaningful activity.

**B.  Imposition of Serious Psychological and Physical Injury, Pain and Suffering**

78.     Second, extremely prolonged exposure to these deprivations of basic human needs is currently imposing serious psychological pain and suffering and permanent psychological and physical injury on Mr. Reynolds.

79.     The permanence of these conditions, imposed both by legislation and by Defendants' prison policies and practices, creates an identifiable and substantial risk of further debilitating mental illness and physical harm.

**C.  Mr. Reynolds's Conditions Cannot be Justified by the Conduct of Others**

80.     Third, Defendants' imposition of punitive conditions on Mr. Reynolds is not legitimately related to security.  Depriving Mr. Reynolds of basic human needs in reaction to the conduct of others, when Mr. Reynolds has demonstrated exemplary behavior, is not rationally related to any legitimate penological goal.

**D.  Disproportionate, Arbitrary and Capricious Punishment**

81.     Fourth, Defendants' policy of permanent confinement in damaging and extreme social isolation imposes disproportionate punishment on Mr. Reynolds. Defendants have no legitimate penological interest in retaining Mr. Reynolds permanently in the debilitating conditions at NCI simply based on the nature and timing of the crime for which he was convicted, in the absence of serious disciplinary infractions that justify placement in such punitive conditions.

82.     This policy is also arbitrary and capricious in light of the fact that at least two individuals – Eduardo Santiago and Terry Johnson – were convicted of a capital felony, sentenced to death and housed on Death Row but are not subject to these conditions because they were transferred to general population after their sentences of death were invalidated by the Connecticut Supreme Court. Mr. Reynolds sought and was denied the opportunity to challenge his sentence of death by the Connecticut Supreme Court. There is no rational reason to deny Mr. Reynolds the treatment accorded to those who had their penalty claims fully adjudicated prior to the decision in *State v. Santiago*.

### E.  Permanent Deprivation of Human Dignity Violates Contemporary Standards of Human Decency

83.     Finally, Defendants' permanent placement of Mr. Reynolds in the severe conditions of solitary confinement at NCI strips him of his human dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

84.     As a direct and proximate result of Defendants' constitutional violations, Mr. Reynolds will be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

85.     Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies that govern Mr. Reynolds' placement in Special Circumstances High Security confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

<u>**Second Cause of Action: Fourteenth Amendment**</u>
<u>**(Procedural Due Process)**</u>

86.     Mr. Reynolds incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

87.     Defendants, acting within the scope of their employment and under the color of state law, deprived and continue to deprive Mr. Reynolds of his right to procedural due process of law. Defendants' actions and omissions violate Mr. Reynolds' right to

procedural due process, as guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

88.     The conditions and the duration of Defendants' confinement deprive Mr. Reynolds of a constitutionally protected liberty interest in that they constitute an atypical and significant hardship as compared with the ordinary incidents of prison life. Specifically, a liberty interest is created by: (a) the exceedingly harsh and isolating conditions at NCI; (b) the lengthy and now permanent duration of confinement at NCI; and (c) the complete absence of any ability to obtain review of or release from these conditions of confinement.

**A.  Death Row and Special Circumstances High Security Conditions at NCI**

89.     The conditions Defendants imposed on Mr. Reynolds while he was on Death Row and the Special Circumstances High Security conditions they continue to impose at NCI were and are unjustifiably severe. He continues to live almost entirely alone in a cement and stainless steel cell with virtually no natural light, excessive noise and extremes of both hot and cold temperature. His job is cleaning his cell, he continues to have no educational or religious programming and no more than one hour a day of outside exposure to sunlight and fresh air. He has minimal human interaction with people who are not DOC employees. He is shackled, monitored and escorted every time he leaves his cell.

**B.  Duration of Death Row and Special Circumstances High Security Confinement at NCI**

90.     Mr. Reynolds has been confined at NCI in substantially similar conditions for more than 22 years. He is 48 years old, which gives him a life expectancy of 30 more years. Defendants intend to confine him in Special Circumstances High Security housing

for the rest of his life. His interactions will be restricted to DOC staff and people who committed a capital felony prior to April 25, 2012.

**C.  Lack of Meaningful Process**

91.    Defendants failed entirely to conduct personal classification interviews and did not even pretend to complete written evaluations of Mr. Reynolds for years at a time. The rote and mechanical reviews they did prepare are inaccurate and inconsistent. By failing to consider accurate, readily-available information and objections from Mr. Reynolds, Defendants have denied him the substantive, legitimate, and meaningful periodic reviews that were required to support his continued confinement in Restrictive Housing.

92.    Mr. Reynolds is provided no notice of what he can do to be removed from solitary confinement and his placement is not given any form of review to decide whether he requires continued confinement in complete isolation. No evidence suggests that this policy promotes safety and security of the prison and its staff.

93.    As a direct and proximate result of Defendants' constitutional violations, Mr. Reynolds will be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

94.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies that govern Mr. Reynolds' placement in Special Circumstances High Security confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

### Third Cause of Action: Fourteenth Amendment
### (Equal Protection)

95.     Mr. Reynolds incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

96.     Mr. Reynolds is similarly situated to at least two individuals – Eduardo Santiago and Terry Johnson – who were convicted of a capital felony before April 25, 2012, sentenced to death and were housed on Death Row but who are not subject to Special Circumstances High Security conditions. Defendants transferred those individuals out of NCI to a lower security Connecticut prison after their sentences of death were invalidated by the Connecticut Supreme Court.

