# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD REYNOLDS,<br>     Plaintiff, | No. 3:13-cv-1465 (SRU) |
| v. | |
| LEO ARNONE, et al.,<br>     Defendants. | |

## MEMORANDUM OF DECISION

Richard Reynolds has spent the past twenty-three years in solitary confinement.
Reynolds' conditions of confinement are the most restrictive available in the Connecticut prison
system. As the result of state legislation directed against him, Reynolds has no genuine
opportunity to have his conditions relaxed for the remainder of his life sentence. Reynolds has
moved for summary judgment on his claim that the punishment meted out by the State of
Connecticut violates the Constitution's protection against cruel and unusual punishment. For the
reasons that follow, Reynolds' motion is granted.

## I.    Introduction

Reynolds committed a heinous crime – he murdered a law enforcement officer. Reynolds
was sentenced to death and awaited execution for twenty-one years. When the death penalty was
abolished retroactively in Connecticut, Reynolds was resentenced to life without the possibility
of release.

The fact that people commit inhumane crimes does not give the state the right to treat
them inhumanely. Solitary confinement is an extreme form of punishment with a long history in
American penal systems. Since its origins at Pennsylvania's Eastern State Penitentiary in the
1800s, the anguish of those held in complete isolation has been well-documented.

> [V]ery few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers . . . . I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torture of the body . . . because its wounds are not upon the surface, and it extorts few cries that human ears can hear.

C. Dickens, American Notes for General Circulation 123–24 (Paris, Baudry's European Library, 1842).

Today, an estimated 61,000 prisoners are held in solitary confinement in American prisons.[1] *See Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell*, Yale Law School 2018 (hereinafter "ASCA-Liman Report") at 10.[2] Those inmates are separated from the general population and are held in their cells for twenty-two hours or more per day. *See id*. at 4. An abundance of clinical literature regarding the psychiatric effects of solitary confinement supports a near-universal conclusion: "The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning." Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 354 (2006). As the mental effects of solitary confinement garner national attention, calls to abolish or reform its use are increasing nationwide. *See, e.g.,* Editorial Board, *Solitary confinement is torture. Will the Bureau of Prisons finally stop using it?*, Wash. Post, July 15, 2017; Joe Hernandez, *New Jersey considers restricting the use of solitary confinement*, The Phila. Tribune, June 7, 2019. "As of the spring of 2018, legislation to eliminate or to limit restrictive housing for subpopulations had been enacted in California, Colorado, Washington, D.C., and Tennessee, and proposed in several other jurisdictions, including Connecticut, Hawaii, Nebraska, New Jersey, New York, and Virginia." ASCA-Liman Report at 88.

---

[1] Also referred to as "restrictive housing", "special housing", or "administrative segregation."
[2] That estimate excludes jails, juvenile facilities, as well as immigration and military detention centers. *See* ASCA-Liman Report at 9.

Despite the growing consensus among the scientific community that solitary confinement inflicts severe harm on prisoners, a select group of "special circumstances high security" inmates in Connecticut are all-but-certain to be housed in prolonged isolation for the rest of their lives. Other than two daily hours of recreation and two 15-minute breaks to eat lunch and dinner, each such inmate is effectively condemned to spend the rest of his life in a cell roughly the size of a parking space.

## II.     Background

Reynolds was convicted of murder and sentenced to death.[3]  In 2017, he was re-sentenced to life in prison without the possibility of release, following the judicial abolition of the death penalty in Connecticut in 2015.  *See* Mem in Supp. Defs' Mot. for Summary Judgment ("Defs' Mot.") (Doc. No. 117-26) at 1.  Reynolds has been confined at Northern Correctional Institution ("Northern"), a level 5 maximum security prison, for the past twenty-three years. Mem. in Supp. Pl's Mot. for Summary Judgment ("Pl's Mot.") (Doc. No. 122) at 1.  Pursuant to Connecticut General Statutes Section 18-10b ("Section 18-10b"),[4] Reynolds is classified as a "special circumstances high security" inmate.  *See id.* at 4.  As an inmate on special

---

[3] Reynolds was convicted of murdering Waterbury Police Officer Walter Williams in December 1992.  The facts of his case are set forth in *State v. Reynolds*, 264 Conn. 1 (2003).

[4] Section 18-10b is a statute enacted by the Connecticut legislature prior to the Connecticut Supreme Court's retroactive abolition of the death penalty in *State v. Santiago*, 318 Conn. 1 (2015).  It states in part,

> (a) The Commissioner of Correction shall place an inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed under subsection (b) of this section, if (1) the inmate is convicted of the class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, and sentenced to a term of life imprisonment without the possibility of release, or (2) the inmate is in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction, or (B) commuted to a sentence of life imprisonment without the possibility of release.

Conn. Gen. Stat. § 18-10b.

circumstances status, he lives alone in a 12 foot by 7 foot cell. *See* Joint Smt. of Undisputed Facts ("JSUF") (Doc. No. 120) ¶¶ 33–34. His cell is enclosed by concrete walls, a metal door, and a three-inch wide window. *Id.* ¶¶ 34, 37–38.

Reynolds is allowed out of his cell for two fifteen-minute periods to eat lunch and dinner. He is allowed to take one fifteen-minute shower each day. *See* Defs' Local Rule 56(a)(1) Stmt., (Doc. No. 117-27) ¶¶ 142, 294. He is allotted two hours of recreation each day for six days a week and two hours of weekly indoor gym recreation. *See* Robles Decl. (Doc. No. 117-6) ¶¶ 61–67. Reynolds may, upon request, receive visits from clergy, attorneys, or prison medical staff. Defs' Mot. at 57. Other than those periods, Reynolds remains isolated with no contact with anyone but the six other inmates on special circumstances status. *See* PL's Mot. at 4; JSUF ¶ 28. Although he is allowed social visits with family members, no physical contact is permitted during those visits, which occur through Plexiglass. Pl's Local Rule 56(a)(1) Stmt. (Doc. No. 121) ¶ 84. Reynolds' conditions of confinement are more restrictive than any other form of incarceration available within the State of Connecticut prison system.

On or about October 4, 2013, Reynolds filed his original *pro se* complaint challenging his conditions of confinement. Doc. No. 1. On June 29, 2015, I granted Reynolds' request for appointment of counsel. Doc. No. 52. About a month later, on August 25, 2015, the Connecticut Supreme Court held that the prospective repeal of the death penalty enacted by the Connecticut State Legislature in 2012 violated the state Constitution and ordered that individuals on death row be re-sentenced to life without the possibility of release. *See State v. Santiago*, 318 Conn. 1 (2015). Accordingly, Reynolds was resentenced on April 21, 2017. On June 29, 2017, Reynolds filed his second amended complaint, which now serves as the operative complaint. Doc. No. 71-1.

Reynolds has sued former Connecticut Department of Corrections ("DOC") Commissioner Leo Arnone and various prisoner officials at Northern Correctional Institution ("Defendants"), pursuant to 42 U.S.C. § 1983. He seeks declaratory and injunctive relief; as well as damages.

The parties filed cross-motions for summary judgment on November 9, 2018. In his motion, Reynolds contends that his conditions offend multiple constitutional protections as well as basic principles of human decency. Pl's Mot. at 2–3. He seeks declaratory and injunctive relief. *Id*. at 58. Defendants argue that they are entitled to qualified immunity because there "is no clearly established law either in the U.S. Supreme Court or the Second Circuit regarding the management of inmates on death row/special circumstances." Defs' Mot. at 1. In addition, Defendants state that Reynolds' claims are unripe because he failed to exhaust his state habeas court remedies regarding Section 18-10b. *Id.* at 2. I held oral argument on April 18, 2019, at which time I took the motions under advisement. *See* Doc. No. 151. For the following reasons, I **grant** Reynolds' motion and **deny** the Defendants' motion.

## III.    Standard of Review

### A.  Summary Judgment

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). In the context of cross-motions for summary judgment, the same standard is applied. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001). However, in deciding each motion, the court must construe the evidence in the light most favorable to the non-moving party. *Id.*

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential

element of nonmoving party's claim). In short, if there is no genuine issue of material fact,

summary judgment may enter. *Celotex*, 477 U.S. at 323.

## B. Injunctive Relief

The party requesting permanent injunctive relief must demonstrate (1) that he will be

irreparably harmed in the absence of an injunction and (2) actual success on the merits.

*Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012) (citation omitted). To demonstrate

irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but

actual and imminent and that cannot be remedied by an award of monetary damages." *Forest*

*City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (quoting

*Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998)). The standard for a permanent injunction

is essentially the same as for a preliminary injunction with the exception that a plaintiff must

show actual success on the merits for permanent injunctive relief rather than a likelihood of

success on the merits for preliminary injunctive relief. *See Amoco Prod. Co. v. Vill. Of Gambell*,

480 U.S. 531, 546 n.12 (1987).

## IV. Discussion

### A. Reynolds' Conditions of Confinement Violate the Eighth Amendment

Reynolds claims his conditions of confinement violate of the Eighth Amendment. The

Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those

convicted of crimes. U.S. Const. amend. VIII. To prevail on his Eighth Amendment claim,

Reynolds must prove "both an objective element—that the prison officials' transgression was

'sufficiently serious'—and a subjective element—that the official acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A condition is objectively serious if it deprives Reynolds of "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)) (internal quotation marks omitted). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

To meet the subjective component, Reynolds must show that prison officials knew "of and disregard[ed] an excessive risk to inmate health or safety," that is, that they were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . dr[e]w the inference." *Id.* at 185–86 (internal citation omitted). The requisite knowledge of risk may be inferred "from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 825); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Brook v. Wright*, 315 F. 3d 158, 164 (2d Cir. 2003) ("Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."). The Supreme Court has also stated that "the Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, or are grossly disproportionate to the severity of the crime. Among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal quotation marks and citations omitted).

1.  *Objective Element*

Reynolds argues that his "inhumane" conditions of confinement establish the objective element of an Eighth Amendment claim, noting that his "extreme social isolation offends contemporary standards of decency." Pl's Mot. at 9. First, he states that "[a]n overwhelming body of scientific research confirms that prolonged, extreme social isolation is inconsistent with 'evolving standards of decency.'" *Id.* at 13; *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 327 (2006) (The confinement of a "prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction – can cause severe psychiatric harm.").

Reynolds notes that many states are severely limiting the use of solitary confinement. *See id.* at 10. For example, Idaho's short-term restrictive housing is capped at fifteen days. *See* ASCA-Liman Report at 69–71. Colorado also limits the use of restrictive housing to fifteen days. *Id.* at 67–68. In North Dakota, an inmate's average stay in solitary confinement is between thirty and sixty days. *Id*. at 72. In 2014, the Nebraska legislature adopted a law that limits the use of solitary confinement. *See* JoAnne Young, *New Rules on Solitary Confinement in Nebraska Prisons to Take Effect Friday*, Lincoln Journal Star (June 26, 2016). The Wisconsin state legislature also approved reforms for the use of solitary confinement, including alternative punishment for behavior in general population and DOC review after 120 days in the restrictive housing unit. *See* Dee J. Hall, *State Changing Solitary Confinement Policy*, Wisconsin Center for Investigative Journalism (Aug. 23, 2015).