97.     The Connecticut Supreme Court denied Mr. Reynolds the opportunity to challenge his death sentence on the ground that it was invalid in light of *State v. Santiago*. There is no rational reason to deny Mr. Reynolds the treatment accorded to those who had their death sentences invalidated prior to the decision in *State v. Santiago*.

98.     This disparate and unjustified treatment denies Mr. Reynolds equal protection of the law in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

99.     As a direct and proximate result of Defendants' constitutional violations, Mr. Reynolds will be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

100.     Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies that govern Mr. Reynolds' placement in Special

28

Circumstances High Security confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

### Fourth Cause of Action: Article I, Section 10 United States Constitution (Ex Post Facto)

101.    Mr. Reynolds incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

102.    In 1992, when the crime for which Mr. Reynolds was convicted occurred, the only penalties for a capital offense were death and life without the possibility of release. Pursuant to statute and governing prison policy, inmates sentenced to death or to life without the possibility of release were housed in general population, had jobs, went to recreation and ate with other inmates unless they had been found guilty of serious disciplinary infractions which could trigger placement in restrictive housing after notice and a hearing.  Placement in restricted housing for those inmates was subject to periodic review.

103.    On April 25, 2012, the Connecticut legislature enacted Public Act 12-5, a law that repealed the death penalty. It did so prospectively so that the eleven men then on death row, including Mr. Reynolds, could be executed. Aware of the questionable constitutionality of prospective repeal, the legislature also enacted Amendment A, subsequently codified as C.G.S. § 18-10b, a statute that imposed substantial and permanent additional punishment on those who had been sentenced to death for a crime committed before that date but whose sentence had been either "reduced" or "commuted."

29

104.    Defendants have implemented C.G.S. § 18-10b, a statute that was enacted as a means of retribution against Mr. Reynolds and other members of an identifiable and unpopular group of individuals, by imposing permanent and severe punishment in addition to that imposed in 1992 for a capital offense sentence of life without the possibility of release.

105.    Enactment of C.G.S. § 18-10b and Defendants' imposition of its punishment on Mr. Reynolds violated and continues to violate the ex post facto clause found in Article 1, Section 10 of the United States Constitution.

106.    As a direct and proximate result of Defendants' constitutional violations, Mr. Reynolds will be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

107.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies that govern Mr. Reynolds' placement in Special Circumstances High Security confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## Fifth Cause of Action: Article I, Section 10 United States Constitution (Bill of Attainder)

108.    Mr. Reynolds incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

109.    By enacting C.G.S. § 18-10b, the Connecticut legislature intended to and did inflict retributive punishment on Mr. Reynolds which constituted a bill of pain and penalties. In so doing, it usurped the traditional judicial role of fixing a degree of punishment, in accordance with its own notions of the enormity of Mr. Reynolds' offense.

110.    Legislative history documents that the legislators both named Mr. Reynolds individually and directed the act against an identifiable closed class of people.

111.    Defendants' application of C.G.S. § 18-10b to inflict permanent punishment on Mr. Reynolds, without first allowing him to contest or challenge the infliction of that punishment, constitutes a bill of attainder in violation of his rights under Article 1, Section 10 of the United States Constitution.

112.    As a direct and proximate result of Defendants' constitutional violations, Mr. Reynolds will be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

113.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies that govern Mr. Reynolds' placement in Special Circumstances High Security confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Mr. Reynolds prays for judgment against the Defendants:

(a) Declaring that Defendants' policies and practices of confining Mr. Reynolds to permanent confinement in Special Circumstances High Security status pursuant to C.G.S. § 18-10b without opportunity for review violates Article 1, Section 10, and the Eighth and Fourteenth Amendments of the United States Constitution;

(b) Granting permanent injunctive relief enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity and concert with them, or on their behalf, from violating Article 1, Section 10, and the Eighth and Fourteenth Amendments of the United States Constitution;

(c) Granting permanent injunctive relief requiring Defendants to present a plan to the Court within 30 days that provides for:

> i. the release of Mr. Reynolds from Special Circumstances High Security confinement and meaningful consideration of him for placement in either (a) a general population unit, or (b) in a modified general population unit, in which the prisoners segregated from the general population have the same privileges as do prisoners in general population;

> ii. modification of the conditions of confinement so that he is no longer incarcerated under conditions of isolation, sensory deprivation and lack of social and physical human contact;

> iii. mandatory physical exams, mental health treatment and other necessary rehabilitation and medical treatment that accord with the relevant and appropriate standards of practice;

> iv. meaningful review of the need for solitary confinement; and

> v. all other relief to which Mr. Reynolds is entitled;

(d) Awarding Mr. Reynolds the compensatory damages he has sustained as a consequence of Defendants' constitutional violations;

(e) Awarding Mr. Reynolds punitive and nominal damages;

(f) Awarding Mr. Reynolds costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

(g) Granting Mr. Reynolds prejudgment and post judgment interest; and

(h) Granting such other and further relief as the Court deems just and proper.


_____*/s/*_____

Brett Dignam, ct 00283
Attorney for Plaintiff Richard Reynolds
Morningside Heights Legal Services Inc.
435 West 116th Street - Room 831
New York, NY 10027
212-854-4291
bdigna@law.columbia.edu