Reynolds argues that his ongoing confinement in near-total isolation poses a serious risk of future harm to his mental health. *See* Pl's Mot. at 14. "Defendants severely limit the amount of meaningful social interaction [Reynolds] has with other inmates . . . . Although Defendants now allow congregate meals during lunch and dinner, the 15–20 minutes allotted for meals

barely allow for some very modicum of social interaction [over] eating and talking." *Id.* at 15 (internal citations and quotation marks omitted). Reynolds is only allowed to interact with other special circumstances inmates. *Id.* He is unable to interact with staff in any meaningful way and he is not allowed to have physical contract with his guests during social visits. *See* Pl's Local Rule 56(a)(1) Stmt. ¶ 84.

Reynolds relies on the expert testimony of Dr. Stuart Grassian, who described special circumstances inmates' confinement as "psychologically toxic, cruel, ineffective and counterproductive." Grassian Expert Report (Doc. No. 100-1) at 11.[5] Dr. Grassian noted that an inmate like Reynolds who does not have a pre-existing mental illness, is placed at great risk of psychiatric decompensation in solitary confinement, leading to self-harm and suicidal tendencies.

> Although it has become widely accepted that mentally ill individuals are at severe risk of psychiatric decompensation in solitary, such decompensation is not limited to those with pre-existent mental illness. After controlling for the presence of mental illness, there remains overwhelming evidence that solitary confinement causes many inmates to become suicidal and self-destructive, on average demonstrating that such acts are about seven times as prevalent among those housed in solitary as they are among those housed in general population.

*Id.* at 14–15.

Furthermore, Reynolds contends that the Defendants continue to deny his basic need for adequate shelter. *See* Pl's Mot. at 17. "Plumbing problems are endemic at Northern; wastewater and fecal matter regularly back up into adjacent cells, causing the entire unit to smell strongly of feces." *Id.* at 18. "On multiple occasions, [Reynolds'] genitals were submerged in his neighbor's wastewater and fecal matter because another inmate had flushed the adjacent cell's toilet while [Reynolds] was using the toilet in his cell." *Id.*; Pl's Local Rule 56(a)(1) Stmt. ¶ 58.

---

[5] Defendants oppose Dr. Grassian's expert report on multiple fronts. They contend that Dr. Grassian's opinions are based primarily on observations of other institutions and are not rooted in any first-hand knowledge of Reynolds or Northern. *See* Defs' Opp. at 17–20. Those arguments are addressed below. *See infra* Section IV. A. 3.

In addition, Reynolds notes that the temperatures and noise levels inside Northern can vary, causing him to experience "extreme" temperatures and "chaotic, noisy conditions, which further deprive [him] of adequate shelter." Pl's Mot. at 19–20.

In response, Defendants argue that Reynolds' complaints about his conditions of confinement do not amount to a constitutional violation. "[Reynolds] fails to allege a sufficiently serious deprivation; he does not lack, shelter, medical care or reasonable safety. Instead, [Reynolds] has a modern well-furnished cell with TV, radio, video games, heating, cooling, lighting, hot and cold water, and is relatively comfortable in his single-cell." *Id*. at 29. In addition, Defendants avow that "many allegations [] are either wholly untrue, inaccurately exaggerated or misrepresentative of the true facts of this case . . . . Many more of [Reynolds'] allegations were completely and wholly raised for the first time in his affidavit, and Rule 56(a)(1) statement." Defs' Opp. (Doc. No. 129-21) at 1.

Moreover, Defendants note that Reynolds and other special circumstances inmates can engage in "unlimited social correspondence" with family and friends. Defs' Mot. at 81. Inmates can talk to one another "through the vents and crevices in the walls" and during their outdoor recreation period. *Id*. They have opportunities to visit with family and friends and can make multiple phone calls daily. *Id*. A special circumstances inmate may request to have a professional visit with a clergyperson from the community, if that clergyperson is the same religion as the inmate. *Id.* at 71.

Defendants rely on the expert report of Dr. Gregory Saathoff, who opined that based upon his own experience and a visit with officials at Northern, the conditions of confinement for special circumstances inmates do not constitute "solitary confinement conditions." Saathoff Decl. (Doc. No. 117-10) ¶ 11. Although Dr. Saathoff agrees with Dr. Grassian regarding the

detrimental effects than can be caused by solitary confinement, he states that Reynolds does not

exhibit the serious symptoms described by Dr. Grassian.

> Because the serious symptoms described by Dr. Grassian that are a consequence of long term solitary confinement are not evident in Mr. Reynolds, it supports a determination that the special circumstances unit as it is designed and implemented does not constitute solitary confinement.

*Id*. ¶16.

Defendants also argue that they are entitled to qualified immunity[6] because their behavior

was objectively reasonable considering the lack of any clearly established law or evidence that

Reynolds suffered either a physical or emotional injury.

> The defendants have acted reasonably and professionally and did not take any action with any knowledge of any [of Reynolds'] clearly established rights being violated. [Defendants] acted in an objectively lawful manner and without knowledge of any injury to [Reynolds], whether physical, emotion or legal. In fact, [Reynolds] suffered no injury whatsoever . . . . [Reynolds] can point to no clearly established legal rights of which the defendants should have been aware with regard to the management of death row.

Defs' Mot. at 16.

Other courts have held similar conditions inconsistent with contemporary standards of

human decency. Recently, the Fourth Circuit affirmed an Eastern District of Virginia ruling that

the conditions of confinement for Virginia's death row inmates violated the Eighth Amendment.

*See Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019), *as amended* (May 6, 2019).

> The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small . . . cell with no access to congregate religious, educational, or social programming—pose a substantial risk of serious psychological and emotional harm.

*Id*. at 357 (internal quotations marks omitted). The *Porter* Court's ruling was based on

"[n]umerous studies [that] reveal that prolonged detention of inmates in conditions akin to those

Plaintiffs faced on Virginia's death row also leads to psychological deterioration, including

---

[6] The Defendants' qualified immunity argument is addressed in Section IV. D. 3.

declines in mental functioning . . . difficulties in thinking, concentration and memory problems, and problems with impulse control." *Id.* at 356 (internal quotations marks omitted).

The plaintiffs in *Porter* were inmates on Virginia's death row who were housed in conditions analogous to Reynolds'. Like special circumstances inmates, Virginia death row inmates "could keep a television and compact disc player in their cell and borrow approved publications and library materials." *Id.* at 354. Two inmates, "were allowed out of their cells to perform institutional jobs," like special circumstances inmates in Connecticut.[7] *Id.*; Mulligan Decl. (Doc. No. 117-1) ¶ 84. Despite the *Porter* defendants' argument that the plaintiffs were not held in "solitary" confinement because they were not "subject to prolonged isolation of lack of stimulation,"[8] the Fourth Circuit noted that "[d]efendants do not dispute–nor could they– that the challenged procedures and regulations restricted death row inmates to their cells for between 23 and 24 hours a day." *Id.* at 359.

The Third Circuit, in *Williams v. Sec'y Pa. Dep't of Corr.*, reached a similar conclusion. 848 F.3d 549 (3d Cir. 2017), *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357 (2017), and *cert. denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357 (2017). In *Williams*, Pennsylvania death row inmates who were granted resentencing hearings challenged their placement in solitary confinement without meaningful review. *Id.* at 552. They argued that their indefinite detention in socially isolating conditions violated their Fourteenth Amendment rights to due process.[9] *Id.*

---

[7] "Inmates on death row [in Connecticut] are given jobs as janitors. This job requires that each inmate keeps his cell clean and that he cleans up after himself when he uses the showers and dayroom." Defs' Mot. at 40.

[8] Defendants in *Porter*, like the Defendants here, argued that the plaintiffs were not held in social isolation because death row inmates "had interaction with prison staff, including mental health counselors, and could have essentially unlimited contact visitation with their attorneys." *See Porter v. Clarke*, 290 F. Supp. 3d 518, 523 (E.D. Va. 2018), *aff'd but criticized*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019).

[9] In *Williams*, inmates were also subjected to conditions analogous to Reynolds'. Plaintiff Craig Williams was confined in a cell for twenty-two hours a day after his death sentence was vacated. 848 F.3d at 555. "During the short intervals that Williams was not in his cell, but in the prison yard, law library, or shower, he was held inside a small locked cage that continued to restrict his movement and freedom of association . . . . He was only permitted non-contact visits." *Id.*

at 553.  After reviewing the "robust body of scientific research on the effects of solitary confinement" the Third Circuit held that "the deprivations of protracted solitary confinement so exceed the typical deprivations of imprisonment as to be the kind of atypical, significant deprivation . . . . which [can] create a liberty interest."  *Id*. at 566.  (internal quotation marks omitted).

In this case, Reynolds has spent nearly half his life alone in a concrete cell.  When considering the average male life expectancy, he still has 34.3 years remaining in those conditions.  *See* Pl's Local Rule 56(a)(1) Stmt. ¶ 113.  Each passing year, he faces the risk of deteriorating psychological health.  Defendants concede that, under current policy, as a former death row inmate Reynolds has no genuine opportunity to enter the general inmate population.  *See, e.g.,* Defs' Mot. at 78 ("Death row inmates are a special class of prisoners . . . . They have nothing to lose in committing assaults or attempting to escape.  It is eminently rational to conclude that death row inmates constitute the biggest escape risk should they be housed in general population.").  Under the Defendants' current policies, Reynolds will never interact with inmates who were not previously on death row, never touch a friend or loved one, and never have another opportunity for meaningful social interaction for the rest of his life.

Although Reynolds may recreate with other special circumstances inmates, the Defendants cannot dispute that Reynolds is detained in his 12 foot by 7-foot cell for nearly twenty-two hours a day.  Nor have the Defendants' experts challenged the scholarly studies regarding the risks of developing disturbing mental health conditions in prolonged isolation.  The fact that Reynolds may not currently exhibit any devastating effects of his confinement does not defeat the claim that the Defendants' behavior was "sufficiently serious" to meet the objective prong of an Eighth Amendment claim.  *See Phelps*, 308 F.3d at 185.  There is every indication

that Reynolds' conditions of confinement would "pose an unreasonable risk of serious damage to his future health." *McKinney*, 509 U.S. at 35.

To the extent that the Defendants argue that Reynolds' conditions of confinement do not constitute "solitary confinement,"[10] that notion is contrary to both the vast array of literature discussing the harmful effects of prolonged periods of isolation and the undisputed facts of this case. Reynolds is confined to his cell an average of 21 to 22 hours a day. *See* Defs' Mot. at 84. He is unable to interact with other inmates in general population. *See id.* at 78. He is unable to physically embrace his visitors. *See* Defs' Local Rule 56(a)(1) Stmt. ¶ 111. Other than his limited recreation time, professional or medical visits, and short fifteen-minute increments to eat and shower, Reynolds will spend the remainder of his life alone in a small cell.

Those types of conditions give rise to the harmful effects described by the growing body of research on social isolation and mental health. *See, e.g.,* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003) (emphasis added) ("[T]here is *not a single published study* of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects.*"); *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[a] conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").

Based on the evidence in the record, I conclude that Reynolds has established the objective element of his Eighth Amendment claim. An overwhelming body of scientific research

---

[10] *See, e.g.,* Defs' Mot. at 84 ("There is no 'solitary confinement' . . . . [Special circumstances] inmates eat collectively, and go to the day room and gymnasium for group recreational activities. The time out of cell is about three hours per day, when counting two-one hour recreation periods, meals, and possible visits, medical appointments, and other out-of-cell opportunities.").

supports the conclusion that prolonged isolation presents dangerous risks to an inmate's physical and mental health.

### 2. *Subjective Element*

Reynolds also contends that the Defendants' deliberate indifference to his conditions of confinement satisfies the subjective element of his Eighth Amendment claim. "The risks of harm from the conditions of [Reynolds'] confinement are obvious; Northern's own policies and the Defendants' own testimony reflect an understanding of the mental health risks of prolonged social isolation. The undisputed facts show not only that Defendants knew the risks posed by the conditions of [Reynolds'] confinement but that they failed to respond to those risks." Pl's Mot. at 21–22.

Reynolds asserts that the risks inherent in subjecting a person to over twenty-three years of social isolation are so "obvious" that no reasonable person could claim to be unaware of them. *Id*. at 22. Specifically, he argues that the Defendants' awareness of those risks is evident in Northern's own internal policies and directives. DOC's Restrictive Housing Unit Matrix requires special circumstances inmates to be reviewed "[b]y a mental health professional after 30 days of initial placement" and then reviewed again "every 90 days thereafter." Doc. No. 121-23 at 1. In addition, Reynolds argues that DOC officials knew about the mental health consequences of social isolation. Defendant Mark Frayne, a former psychologist at Northern, stated that the scientific literature regarding the effects of solitary confinement reflects, "[t]hat there is a propensity for solitary confinement to adversely affect [a person's] mental health." Frayne Dep. (Doc. No. 121-8) at 8. Despite the Defendants' knowledge of those risks, Reynolds notes that DOC officials continue to house him in social isolation for an indefinite period.

"There is no evidence that [Defendants] have taken any action to order an evaluation or otherwise inquire into the effects of this isolation on [Reynolds'] mental health."  Pl's Mot. at 23.

Reynolds also cites the Defendants' own testimony to show that his conditions of confinement lack a penological justification.  "Defendants themselves acknowledge that there is no security justification for the extreme conditions of [Reynolds'] confinement.  Defendants Frayne and Semple, and Dr. Saathoff, all testified that [Reynolds] can be managed safely in general population."  *Id.* at 24.

In response Defendants argue that "any and all claims regarding alleged deleterious effects on [Reynolds'] mental health must be dismissed because [Reynolds] has no such deleterious mental health effects."  Defs' Mot. at 2.  "[Reynolds] [has] never asked for mental health assistance and has been determined to have no mental health issues.  He certainly never exhausted his mental health claims, and thus, this court is without any power to review them."  *Id.* at 16.  Reynolds never reported to a DOC official that he was suffering from any mental instability deterioration.

> [Reynolds] never wrote or spoke to me concerning his mental health nor was I ever advised by any other staff member that he was in any way suffering from mental instability or deterioration of any kind . . . . If anything, he seemed to be relatively satisfied with having a single cell, with all of his property and being able to remain on single-cell status, which death row allowed him to do.

Maldonado Decl. (Doc. No. 117-3) ¶ 18.

Here, Reynolds has demonstrated that the Defendants acted with deliberate indifference to a substantial risk of harm by continuing to house him in social isolation.  There is no dispute that prison officials at Northern were aware of the mental health risks associated with prolonged isolation.  Indeed, Defendant Frayne, the former managing mental health provider at Northern, testified that he was familiar with the detrimental effects of solitary confinement.  The

Defendants' knowledge of the health risks of solitary confinement is apparent through DOC's own policies, which mandate that special circumstances inmates be assessed by a mental health professional one month after their initial placement and every three months thereafter. Additionally, a psychiatrist remained on-call during second and third shifts at Northern to assist special circumstances inmates. *See* Defs' Local Rule 56(a)(1) Stmt. ¶ 410. Medical staff and social workers toured the death row housing unit multiple times a day. *Id.* ¶¶ 427, 435. The Defendants implemented those policies because they were aware of the disturbing mental health consequences of solitary confinement. It is immaterial to the Eighth Amendment analysis that Reynolds has yet to display symptoms of a mental disease.[11]

Furthermore, the Defendants' description of Reynolds' stable behavior supports a finding that there is no penological purpose for his severe conditions. Indeed, Defendant Maldonado, the District Administrator for DOC, characterized Reynolds as "respectful and professional." Maldonado Decl. ¶ 17. Based on his observations, Reynolds appeared to be "relatively well-adjusted" to prison life. *Id.* Hipolito Rodriguez, former Warden of Northern, found that Reynolds "is articulate and able to communicate well." Rodriguez Decl. (Doc. No. 117-5) ¶ 20. Defendant Frayne stated that Reynolds "continues a very favorable adjustment considering his correctional title." Frayne Decl. (Doc. No. 117-9) ¶ 72. Even the Defendants' own expert, Dr. Saathoff, opined that Reynolds is "a thoughtful, articulate and disciplined individual." Saathoff Decl. ¶ 12.

> [Reynolds] continues to serve as the barber for the special circumstances population . . . . Because a prison barber is in a unique position to harm others when they are at their most vulnerable, it is incumbent upon the institution to allow only someone who has the requisite and appropriate interpersonal, cognitive and emotional stability to accomplish this important role – the most intimate job that any prisoner can be assigned. That

---

[11] The fact that Reynolds has not yet shown any symptoms of mental health injury does not defeat his claim. Prison officials could not avoid the subjective element of an Eighth Amendment claim if they confined an inmate in a cell exposed to PCBs or other cancer-causing chemicals only as long as the inmate showed no symptoms of disease.

[Reynolds] performs this job with exceptional skill in the dayroom according to correctional staff and is fully accepted in this role by other inmates as well as security and administrative staff and leadership is a testament to his mental and emotional stability.

*Id.* ¶ 17.  The individual that Dr. Saathoff describes is a far cry from the impulsive death row inmate who has "nothing to lose in committing assaults or attempting to escape."  *See* Defs' Mot. at 78.

The Defendants' attempt to justify Reynolds' current conditions based on his underlying state murder conviction[12] (which occurred in 1992) is without merit.  *See* Defs' Opp. at 3–6.  Despite the Defendants' objection to Reynolds' characterization as a "model inmate," Reynolds' most recent disciplinary citation occurred in 2013.  *See id.* at 4 n. 3.  As noted above, the Defendants' sworn testimony indicates that Reynolds does not exhibit "paranoid rage" nor "compulsive behaviors" and has adjusted "relatively well" to prison life.  Saathoff Decl. ¶ 16; Maldonado Decl. ¶ 17.  There is no evidence in the record that there is any penological justification for Reynolds' current conditions of confinement.

Based on the evidence in the record, I conclude that Reynolds has established the subjective element of his Eighth Amendment claim.  The Defendants knew or reasonably should have known of the serious risks of harm to Reynolds from his conditions of confinement; their failure to ameliorate those conditions reflects deliberate indifference.

Thus, Reynolds has shown that his conditions of confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment.

---

[12] The Fourth Circuit in *Porter* rejected a similar argument.  "[T]he Five Percenters were placed in segregation based on their *in-prison conduct* and were removed from segregation if they renounced their membership with the group.  By contrast, the challenged Virginia procedures and regulations place death row inmates in solitary confinement *based on their sentence alone* and do not provide death row inmates with an avenue for removing themselves from segregation."  *Porter*, 923 F.3d at 359 (emphasis added) (internal citations omitted).

3. *Daubert Analysis*

Defendants move to preclude the opinions of Dr. Stuart Grassian, [13] arguing that his report fails the admissibly test for expert opinions set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

Rule 702 of the Federal Rules of Evidence addresses testimony to be provided by experts. The Rule provides:

> If the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, [a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if] (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 "establishes a standard of evidentiary reliability," *Daubert*, 509 U.S. at 590, and "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

In determining the admissibility of expert testimony, whether based on "scientific," "technical," or "other specialized knowledge," the Supreme Court has adopted a two-step inquiry under which trial judges must determine "whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Kumho Tire*, 526 U.S. at 141. Specifically, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004)

---

[13] Defendants also move to preclude the export report of former Commissioner Martin Horn. Reynolds in his motion, however, relies almost exclusively on the expert opinions of Dr. Grassian.

(instructing that "the district court must consider both the reliability and relevance of the proffered testimony").

In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See id.* at 590; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001). In *Daubert*, the Supreme Court set out a list of non-exclusive factors the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique on which the expert relies has been tested – that is, whether the expert's theory can be challenged in an objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the technique when applied; (4) the existence of standards controlling the technique's operation; and (5) whether the method has been generally accepted by the scientific community. *See Daubert*, 509 U.S. at 593–94.

Those factors are not a definitive checklist, however. *See Kumho Tire*, 526 U.S. at 150. A court applying the *Daubert* factors must look at "the nature of the issue, the expert's particular expertise, and the subject of his testimony," and "consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 150–52. In short, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

The Defendants focus their objection on the reliability of Dr. Grassian's methods. *See* Defs' Opp. at 17–21. They contend that Dr. Grassian's conclusions regarding Reynolds'

conditions at Northern are inadmissible because he did not visit Northern and did not interview Reynolds prior to producing his expert report.[14] "Dr. Grassian's opinions had been pre-judged and pre-determined before he ever became involved in this case, and not only did he simply copy and paste from other reports, he blindly adhered to the same viewpoints that he held in his first article which was essentially a literature review." *Id*. at 20.

In response, Reynolds notes that Dr. Grassian did not believe a personal visit to Northern was necessary in order to opine on the potential psychiatric effects of social isolation at Northern. "[Dr. Grassian] had access to a wealth of material about the physical conditions at Northern, out-of-cell time and the social interaction available to [Reynolds]. Dr. Grassian has done a considerable amount of academic and scientific research that focuses on the possible psychiatric effects of near total isolation." Pl's Reply (Doc. No. 137) at 8.

Dr. Grassian's expert testimony is admissible under *Daubert*. Notably, Reynolds does not rely on Dr. Grassian to demonstrate that he is currently suffering from deteriorating mental illness as a result of his conditions of confinement. Instead Reynolds relies on Dr. Grassian to show that he is at risk of the detrimental health effects commonly associated with prolonged confinement in social isolation. *See, e.g*., Pl's Mot. at 14. Dr. Grassian bases his opinions on his own research, which has been subject to peer review. *See, e.g.,* Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 11 (1983); *see also Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 Int'l J. Law & Psychiatry (1986). His research is also generally accepted by the scientific community, including the Defendants' own expert Dr. Gregory Saathoff. *See, e.g,* Saathoff Decl. ¶ 15. ("I agree with Dr. Grassian about detrimental effects that can occur in conditions of solitary

---

[14] Defendants do not dispute Dr. Grassian's expert qualifications.

confinement. I have referred my students and residents to Dr. Grassian's writings and other psychiatric literature and research that details the consequences of what is known as solitary confinement."). Therefore, I find Dr. Grassian's testimony both relevant and admissible.

B. Reynolds' Conditions of Confinement Violate His Rights Under the Due Process Clause of the Fourteenth Amendment

Reynolds also argues that Defendants have violated his rights under the Due Process Clause by depriving him of a protected liberty interest without any meaningful review.

To assert a due process claim in connection with a classification decision, Reynolds must show that he had a protected liberty interest in remaining free from the classification and, if he had such an interest, that the Defendants deprived him of the interest without affording him due process of law. *See Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (summary order) (citing *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court reexamined the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause. *Id.* at 474. The Court explained that for prisoners, a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484 (internal citations omitted).

Whether restraint constitutes an "atypical and significant hardship" depends on the totality of the circumstances, particularly the severity and the duration of the deprivation. *See, e.g., Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). Hardship is atypical and significant in relation to the ordinary incidents of prison life based on a comparison of the frequency and

duration of similar conditions of confinement. *See, e.g., Colon v. Howard*, 215 F.3d 227, 230–32 (2d Cir. 2000). Atypicality should be measured against the conditions afforded to the general population within a given prison system, as well as those in routine administrative confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). Whether conditions constitute an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" is a matter of law. *Colon*, 215 F. 3d at 230.

1. *Liberty Interest*

Reynolds alleges that he has a protected liberty interest in freedom from the extreme social isolation imposed by the Defendants. *See* Pl's Mot. at 26. Regarding atypicality, Reynolds states that his conditions at Northern are a "significant departure from the hardships normally attendant to incarceration in Connecticut [and] that he has a liberty interest in not being made to endure them indefinitely." *Id*. at 30. Moreover, because of its indefinite duration and lack of meaningful review, Reynolds argues that special circumstances confinement is even more restrictive than administrative segregation. *See id*. at 31. Reynolds' conditions apply only to himself and six other inmates on special circumstances status. *Id*. at 32. "Defendants have imposed those [conditions] without regard to misconduct and with no rehabilitative goal. There is no better indicator of atypicality." *Id*.

The Defendants respond by noting that there is no caselaw to support Reynolds' contention that he has a liberty interest to be free from restraints as a death row inmate. *See* Defs' Mot. at 21. In addition, Defendants argue that Reynolds has no constitutional right to be housed in general population, to live in a certain cell, nor be housed in a particular prison. *See* Defs' Opp. at 8 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) ("[Just as] an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he

has no justifiable expectation that he will be incarcerated in any particular State.") (footnote omitted)).

All parties cite *Wilkinson v. Austin*, where the Supreme Court held that there may be a state-created liberty interest in avoiding particular conditions of confinement.  545 U.S. 209, 221–22 (2005).  In *Wilkinson*, the Supreme Court considered a due process claim regarding the classification of Ohio inmates to the state's high security "Supermax" prison for non-disciplinary reasons.  Conditions at the Ohio State Penitentiary ("OSP") were more restrictive than any other prison facility in Ohio, including its death row and administrative control units.  *See id*. at 214. Inmates were held in "extreme isolation" in 7 foot by 14 foot cells for twenty-three hours a day. *Id.*  During the one hour per day that an inmate could leave his cell, access was limited to one of two indoor recreation cells.  *Id*.  Opportunities for social visits were rare and conducted through glass walls.  *Id*.  "Aside from the severity of the conditions, placement at OSP [was] for an indefinite period of time, limited only by an inmate's sentence.  For an inmate serving a life sentence, there [was] no indication how long he may be incarcerated at OSP once assigned there."  *Id.* at 214–15.

The Court applied the *Sandin* analysis to determine whether inmates had a liberty interest in avoiding indefinite confinement in the restrictive high-security prison.  *Id.* at 223  ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest in avoiding restrictive conditions of confinement is not the language of the regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484).

Applying that analysis, the Court held that inmates had a liberty interest protected by the Fourteenth Amendment's Due Process Clause in avoiding assignment to OSP.

For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30–day placement in *Sandin*, placement at OSP is *indefinite* and, after an initial 30–day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration . . . . While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

*Id.* at 223–24 (internal citation omitted) (emphasis added).

Reynolds contends that his conditions of confinement are analogous to the "extreme" conditions imposed on inmates at OSP. *See* Pl's Mot. at 30–32. He notes that his cell is smaller[15] than the cells in *Wilkinson* and that he is only allowed to interact with other inmates on special circumstances status. *Id.* at 30. In addition, "[i]nmates at Ohio's supermax retained some opportunity to leave the facility, either through the termination of their sentence, or through an annual review process. By contrast, Defendants have imposed permanent social isolation on [Reynolds] that he must endure until the day he dies." *Id.*

Defendants do not contest that the conditions imposed on special circumstances inmates are far more restrictive than other forms of incarceration available in Connecticut prisons. Northern is a level 5 maximum security facility. JSUF ¶ 31. Unlike special circumstances inmates, prisoners in general population in Connecticut have access to open-air outdoor activities with natural light. *See* Pl's Local Rule 56(a)(1) Stmt. ¶ 187. Inmates in general population are permitted to have social visits where physical contact is permitted. *See id.* ¶¶ 183, 217.

---

[15] Reynolds' cell measures 12 feet by 7 feet in size. JSUF ¶ 34. By contrast, cells in Ohio's Supermax facility were 14 feet by 7 feet. *See Wilkinson*, 545 U.S. at 214.

Reynolds asserts that his conditions of confinement "differ significantly from routine prison conditions in Connecticut state institutions." Pl's Mot. at 31 (internal quotation marks omitted).

In response, the Defendants argue that the prison conditions at issue in *Wilkinson* were far more extreme than the conditions imposed on special circumstances inmates at Northern. *See* Defs' Mot. at 81. Unlike the inmates in *Wilkinson* who were detained in their cells for twenty-three hours a day, special circumstances inmates are allowed "out of their cells nearly three full hours per day, which could be more if they have a job, medical or mental health appointment, or a social or legal visit." *Id.* Though inmates in *Wilkinson* were not allowed to communicate from cell to cell, special circumstance inmates may "communicate with other inmates through the vents and crevices in the walls" and during their outdoor recreation period. *Id.*

The Defendants' attempts to distinguish Reynolds' conditions of confinement from the conditions at issue in *Wilkinson* are unconvincing. Reynolds spends (at best) only one to two additional hours outside of his cell compared to the inmates at OSP. He returns to a cell that is even smaller than those at Ohio's Supermax facility. Like the plaintiffs in *Wilkinson*, Reynolds is not allowed to physically embrace his visitors when he is allowed a social visit. If Reynolds does not have a scheduled visit, he is only allowed to interact with the other six inmates on special circumstances status. Those conditions are "synonymous with extreme isolation." *Wilkinson*, 545 U.S. at 214.

More troubling, however, is the permanent nature of Reynolds' classification. Special circumstance inmates at Northern are ineligible for parole and are held in social isolation for the remainder of their life sentences. *See* DOC Restrictive Housing Unit Matrix at 1. Special circumstances confinement is even more restrictive when compared to other forms of administrative segregation. Inmates housed in "Administrative Segregation" are classified based

on disciplinary history while in DOC custody.  *Id.*  Those inmates require a hearing prior to their placement in isolation to determine whether they are a threat to the facility, to staff, or to other inmates.  An inmate in "Interval I" or "Interval II" of the "Chronic Discipline" program is placed on restrictive status to "prepare [the] inmate for return to general population."  *Id.*  Reynolds, however, received no administrative hearing prior to his placement on special circumstances status.  He has an "[i]ndefinite" authorized length of confinement and is not eligible for release to the general population.  *Id.*  "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context."  *Wilkinson*, 545 U.S. at 224; *see also Williams*, 848 F. 3d at 562 (internal citation and footnotes omitted) ("This indefiniteness contrasts sharply with other common forms of solitary confinement . . . . The duration of the deprivations that follow from that seclusion is often predetermined and fixed unless the inmate's behavior is thought to require an additional period of segregation.").

Accordingly, Reynolds has a protected liberty interest in remaining free from the conditions imposed due to his classification as a special circumstances inmate.

## 2.  *Procedural Protections*

Reynolds further argues that because he has a liberty interest in freedom from his conditions, the Defendants violated his due process rights by failing to provide him procedural protections before placing him on special circumstances status.  *See* Pl's Mot. at 34.  "Defendants have done nothing beyond perfunctory 'classification reviews' that afford [Reynolds] no notice and no opportunity to plead his case.  In practice, these reviews are meaningless exercises.  There is no provision for release from special circumstances status."  *Id.* at 34–35.

The review offered by Defendants regarding special circumstances status is governed by Section 18-10b, which directs the Commissioner of Correction to establish a "reclassification process" that includes "an assessment of the risk an inmate" and "an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody." Conn. Gen. Stat. § 18-10b(b). The statute further directs the Commissioner to "conduct an annual review of such inmate's conditions of confinement within such housing unit," permitting the Commissioner "for compelling correctional management or safety reasons" to "modify any condition of confinement," subject to the stringent requirements of the statute. *Id.* § 18.10b(c)(2).

Although the Defendants have completed several "reclassification reviews" regarding his placement on special circumstances status, Reynolds argues that prison officials have never provided him with advance notice of those reviews, nor given him an opportunity to be heard. *See* Pl's Mot. at 36.

> On May 18, 2017, Defendants sent [Reynolds] a letter notifying him that the "reclassification review process has been completed" and that the commissioner had "determined" that [Reynolds] would be maintained on Special Circumstances High Security status. [Reynolds] has subsequently received the results of similar classification reviews, but had no opportunity to participate. On each occasion, Defendants mechanically classified [Reynolds] as a level 5 security risk based on the length of his confinement. In practice, these reviews are meaningless exercises.

*Id.* (internal citations omitted).

Furthermore, Reynolds notes that the Defendants have never made an individualized determination finding that he presents a risk that requires indefinite placement in restrictive housing. *Id.* at 35–36. To the contrary, the Defendants consider Reynolds to be a "respectful and professional" inmate who "continues a very favorable adjustment considering his correctional title." Maldonado Decl. ¶ 17; Frayne Decl. ¶ 72.

The Defendants admit that "there would be no point to a due process hearing" because Reynolds' classification is inherently tied to his initial death sentence issued by the state trial court. Defs' Mot. at 19. Additionally, the Defendants proclaim that "[t]here were ample and abundant due process procedures with innumerable habeas corpus opportunities in connection with [Reynolds'] conviction and sentence. It is absurd to claim [Reynolds] did not receive due process." *Id.* at 20

In *Hewitt v. Helms*, the Supreme Court held that prison officials must provide an inmate with at least an informal hearing "within a reasonable time after confining him to administrative segregation." 459 U.S. 460, 472 (1983), *overruled in part on other grounds by Sandin*, 515 U.S. 472 (1995). In addition, an inmate must at least "receive some notice of the charges against him and an opportunity to present his views [orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476. So long as those two requirements are met "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* (footnote omitted). In *Wilkinson*, the Court noted the "informal, nonadversary procedures set forth in . . . [*Hewitt*]" are the appropriate procedural safeguards for inmates faced with indefinite confinement." 545 U.S. at 229.

Defendants have failed to meet even that minimal requirement. There is no evidence in the record to suggest that Reynolds was provided any advance notice or an opportunity to be heard during his reclassification process pursuant to Section 18-10b.[16] Defendants acknowledge

---

[16] Defendants assert that Reynolds declined to meet with Dr. Craig Burns, whose duties included reviewing medical records as part of the reclassification process. *See* Burns Decl. (Doc. No. 136-4) ¶¶ 8–9. Defendants have not stated how Reynolds' decision not to speak with Dr. Burns adversely affected review of his special circumstances classification.

that Reynolds' participation in any hearing would be futile.[17]  They claim that their burden for

providing Reynolds an informal hearing was satisfied by his 1994 criminal trial and his April 21,

2017 resentencing.  "There can be no doubt that [Reynolds] knew he was facing the death

penalty and that if sentenced to death, would be confined on death row, now reduced to special

circumstances." Defs' Mot. at 84.

The Defendants' reliance on Reynolds' original conviction to satisfy their constitutional

obligations fails.  As an initial matter, special circumstances status did not exist when Reynolds

was initially convicted of murder.  It was impossible for Reynolds' to dispute his current

classification during his original trial and sentencing.  More importantly, Section 18-10b is not a

penal statute, but is rather a directive to the Commissioner of DOC.  *See, e.g,* Conn. Gen. Stat. §

18-10b(a) ("The *Commissioner of Correction* shall place an inmate on special circumstances

high security status.") (emphasis added).  It is not a directive to a *sentencing judge*.  Contrary to

the Defendants' view, Reynolds' conditions of confinement were not part of his underlying

criminal sentence.  Thus, any due process hearing concerning Section 18-10b is beyond the

scope of the judicial proceedings that resulted in Reynolds' underlying conviction.  In short,

neither his original death sentence nor Section 18-10b can trump Reynolds' federal due process

rights.

For the reasons stated above, Reynolds was deprived of his due process rights under the

Fourteenth Amendment.

---

[17] Indeed, when Reynolds protested his restraint status through the administrative grievance system, Defendant
Maldonado responded that "[n]o hearing needed to be held for your restraint status.  You are managed as a Death
Row inmate."  *See* Maldonado Dep. (Doc. No. 121-12) at 7–8.

C.  Reynolds' Conditions of Confinement Violate His Rights Under the Equal Protection Clause of the Fourteenth Amendment

Reynolds also argues that his treatment compared to other similarly situated prisoners in DOC custody violates his rights under the Equal Protection Clause of the Fourteenth Amendment.

The Equal Protection Clause protects prisoners from invidious discrimination. The provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439–40 (1985). To prevail on an Equal Protection claim, Reynolds must prove that he was treated differently from other similarly situated individuals and the reason for the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

Reynolds does not allege that the Defendants treated him differently because of his membership in a protected class. He does, however, allege an equal protection violation under the "class of one" theory. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Under that theory, Reynolds must allege that "[He] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* To support a class-of-one claim, Reynolds must allege an "extremely high degree of similarity" with the person to whom he compares himself. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.). Reynolds' circumstances and the other person's circumstances must be "*prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (internal quotation marks and citation omitted), *overruled on other grounds by Appel v. Spiridon*, 531

F.3d 138 (2d Cir. 2008). "A government official's decision 'can be considered irrational only when [the official] acts with no legitimate reason for [his or her] decision.'" *Harvey v. Mark*, 352 F. Supp. 2d 285, 290 (D. Conn. 2005) (quoting *Harlen Associates v. The Incorporated Village of Mineola,* 273 F.3d 494, 500 (2d Cir. 2001)).

Reynolds identifies two inmates, Eduardo Santiago ("Santiago") and Terry Johnson ("Johnson"), who were both convicted of capital crimes prior to the prospective repeal of the death penalty and the enactment of Section 18-10b. He contends that both inmates, who have worse disciplinary records, are housed in "substantially more humane level 4 facilities." Pl's Mot. at 38.

### 1. *Eduardo Santiago*

Santiago and Reynolds were both sentenced to death after being convicted of capital murder.[18] Santiago was initially sentenced to death in 2004 and was housed on Connecticut's death row at Northern from 2004 to 2013. Pl's Local Rule 56(a)(1) Stmt. ¶ 165. While at Northern, Santiago was housed in the same unit as Reynolds under the same conditions. *See* Santiago Decl. (Doc. No. 121-3) at ¶ 3. Between 1998 and 2010, Santiago received eight disciplinary infractions. Pl's Local Rule 56(a)(1) Stmt. ¶ 168. During that time, Reynolds received zero. *Id.* ¶ 2. In 2001, Santiago received disciplinary infractions for threatening a doctor and for flagrant disobedience, including resisting handcuffing by officers. *Id.* ¶ 169. Reynolds has never received an infraction for violent conduct during his incarceration. *Id.* ¶ 3.

---

[18] The background facts underlying Santiago's original conviction are set forth in *State v. Santiago*, 305 Conn. 101, 121 (2012), *judgment set aside, opinion not vacated* (Aug. 25, 2015), *opinion supplemented on reconsideration*, 318 Conn. 1 (2015).

Despite his disciplinary history, Santiago was transferred from Northern to general population at MacDougall-Walker Correctional Institution ("MacDougall") in June 2014. Santiago Decl. ¶ 4. He is currently housed at MacDougall, a level 4 facility. *See* Pl's Mot. at 38; Pl's Local Rule 56(a)(1) Stmt. ¶ 166. Reynolds notes that as an inmate at MacDougall, Santiago is afforded far more social interaction and programming opportunities. *See* Pl's Mot. at 41. At MacDougall, Santiago spends eight hours outside his cell during a normal week day. Pl's Local Rule 56(a)(1) Stmt. ¶ 173. At Northern, Reynolds is allowed at most three hours a day outside his cell. *See* Defs' Mot. at 84. As an inmate in general population at MacDougall, Santiago has access to extensive programming opportunities, including art, drama, age-specific wellness groups, poetry, and a college program organized by Yale University. Pl's Local Rule 56(a)(1) Stmt. ¶ 181. Reynolds has no access to such programming. *See* Pl's Mot. at 42. Santiago makes approximately $80 per month as a stocker in the commissary warehouse. Pl's Local Rule 56(a)(1) Stmt. ¶ 182. By comparison, Reynolds earns $0.75 per day as the barber for other special circumstances inmates. *Id.* ¶ 79; JSUF ¶ 45. Lastly, Santiago can physically embrace his social guests who visit him at MacDougall. Pl's Local Rule 56(a)(1) Stmt. ¶ 183. Reynolds has not had any human contact with anyone aside from health providers, lawyers, and prison staff for twenty-three years. *Id.* ¶ 87.

## 2. *Terry Johnson*

Terry Johnson received a death sentence after the murder of a Connecticut police officer in 1991.[19] *See* Pl's Mot. at 40. Johnson was housed at Northern from June 1995 until his death sentence was overturned by the Connecticut Supreme Court in 2000.[20] While at Northern,

---

[19] The history of Johnson's criminal case is set forth in *State v. Johnson*, 253 Conn. 1 (2000).
[20] Johnson's death sentence was overturned because the court held that there was insufficient evidence of the existence of an aggravating factor. *Johnson*, 253 Conn. at 56. When Johnson was originally sentenced, the murder

Johnson was housed under the same conditions as Reynolds. Johnson Decl. (Doc. No. 121-4) at ¶ 3. Throughout his incarceration, Johnson has received multiple disciplinary citations for fighting with other inmates. In 1998, Johnson was cited for fighting another inmate at Northern. Pl's Local Rule 56(a)(1) Stmt. ¶ 197. Between 2003 and 2011, Johnson was cited for fighting on three separate occasions. *Id.* ¶¶ 198–200. Johnson has been placed in punitive segregation twenty-two times. *Id.* ¶ 201. Reynolds has never been cited for fighting during his twenty-three years of incarceration. *See id.* ¶ 3.

Notwithstanding his history of fighting, Johnson has lived in general population at MacDougall since the summer of 2013. Johnson Decl. ¶ 4. He has access to the same programming and social opportunities as Santiago. Johnson currently plays on the intramural volleyball team at MacDougall and eats lunch and dinner in the dayroom with about 50 other inmates. *Id.* ¶¶ 23–24. He has access to institutional jobs such as maintenance, commissary, and food service, which pay between $ 0.75 to $1.25 a day. *Id.* ¶ 37. He can enroll in vocational education programs including electronics, welding, and a Certified Nursing Assistant program. *Id.* Johnson is also afforded weekend long family visits three to four times a year. Pl's Local Rule 56(a)(1) Stmt. ¶ 218. At Northern, Reynolds may only recreate and eat with the other six special circumstances inmates. *See* Pl's Mot. at 4; Pl's Local Rule 56(a)(1) Stmt. ¶ 73. He does not have access to the jobs or vocational training offered at MacDougall and he may not have weekend family visits.

---

of a police officer was not a statutory aggravating factor under Connecticut's death penalty statute. *See* Pl's Local Rule 56(a)(1) Stmt. ¶ 194. Accordingly, the Court remanded the case for resentencing to impose a life sentence without the possibility of release. *Johnson*, 253 Conn. at 56.

### 3. *Reynolds is Similarly Situated to Santiago and Johnson*

Defendants' attempts to justify Reynolds' different conditions are almost entirely based on Reynolds' underlying conviction. "[Reynolds] consciously made a decision to murder Officer Williams . . . . [Those] heinous facts make [Reynolds] not only violent and dangerous but also wholly distinguishes his case from the cases of both Terry Johnson and Eduardo Santiago."[21] Defs' Opp. at 4. Defendants contend that Reynolds' crime makes him more of a hazard than both Santiago and Johnson, who were also sentenced to death and who have a history of fighting staff and other inmates.[22]

Based on the facts presented, Reynolds exhibits a "extremely high degree of similarity" to Santiago and Johnson. *See Clubside, Inc.,* 468 F.3d at 159. Reynolds, Santiago, and Johnson were all sentenced to death after being convicted of murder. All three inmates had their initial death sentences vacated by the Connecticut Supreme Court and are now serving life sentences without the possibility of release. Santiago and Johnson both served time with Reynolds at Northern and were released to general population at MacDougall, despite having more violent disciplinary histories. The facts of Reynolds' criminal conviction compared to Santiago's and Johnson's are irrelevant to the Equal Protection analysis. Based on this record, a reasonable fact finder would have to conclude that Reynolds is sufficiently "similarly situated" to Santiago and Johnson to provide a basis for an Equal Protection "class of one" claim.

---

[21] Defendants also argue that Reynolds is not similarly situated to Johnson because Johnson's death sentence was vacated in 2000 due to insufficient evidence of the existence of an aggravating factor. *See* Defs' Opp. at 5. Their crimes, however, were identical; they both murdered law enforcement officers. Moreover, Defendants' argument that Johnson was never given a valid death sentences is trivial, considering that Reynolds' death sentence was also vacated after the Connecticut Supreme Court held that the death penalty constituted cruel and unusual punishment in *Santiago*, 318 Conn. at 1.

[22] Ironically, Public Act 01-151, which modified the Connecticut Death Penalty Statute to include murder of a police officer as an aggravating factor, was passed in part due to Johnson's death sentences being vacated. *See* Conn. J. Standing Comm. Hearing, Jud. Pt. 13, 2001 Sess. p. 4529 (statement of Rep. Ward) ("The state Supreme Court's opinion last spring overturning the death sentence of Terry Johnson for the killing of Trooper Russell Bagshaw is reason enough to make killing a police officer an aggravating factor.").

4. *No Rational Basis for Reynolds' Differential Treatment*

There is no rational basis for Reynolds' more restrictive conditions. Although Reynolds, Santiago, and Johnson all received death sentences, Reynolds is classified as a level 5 inmate and Santiago and Johnson are classified as level 4. *See* Pl's Mot. at 43. Inmates in DOC custody are routinely evaluated on seven categories to determine their classification level. DOC Classification Manual (Doc. No. 121-24) at 3. Those categories include: escape profile, severity/violence of the current offense, history of violence, length of sentence, presentence of pending charges and/or detainers, disciplinary history, and security risk group membership. *Id.* Each inmate is assigned a score from 1 to 5 for each category, with 1 being the lowest score, and 5 being the highest score. *Id.* at 7. After each category is ranked, an overall "Risk Level" is established. *Id.* "Risk Levels primarily reflect the structural constraints or security required to house the inmate." *Id.* at 3.

Reynolds is classified at a Level 5 Risk Level, despite receiving a "1" in every category except for "length of sentence" and "severity/violence of the current offense," where he received a "5" and "4" respectively. *See* Reynolds' Classification Review Sheet (Doc. No. 121-25) at 1.[23] The only difference between Reynolds' classification score and Santiago's and Johnson's is the "4" that Santiago and Johnson receive for the "length of sentence" category. *See* Pl's Local Rule 56(a)(1) Stmt. ¶¶ 221, 224. The Defendants classify inmates who have a sentence of more than ten years but less than death as a "level 4" for length of sentence. DOC Classification Manual at 20. To justify that score, the Defendants state that the "[l]enth of sentence is rated since an

---

[23] Reynolds Classification Review Sheet dated April 24, 2018 states: "Escape 1, Length of Confinement 5, Discipline 1, Sev/Viol Offense 4, Detainers 1, Security Risk Group 1, Violence History 1, Overall 5." Doc. No. 121-25 at 1.

inmate facing a long period of confinement may attempt an escape at some point during incarceration."[24] *Id.* at 20.

Even though Reynolds is serving the *same* sentence of life without the possibility of release as Santiago and Johnson, they are given a score of "4" for their "length of sentence" classification, but Reynolds arbitrarily receives a score of "5." That scoring difference allows Santiago and Johnson to obtain an overall Level 4 Risk Level, which enables them to live among the general population at MacDougall and avoid the harsh conditions that Reynolds endures at Northern. The Defendants attempt to explain Reynolds' Level 5 classification by noting that he "may attempt an escape at some point" during his incarnation. *See id.* Yet in his own classification review, Reynolds' escape risk is scored a "1," the lowest possible score. Reynolds' Classification Review Sheet at 1. Scoring Reynolds as a "5" for length of sentence is an irrational classification serving no legitimate purpose. *See Harvey*, 352 F. Supp. 2d at 290.

Based on the foregoing, I conclude that the Defendants have violated Reynolds' rights afforded under the Equal Protection Clause of the Fourteenth Amendment.

## D. The Defendants' Arguments in Opposition

The Defendants present a number of defenses to liability and damages that they contend prevent entry of summary judgment in favor of Reynolds. Each is discussed below.

### 1. *Prison Litigation Reform Act*

Defendants also defend Reynolds' claims by relying on the Prison Litigation Reform Act ("PLRA"), which places limitations on inmates' requests for prospective relief.[25] 18 U.S.C. §

---

[24] Notably, "[t]here are no aggravating or mitigating circumstances for [the length of sentence] factor." DOC Classification Manual at 20.

[25] The statute states in relevant part:

3626.  Defendants argue that the PLRA bars the relief sought because (1) Reynolds' claim does not involve an ongoing constitutional violation and (2) Reynolds' claim for injunctive relief is not "narrowly drawn."  Defs' Mot. at 9.

Reynolds complaint involves not one, but multiple ongoing constitutional violations.  He has demonstrated that his conditions of confinement and his classification as a special circumstances inmate violate his rights afforded by both the Eighth Amendment and Due Process Clause of the Fourteenth Amendment.  In addition, Defendants do not identify how Reynolds' request for injunctive relief is not "narrowly drawn."  In their motion, Defendants state that Reynolds' request for injunctive relief is "not narrowly drawn, extend[s] further than necessary, and [is] not the least intrusive means of addressing [his] allegations."  *Id*.  Defendants, however, offer no legal or factual support for that assertion.

Here, Reynolds requests an order enjoining the Defendants from placing him in the special circumstances conditions of confinement.  He seeks to enjoin any Defendant from imposing high security restraints on him for a period exceeding seven days without providing for individualized meaningful review of those restraints, in accordance with Administrative

---

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--
    **(i)** Federal law requires such relief to be ordered in violation of State or local law;
    **(ii)** the relief is necessary to correct the violation of a Federal right; and
    **(iii)** no other relief will correct the violation of the Federal right . . . .

18 U.S.C. § 3626.

Directive ("A.D.") 9.4.[26]  *See* Pl's Proposed Order (Doc. No. 154) at 1–3.  He also seeks to

enjoin the use of the restrictive conditions of confinement that give rise to his liberty interest.  *Id.*

I hold that Reynolds' requested relief is "narrowly drawn" to remedy the constitutional

violations.  *See Handberry v. Thompson*, 446 F.3d 335, 346 (2d Cir. 2006) ("Although the

PLRA's requirement that relief be narrowly drawn and necessary to correct the violation might at

first glance seem to equate permissible remedies with [legal] minimums, a remedy may require

more than the bare minimum [federal law] would permit and yet still be necessary and narrowly

drawn to correct the violation.  A remedy may be deemed to be properly drawn if it provides a

practicable means of effectuati[on] even if such relief is over-inclusive."  (Internal citations and

quotations marks omitted)).  Contrary to the Defendants' argument, Reynolds does not seek his

release from DOC custody, nor the right to "unmonitored movement."  *See* Defs' Opp. at p. 7.

Defendants also contend that Reynolds failed to exhaust his administrative remedies as

required by the PLRA, in connection with two aspects of his constitutional claims: (1) his mental

health claims and (2) his classification as a special circumstances inmate in accordance with

Section 18-10b.  *See* Defs' Mot. at 2.  The Supreme Court has held that inmates must exhaust

administrative remedies before filing an action in federal court, "regardless of the relief offered

through [those] administrative procedures."  *Booth v. Churner*, 532 U.S. 731, 741 (2001)

(footnote omitted).  The exhaustion requirement "applies to all inmate suits about prison life."

*Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The PLRA's exhaustion requirement, however, is

excused if remedies are in fact unavailable.  *See Ross*, 136 S. Ct. 1850, 1858 (2016).  "[A]n

---

[26] Administrative Directive 9.4 is the DOC Administrative Directive regarding "Restrictive Status."  *See* A.D. 9.4
"Restrictive Status" available at https://portal.ct.gov/DOC/AD/AD-Chapter-9. From 2010 to 2017,  From 2010 to
2017, Reynolds was not allowed out of his cell without full restraints, including handcuffs and ankle chains.  *See*
Pl's Local Rule 56(a)(1) Stmt. ¶¶ 21–24. The Defendants discontinued the restraints policy in September 2017.  *Id.*
at ¶ 21.

administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859.

First, the Defendants contend that Reynolds failed to exhaust his mental health claims. "It is completely disingenuous for [Reynolds] to assert mental health claims when he has never complained about any mental health symptoms, nor filed a grievance regarding alleged lack of mental health care by either Dr. Frayne or Dr. Gagne, or indeed by anyone."[27] Defs' Mot. at 26. Secondly, the Defendants assert that Reynolds also failed to exhaust his remedies regarding Section 18-10b. "[Reynolds] admits he did not exhaust . . . any of his claims with regard to § 18-10b prior to filing this action." Defs' Reply. Br. (Doc. No. 136-11) at 1 (citing *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)).

Although the Defendants indicate that Reynolds has failed to exhaust his administrative remedies, they have not demonstrated that remedies were in fact "available" to Reynolds. Defendants argue that the exhaustion process set forth in DOC Administrative Directive ("A.D.") 9.6, is readily "available" for Reynolds to grieve his conditions of confinement. *Id.* at 3. Indeed, Reynolds used A.D. 9.6 to contest his classification as a level 5 inmate. *See* Doc. No. 121-30.

The Supreme Court recently declared in *Ross* that an administrative remedy is "unavailable" when officers are incapable of providing relief. 136 S. Ct. at 1859. "Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then 'capable of use' for the pertinent purpose." *Id.* (quoting *Booth*, 532 U.S. at 738).

---

[27] Reynolds does not complain about a lack of mental health care. He complains that the extreme conditions of his confinement pose a severe risk to his mental health.

That is precisely the case here.  Section 1 of A.D. 9.6 sets forth the "Policy" purpose of DOC's Administrative Remedy Process. "The Department of Correction shall provide a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority."  A.D. 9.6 "Inmate Administrative Remedies" available at https://portal.ct.gov/DOC/AD/AD-Chapter-9.  Similarly, Section 6(B), which explains the "Grievable Matters" for the "Inmate Grievance Procedure" provides that, "[a]ll matters subject to the Commissioner's authority for which another remedy is not provided are grievable."  *Id*.  But it is undisputed that the Defendants interpret the language of Section 18-10b, which governs Reynolds' classification, as depriving the Commissioner of authority to alter Reynolds' conditions of confinement.  Conn. Gen. Stat. § 18-10b ("The Commissioner of Correction shall place an inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed.").[28]  Although Reynolds grieved his level 5 classification to a unit supervisor on August 4, 2014, Supervisor Bachman responded that the matter was out of DOC's control.  "[Y]our classification cannot be changed unless your sentence is overturned by the courts.  Your placement at Northern is due to your Death Row Status."  *See* Doc. No. 121-30 at 5.  Thus, Reynolds' failure to exhaust is excused because his administrative remedies were in practice "unavailable."[29]

---

[28] As discussed above, the Defendants failed to provide Reynolds with any meaningful review in regard to his reclassification status. Nor is there evidence that any special circumstances prisoner has ever been reclassified.  *See, e.g.,* Defs' Response to Pl's Local Rule 56(a)(1) Stmt. (Doc. No. 131) ¶ 158 ("The defendants are obliged to follow the mandate of Conn. Gen. Stat. §18-10b and there is no provision in the statute for an inmate to be released from this classification.).

[29] Defendants' argument that "futility" is not an exception to the PLRA's exhaustion requirement is based on the Court's decision in *Booth*, 532 U.S. at 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").  The *Booth* Court also noted that the ordinary meaning of the word "available" is "capable of use for the accomplishment of a purpose," and that which "is accessible or may be obtained."  *Id*. at 737 (internal citation and quotations marks omitted).  That definition served the basis for the Court's holding in *Ross*.  *See* 136 S. Ct. at 1859.  Here, Reynolds' grieved his classification to the Commissioner of DOC, and was told the Commissioner is incapable of effectuating any requested remedy.  Under Section 18-10b, as interpreted by the Defendants, Reynolds' conditions are a mandate from the state legislature and therefore out of the Commissioner's authority.

2. *Writ of Habeas Corpus*

Defendants argue that a writ of habeas corpus is the exclusive remedy available to Reynolds because he is ultimately "seeking release from his confinement" at Northern. Defs' Mot. at 87. Because Reynolds' challenge of Section 18-10b implicates "important state policy interests," Defendants avow that a state habeas petition is the appropriate method for Reynolds to present his claims. *Id*. at 93. Defendants cite *State v. Campbell*, where the Connecticut Supreme Court opined that "because the defendant's argument centers on a potential challenge to conditions of confinement, the proper vehicle for those claims is a petition for a writ of habeas corpus." 328 Conn. 444, 463 (2018). Defendants note that Reynolds did file a separate state habeas petition on November 2, 2017.[30] Defs' Reply Br. at 7. In that petition, Reynolds does not challenge the constitutionality of his current conditions of confinement under Section 18-10b. *See* Doc. No. 117-18 at 5 ("In this petition [Reynolds] does not challenge the constitutionality of C.G.S. § 18-10b or the constitutionality of the conditions mandated by C.G.S. § 18-10b, but only the suitability of the statute's application to him.).

Moreover, Defendants rely on *Preiser v. Rodriguez* for the proposition that Reynolds' sole federal remedy is a writ of habeas corpus, after he fully exhausts his state court habeas remedies. 411 U.S. 475, 500 (1973) ("[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.").

---

[30] *See Reynolds v. Commissioner of Correction*, Judicial District of Tolland, CV-18-4009203 (Doc. No. 117-18). In his pending state habeas petition, Reynolds challenges his underlying criminal conviction and argues that Section 18-10b should not apply to him because his death sentence was illegally imposed.

The Defendants' argument fails for two reasons. First, this case is factually and procedurally distinguishable from the *Campbell* case. The *Campbell* Court concluded that a state habeas petition was the appropriate way to address the defendant's challenges to Section 18-10b because his claims were unripe. The Connecticut Supreme Court opined that the habeas court was in a better position to adjudicate the defendant's penalty phase claims (including the defendant's challenges to Section 18-10(b)) because the record presented to the Connecticut Supreme Court was limited.

> [T]he record is insufficient to resolve the defendant's claim that he will be subjected to more severe conditions of confinement . . . . There is no evidence in the record as to whether the commissioner has established a reclassification process pursuant to § 18–10b, or, if such a process has been established, of what it is comprised . . . . [T]he record is devoid of any information as to whether there are other inmates who are similarly situated to the defendant and, if so, under what conditions they are confined and how those conditions differ, if at all, from the defendant's conditions of confinement . . . . In the habeas court, the defendant will have the opportunity to present any and all evidence that is relevant to his claim. That court is empowered to make factual findings on that evidence. This court is not.

*Campbell*, 328 Conn. at 464–66 (internal citations and quotation marks omitted). Here, the record is much more developed. The parties have engaged in voluminous discovery concerning Reynolds' conditions of confinement. Defendants have testified about the reclassification process. Reynolds has brought an Equal Protection claim relying on discovery regarding other similarly situated inmates. In this case, I am able to decide summary judgment based on a voluminous record.

Secondly, *Preiser* does not apply here. In that case, prisoners brought a Section 1983 suit alleging that the defendants acted unconstitutionally in depriving them of good time credits, which would have resulted in their immediate release from custody. The Court held that a federal habeas petition was the exclusive remedy for those circumstances because the prisoners were "challenging the very fact" of their physical imprisonment. *Preiser*, 411 U.S. at 500. The

Court in *Preise*r expressly noted that a Section 1983 action is "a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody." *Id*. at 500. As an example of a permissible Section 1983 action, the Court cited *Haines v. Kerner*, 404 U.S. 519 (1972), where a prisoner claimed that prison officials acted unconstitutionally by placing him in solitary confinement. *Id*. at 498–99. In *Haines*, the prisoner's claims related solely to the State's alleged unconstitutional treatment of him while in confinement. The prisoner did not seek to challenge the very fact or duration of his confinement. *See id.*

In this action, Reynolds is *not* challenging "the very fact or duration of his physical imprisonment," but is rather seeking an order that enjoins the Defendants from placing him on special circumstances high security status. *See* Pl's Proposed Order at 1–3. He is not asking to be released from prison, to have his sentenced shortened, or to be transferred to another institution. Thus, a Section 1983 claim is a proper method for Reynolds to present his claims.

### 3. *Qualified Immunity*

The Defendants argue that, even if Reynolds' conditions of confinement violate a constitutionally protected right, they are entitled to qualified immunity. The defense of qualified immunity, if proven, protects an individual defendant from a claim for money damages; it does not bar injunctive relief. The Defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)

45

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A governmental official is entitled to qualified immunity either where (1) his conduct did not violate a constitutional right or (2) where the right at issue was not "clearly established" at the time of the alleged misconduct. *Id*. at 232. The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first, in view of the particular circumstances surrounding the case to be decided. *See id.* at 236.

Under the second prong, a right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a right be "clearly established" through a binding decision directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "[A] broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards*, 566 U.S. 658, 665 (2012) (internal quotation marks omitted). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

For the reasons discussed above, Reynolds has sufficiently shown that the Defendants' conduct violated Reynolds' constitutional rights, satisfying the first prong of the inquiry.[31] Regarding the second prong, when Reynolds was initially classified and placed in solitary confinement, it was clearly established that inmates have a liberty interest protected by the Fourteenth Amendment in avoiding prison conditions that impose an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Wilkinson*, 545 U.S. at 224

---

[31] *See supra*, Sections IV. A. 2., IV. B. 2., and IV. C. 4.

(citing *Sandin*, 515 U.S. at 483). Those conditions included limited human interaction, no contact social visits, and indefinite duration of assignment. *See id*. at 214–15.

Although there is no case that provides a bright-line rule on how long an inmate may be held in administrative segregation, the Second Circuit held in 2000 that 305 days of confinement in segregated housing was a "sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon*, 215 F.3d at 231. "There are no precise calipers to measure the severity of SHU [segregated housing unit] hardship, but we believe that wherever the durational line is ultimately drawn, 305 days satisfies the standard." *Id.* Thus, both the Supreme Court and the Second Circuit have made clear that inmates have a clearly established right to due process protections to avoid indefinite assignment to administrative segregation.

Defendants argue that their actions were objectively reasonable given the lack of controlling precedent dictating how inmates are to be housed on death row. "A healthy number of Second Circuit opinions address the due process analysis related to atypical conditions of confinement that impose substantial hardship, but only in the context of administrative segregation. None of them discuss death row. Death is different." Defs' Mot. at 17 n. 3. They contend that the cases holding that inmates have due process protections in avoiding solitary confinement are distinguishable because none of those cases concern death row inmates who were subject to automatic maximum-security classification. *See id.*

Defendants, however, have failed to demonstrate why the housing conditions of special circumstances inmates do not impose "an atypical and significant hardship" compared to ordinary prison life in Connecticut. Moreover, the Defendants' conclusory statement that "death is different" is unavailing, especially considering that Reynolds is no longer a death row inmate.

*See* JSUF ¶ 64.  Moreover, even if death is different as a form of punishment, it does not follow that death row – or former death row – is "different" with respect to a conditions of confinement claim.  Given the holdings in *Wilkinson* and *Colon* no reasonable official could believe that placing an inmate in administrative segregation indefinitely without a meaningful hearing could be lawful.  The conditions of confinement, social isolation, and length of assignment in those cases closely mirror Reynolds'.

Accordingly, the Defendants are not entitled to qualified immunity.

E.  Connecticut General Statutes Section 18-10b is an Unconstitutional Bill of Attainder

Reynolds also contends that Section 18-10b, which mandates that former death row inmates in Connecticut be placed under "special circumstances" status, is an unconstitutional Bill of Attainder.

Article I, section 10 of the United States Constitution declares "[n]o State shall . . . pass any Bill of Attainder [or] ex post facto Law."  U.S. Const. art I. § 10, cl. 1 "Briefly stated, a constitutionally proscribed bill of attainder is 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'"  *Consolidated Edison Co. of New York v. Pataki*, 292 F.3d 388, 346 (2d Cir. 2002) (quoting *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 468 (1977)).  In other words, the Constitution bars the imposition of punishment resulting from "trial by legislature."  *United States v. Brown*, 381 U.S. 437, 442 (1965).

The Supreme Court has stated that to determine "whether a particular statute is a bill of attainder, the analysis necessarily requires an inquiry into whether the three definitional elements—[1] specificity in identification, [2] punishment, and [3] lack of a judicial trial— are contained in the statute."  *United States v. O'Brien*, 391 U.S. 367, 383 n.30 (1968); *see*

*also ACORN v. United States*, 618 F.3d 125, 135–36 (2d Cir. 2010) (identifying the same three elements).

1.  *Specificity in Identification*

Section 18-10b applies to any inmate "convicted of the class A felony of murder with special circumstances committed on or after April 25, 2012 . . . and sentenced to a term of imprisonment of life imprisonment without the possibility of release" as well as any inmate "in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012 . . . for which a sentence of death is imposed . . . and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction, or (B) commuted to a sentence of life imprisonment without the possibility of release." Conn. Gen. Stat. § 18-10b(a).

Prior to the passage of Section 18-10b, the eleven inmates sentenced to death prior to April 25, 2012 were a known group, and the legislature specifically identified that group as the target of the statute during debate in the Judiciary Committee. "The bill that we have before us has yet to be determined whether or not it's constitutional. But you see here is the rub. Many people are making their decision on whether or not to vote for this because they are trusting that even if they -- it passes, *those 11 animals* on death row will die -- to go to bed, rest easy, think about that." 55 H.R. Proc., Pt. 4, 2012 Sess., p. 87 (statement of Rep. Cafero) (emphasis added); *see also id*., p. 281 (statement of Sen. Kane) ("Because these 11 individuals, according to this bill, will still get the death penalty or so we believe . . . . ").

It undisputed that Reynolds was specifically mentioned by name throughout the legislative debate of Public Act 12-5 entitled "AN ACT REVISING THE PENALTY FOR CAPITAL FELONIES," later codified as Conn. Gen. Stat. § 18-10b(a). For example,

Representative Adinolfi mentioned Reynolds during the March 14, 2012 Joint Standing

Committee Hearings.

> But I think I could bend, although I don't want to, if we gave them solitary confinement
> for life.  That is, stay in death row just where they are and change the name.  Don't give
> them all the recreation.  Let's punish them for their crimes . . . . You have Richard
> Reynolds, who is [convicted of] murdering Waterbury Police Office Walter T. Williams.

Conn. J. Standing Comm. Hearing, Jud. Pt. 8, 2012 Sess. p. 62 (statement of Rep. Adinolfi).

Similarly, Representative Davis, in an April 11, 2012 speech during the General

Assembly proceedings, specifically identifies Reynolds as a "New York City crack dealer."

> But before I finish, I'd like to bring attention to one particular inmate on death row.  And
> the Representative from Waterbury was very eloquent in his discussion of this particular
> case that of New York City crack dealer Richard Reynolds.  Richard Reynolds murdered
> a Waterbury police officer named Walter Williams in cold blood on the streets of
> Waterbury. Now, this is something that is very personal to me.

55 H.R. Proc., Pt. 4, 2012 Sess., pp. 224–25 (statement of Rep. Davis).

There is no doubt that the specificity in identification element is met.

### 2.  *Punishment*

Reynolds argues that the "punishment" element is satisfied because legislators described

in detail the punitive nature of the proposed conditions the statute would impose on special

circumstances high security inmates.

Courts consider three factors in determining whether a statute inflicts "punishment" on

specified individuals:  "(1) whether the challenged statute falls within the historical meaning of

legislative punishment (historical test of punishment); (2) whether the statute, 'viewed in terms

of the type and severity of burdens imposed, reasonably can be said to further nonpunitive

legislative purposes' (functional test of punishment); and (3) whether the legislative record

'evinces a [legislative] intent to punish' (motivational test of punishment)."  *ACORN*, 618 F.3d at

136 (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852

(1984)).  All three factors do not need to be satisfied to prove that a particular law constitutes "punishment."  *Id.*  Instead, the three factors are weighed together when analyzing a bill of attainder claim.  *Id.*

    a.   Historical Test of Punishment

"The Supreme Court has recognized that certain types of punishment are 'so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of the [Bill of Attainder Clause]."  *ACORN*, 618 F.3d at 136 (quoting *Nixon*, 433 U.S. at 473).  "The classic example is death, but others include imprisonment, banishment, the punitive confiscation of property, and prohibition of designated individuals or groups from participation in specified employments or vocations."  *Id.* (quoting *Consol. Edison Co*., 292 F.3d at 351).

The conditions of confinement set forth in Section 18-10b undoubtedly constitute a traditional form of punishment that is "considered to be punitive per se."  *Consol. Edison Co*., 292 F.3d at 351.  The statute directs the DOC Commissioner to "house [special circumstances] inmate[s] in administrative segregation" until a classification process is completed.  Conn. Gen. Stat. § 18-10b(a).  Those inmates are subjected to the most restrictive form of incarceration available within the State of Connecticut.  As discussed above, special circumstances inmates are also banned from certain prison employment, intramural recreational opportunities, and contact social visits.  The historical test easily weighs in Reynolds' favor.

    b.   Functional Test of Punishment

Under the functional test, the court considers whether the challenged statute "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes."  *Nixon*, 433 U.S. at 475–76 (footnote omitted).  "It is not the severity of a

statutory burden in absolute terms that demonstrates punitiveness so much as the magnitude of the burden relative to the purported nonpunitive purposes of the statute." *Foretich v. United States*, 351 F.3d 1198, 1222 (D.C. Cir. 2003). "Where a statute establishing a punishment declares and imposes that punishment on an identifiable party . . . we look beyond simply a rational relationship of the statute to a legitimate public purpose for less burdensome alternatives by which the legislature could have achieved its legitimate nonpunitive objectives." *ACORN*, 618 F.3d at 138 (quoting *Consol. Edison Co*., 292 F.3d at 350).

Section 18-10b does not have a nonpunitive purpose. It was expressly created to punish inmates on Connecticut's death row for their underlying crimes. To the extent that the Defendants argue that Section 18-10b is a "reduction" in punishment to individuals who were previously facing the death penalty, that argument is contrary to Section 18-10b's legislative history. *See* Defs' Mot. at 86. Section 18-10b was enacted to keep death row inmates in administrative segregation indefinitely, if they were ever resentenced to life without the possibly of release.

> So the underlying amendment [Section 18-10b] and what this amendment does is say, "Well, if we're going to take away the sword of Damocles hanging over your head, the notion that you can wake up at any given day and your appeals have run out and you're going to take a walk to the death chamber, in exchange for that, knowing that as long as God wills you to be alive you will exist on this earth, then your time in corrections is going to be a little harder as an appropriate punishment for the time[] that you are served."

55 S. Proc., Pt. 3, 2012 Sess., p. 154 (statement of Sen. Kissel).

Therefore, I find that the functional test of punishment weighs in Reynolds' favor.

### c. Motivational Test of Punishment

"The legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish."

*ACORN*, 618 F.3d at 141.  Statements by only a "smattering of legislators" will not establish

evidence of punitive intent by the legislature.  *Id.*  Rather, "only the clearest proof could suffice

to establish the unconstitutionality of a statute on such a ground."  *Flemming v. Nestor*, 363 U.S.

603, 617 (1960).

The legislature record of Section 18-10b offers much more than a "smattering" of

punitive intent.  The extensive legislative history establishes unequivocally that Section 18-10b

was intended to punish the eleven inmates who were on Connecticut's death row by subjecting

them to the harshest conditions available.  For example, Senator Looney in his address to the

Joint Standing Committee made it crystal clear that Section 18-10b was intended to inflict

additional punishment for the inmates on death row who were resentenced to life.  "I think that

someone serving a sentence without the possibility of release should be subject to the harshest

possible constitutional conditions that could be imposed on someone."  Conn. J. Standing

Comm. Hearing, Jud. Pt. 8, 2012 Sess., p. 93 (statement of Sen. Looney).

> [I]n anticipation of a change in the circumstance of the 11 people currently on death row .
> . . . what this language in this amendment provides for is that . . . for those people, they
> will not be returned to the general prison population, but will in fact be subject to the new
> conditions that are being designated in this bill with the amendment . . . [W]hat we are
> trying to provide for in the bill and the amendment [Section 18-10b] is a more restrictive
> set of circumstances for those in the future who will be serving the maximum sentence in
> Connecticut.

*Id.* at 79–80.

Several of Senator Looney's colleagues joined in explaining the punitive nature of

Section 18-10b.

> The death penalty doesn't bring back the victims of their crimes.  And we certainly can
> punish criminals and protect the public safety without it.  But people don't get me wrong,
> these people have committed horrible crimes and they deserve to be punished.  And with
> the amendment that was offered at the beginning of this debate [Section 18-10b], we will
> have a very severe punishment, a punishment so horrible at least one person chose to die
> instead.

55 S. Proc., Pt. 3, 2012 Sess., p. 154 (statement of Sen. Slossberg).

> I did go to Northern and saw death row and saw how horrible it is there and spending life in prison without the possibility of parole on death row in a situation that is just like death row is very, very, very, severe punishment. So – and that was our Amendment [Section 18-10b].

55 S. Proc., Pt. 3, 2012 Sess., p. 296 (statement of Sen. Prague).

> And while some would say doing this bill may be soft on crime, I'd just like to remind those, you know, those of you about Northern Prison, death row. To me, that is hell on earth. How one retains his sanity in an environment like that is incomprehensible. And the amendment that we approve tonight [Section 18-10b] . . . really presents to us, I believe, the right way to go.

55 S. Proc., Pt. 3, 2012 Sess., p. 306 (statement of Sen. Crisco).

> Madam Speaker, we've heard a lot of very eloquent debate today. And part of the conversation around the argument for the abolishment of the death penalty is that, one, life and imprison -- life in prison is actually worse or even more punitive than being put to death. But, for me, these individuals are the most vile in our society and because of their choices and their behaviors, they will have received Connecticut's maximum sentencing for prison[.]

55 H.R. Proc., 2012 Sess., p. 162 (statement of Rep. Hovey).

> I have got to tell you, the mere fact of walking outside and looking up to the sky and feeling air on your face, the mere fact that even through maybe six inches of glass you could look at a loved one and watch them grow is a privilege. It's a privilege, and I'm not sure it's one people convicted of the kind of crimes we define are entitled to.

55 H.R. Proc., 2012 Sess., p. 90 (statement of Rep. Cafero).

The above statements exemplify a record that reflects "overwhelmingly a clear legislative intent to punish" death row inmates through more restrictive conditions. *ACORN*, 618 F.3d at 141. The motivational purpose test also favors Reynolds.

3. *Lack of a Judicial Trial*

The final element of a bill of attainder claim is the lack of a judicial trial. *See O'Brien*, 391 U.S. at 383 n.30. Here, Reynolds argues that he was never afforded a judicial proceeding

before being subjected to the punishment mandated by Section 18-10b. *See* Pl's Mot. at 56–57. In response, the Defendants state that Reynolds' initial criminal trial served as an adequate judicial forum to adjudicate his rights regarding Section 18-10b. *See* Defs' Mot at 95. "It is undisputed that [Reynolds] was found guilty after a two-part trial . . . . [Reynolds] cannot reasonably argue that he was legislatively found guilty without the benefit of a judicial trial." *Id.*

There is no language in the text of Section 18-10b that affords Reynolds a judicial proceeding. Defendants' argument fails because Section 18-10b is not a penal statute, but a directive from the state legislature to the DOC. During Reynolds criminal trial he was found guilty of "one count of capital felony in violation of General Statutes (Rev. to 1991) Section 53a–54b (1) [32] and one count of murder in violation of General Statutes Section 53a–54a (a).[33] *State v. Reynolds*, 264 Conn. 1, 15 (2003). He was neither convicted nor sentenced pursuant to Section 18-10b because Section 18-10b did not exist. It was enacted in 2012, well after Reynolds' original criminal trial. Quite simply, Reynolds was not afforded a judicial trial regarding the punishment inflicted by Section 18-10b.

---

[32] General Statutes (Rev. to 1991) Section 53a–54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (1) [m]urder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29–18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman ... while such victim was acting within the scope of his duties. . . . ."

[33] General Statutes Section 53a–54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

For the reasons stated above, I declare that Connecticut General Statutes Section 18-10b is an unconstitutional bill of attainder.[34]  Because I conclude that Section 18-10b is an unconstitutional bill of attainder, I do not reach the issue of whether Section 18-10b also violates the Ex-Post Facto Clause.

F.  <u>Reynolds is Entitled to Injunctive Relief</u>

Lastly, Reynolds has proven that he is entitled to permanent injunctive relief.

1.  *Irreparable Harm*

Reynolds' current condition of confinement poses a serious, continuing risk of harm to his mental health.  The Defendants deprive him of contact social visits and meaningful social interaction.  He is unable to engage in numerous educational and recreational programming that is offered to other inmates under the custody of DOC.  He is placed in those conditions indefinitely without any meaningful reclassification hearing.  Money damages are wholly inadequate to address those harms.  Without injunctive relief, he will continue to be subjected to severe, atypical, and unconstitutional conditions.

2.  *Actual Success on the Merits*

As discussed above, Reynolds succeeds on the merits on multiple constitutional claims. His conditions of confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment.  Defendants do not offer him procedural protections in violation of his due process

---

[34] I recognize that, as a general rule, federal courts should avoid reading state statutes concerning public safety in a manner that renders them unconstitutional.  *See Vizio, Inc. v. Klee*, 2016 WL 1305116, at *6 (D. Conn. Mar. 31, 2016) ("In particular, 'regulations that touch upon safety . . . are those that the [Supreme] Court has been most reluctant to invalidate.'") (quoting *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670 (1981)).  In this case, however, state legislators passed Section 18-10b recognizing that it might not pass constitutional scrutiny. *See* 55 H.R. Proc., Pt. 4, 2012 Sess., p. 187 (statement of Rep. Cafero) ("But as it stands right, now [the death penalty is] constitutional.  The bill that we have before [Section 18-10b] us has yet to be determined whether or not it's constitutional.").  Because the statute manifestly constitutes a bill of attainder, I feel compelled to hold that it is unconstitutional.

rights afforded under the Fourteenth Amendment.  His confinement compared to other similarly situated prisoners violates his rights under the Equal Protection clause.  Finally, the statute that directs the DOC Commission to impose those onerous conditions on Reynolds is an unconstitutional bill of attainder.

## V.      Conclusion

For the reasons stated above, **I grant** Reynolds' Motion for Summary Judgment (Doc. No. 119) and **deny** the Defendants' (Doc. No. 117).  Reynolds is entitled to declaratory and injunctive relief.  A separate injunction order shall issue.  A hearing in damages will follow to determine the scope and amount of liability of each defendant.

So ordered.

Dated at Bridgeport, Connecticut, this 27th day of August 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge