**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RICHARD REYNOLDS, ) | |
| ) | |
| Plaintiff, ) | Case No.: 3:13-cv-1465 (SRU) |
| ) | |
| v. ) | |
| ) | |
| LEO ARNONE, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE</u>

Plaintiff requests orders *in limine* with respect to several matters that can reasonably be addressed before trial and will help set the trial's parameters. This memorandum addresses the following items:

1. Plaintiff moves for an order allowing him to seek damages as of July 2009, the first date that one of the defendants, Angel Quiros, assumed a relevant position of responsibility. This case was filed in October 2013 and the limitations period for Section 1983 claims in Connecticut is three years, *see Williams v. Walsh,* 558 F.2d 667, 669-70 (2d Cir. 1977). That period is extended here by the continuing-violation doctrine. *See Lucente v. Cty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020).

Plaintiff also moves to preclude evidence of the following matters:

2. The details of Plaintiff's crime of conviction, and any prior convictions or arrests.

3. Plaintiff's disciplinary history prior to 1999 (ten years before the liability period) and for the time following the liability period.

4. Opinion, expert or otherwise, about whether the term "solitary confinement" accurately describes the conditions in which Plaintiff was held at Northern Correctional Institution.

5. Purported expert opinion about Plaintiff's psychological condition. Plaintiff has not been evaluated psychologically since his incarceration.

6. Plaintiff's medical records. Plaintiff does not contend that he is mentally ill or that deprivation of mental healthcare violated his constitutional rights.

7. Testimony or argument that any of the conditions of Plaintiff's confinement were authorized or permissible punishment for his offense.

8. Cumulative testimony from six defense witnesses regarding Plaintiff's conditions of confinement.

9. Testimony from Michelle Deveau concerning Plaintiff's sentencing and resentencing. The parties have stipulated to the facts of Plaintiff's sentencing and resentencing.

10. Cumulative testimony concerning DOC classification and procedures.

11. The portion of a photo of his cell showing the title on the cover of the novel "Clockers," by Richard Price (because it is about drug dealers in Brooklyn and potentially prejudicial).

We address these items in turn. Plaintiff reserves the right to move to preclude other evidence.

## I.  Plaintiff Should be Able to Seek Damages Beginning in July 2009 for Continuing Violations of His Constitutional Rights

Plaintiff may seek damages for injury that preceded the statutory limitations period because Defendants violated his constitutional rights continuously from 1999 until 2021. Throughout that period, Defendants persisted in the same course of wrongful conduct—confining Plaintiff in inhumane conditions without meaningful review. The continuing nature of the violation permits Plaintiff to recover for all harm

suffered at the hands of Defendants during that span. Plaintiff is entitled to recover for harm suffered as early as July 2009, when Defendant Angel Quiros became the Warden at Northern Correctional Institution.

A. **The Continuing-Violation Doctrine Allows a Plaintiff to Recover Damages That Precede the Limitations Period**

The continuing-violation doctrine creates an exception to statutes of limitations. State law determines the statute of limitations for § 1983 claims like the ones brought here. *See, e.g., Wallace v. Kato,* 549 U.S. 384, 387 (2007). In Connecticut, that limitations period is three years. *See, e.g., Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005). By contrast, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace*, 549 U.S. at 388 (emphasis in original). The default rule is that a claim accrues once a plaintiff knows or has reason to know of the injury that is the basis of his action. *See, e.g., Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir. 2002). Where the claims are "composed of a series of separate acts that collectively constitute one unlawful ... practice," however, the knew-or-should-have-known accrual date does not apply. *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020). In such a case, a plaintiff may seek relief beyond the limitations period so long as at least one non-time-barred act contributed to the violation. *See id.*

This continuing-violation doctrine applies to constitutional claims brought under § 1983. *See id; Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 291-92 (2d Cir. 2013) (applying doctrine to Equal Protection claim); *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (applying doctrine to Eighth Amendment deliberate indifference claim); *Rivera v. Comm'r of Dep't of Corr.,* No. 3:20-CV-1333 (SRU), 2021 WL 293254, at *3 (D. Conn. Jan. 27, 2021) (applying doctrine to Eighth Amendment claim). To establish a continuing violation stemming from conditions of confinement, a plaintiff must show an ongoing policy of unconstitutional confinement and some

non-time-barred acts that furthered that policy. A claim subject to this doctrine continues to include new wrongful acts for as long as the defendant perpetuates the misconduct.

Proof of a continuing violation likewise permits a plaintiff to recover *damages* for injury suffered prior to the limitations period on account of that violation. *See, e.g., Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 155, 159 (2d Cir. 2012) ("Pursuant to the district court's conclusion that the continuing violation doctrine was applicable to plaintiffs' disparate impact proof, however, the jury was permitted to assess damages for failures to promote occurring outside the limitations period.") (reversing award of damages only because "continuing violation does not apply to plaintiffs' disparate impact proof"); *Pollis v. New Sch. for Soc. Research.*, 132 F.3d 115, 118 (2d Cir. 1997) ("The continuing violation doctrine allows a plaintiff in certain circumstances to recover on the basis of an ongoing policy or practice of illegal activity initiated prior to the limitations period.").

### B.    Plaintiff's Eighth Amendment and Due Process Claims Address Continuing Violations

Plaintiff's claims under the Eighth Amendment and the Due Process Clause[1] involve a single unlawful practice that persisted over many years. *See Lucente*, 980 F.3d at 309. Defendants placed Plaintiff on death row at Northern on March 30, 1995. Between 1995 and this Court's grant of summary judgment in August 2019 (the end date for Plaintiff's claim), and even beyond, Defendants kept Plaintiff in one of two housing units at Northern: One East (from 1995 to 2012) and One West (from 2012 to August 2019 and beyond). Dkt. 121-2 (Affidavit of Richard Reynolds in Support of Summary Judgment) ¶¶ 5, 7. Plaintiff was confined to a 12' x 7' cell with one small window and a slot for guards to observe him in a building made of metal and concrete

---

[1] Plaintiff's Equal Protection claim challenges differential treatment following his re-sentencing on April 25, 2017 and is timely without regard to the continuing violation doctrine.

materials that amplified sound and subjected him to extreme temperatures. *Id.* ¶¶ 9-10.

The evidence at trial will show that these conditions remained largely the same between 1999 and 2016—with additional restrictions being added in 2010 in response to the conduct of a different inmate—after which some restrictions were lifted. Defendants denied Plaintiff physical contact during his social visits during the entire span. *Id.* ¶ 4. From 1999-2015, Plaintiff was locked in his cell for breakfast, lunch, and dinner. *Id.* ¶ 22. From 1999-2015, all of Plaintiff's recreation—as it was called—was solitary. *Id.* ¶ 23. This one hour was the only time Plaintiff was allowed out of his cell, except for showers and professional or social visits. *Id.* From 2010 to2017, Defendants shackled Plaintiff in restraints every time he left his cell. *Id.* ¶ 28. At no time between 1999 and the end of the liability period in August 2019 (or indeed until 2022) did Defendant provide Plaintiff with notice or a hearing at which he could contest the conditions of his confinement. *Id.* ¶¶ 37-39, 53-55.

In sum, the conditions that give rise to Plaintiff's claims under the Eighth Amendment and Due Process Clause persisted from 1999 until 2016—except that they got even worse in 2010—and did not significantly change thereafter. At all times, these conditions constituted an "atypical and significant hardship" that gave rise to a liberty interest under the Due Process Clause. *See Wilkinson v. Austin* 545 U.S. 219, 233 (2005). At all times, these conditions deprived Plaintiff of a "basic human need" for social interaction in violation of the Eighth Amendment. *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). Throughout this span, Defendants housed Plaintiff in inhumane conditions and denied him his right to a hearing. Each Defendant contributed to the same ongoing policy of unconstitutional confinement, which was in place continuously during the 2009-August 2019 liability period. That policy constitutes a single unlawful practice and therefore qualifies as a continuing violation. *See Lucente*, 980 F.3d at 309.

Because these policies were in place for years before 2009, Plaintiff would be entitled to seek damages for earlier years as well. *See Chin*, 685 F.3d at 159. The earliest personal involvement of a named defendant, however, is July 2009. That is when Defendant Quiros became Warden of Northern. *See* Dkt. 117-4 ¶ 3 (Declaration of Angel Quiros). Plaintiff may thus seek damages dating back to July 2009 for his Due Process and Eighth Amendment claims.

On the Due Process claim, Plaintiff seeks damages from July 2009 until May 18, 2017, when he was re-classified from death row to special-circumstances status. On the Equal Protection Claim, Plaintiff seeks damages from his re-sentencing on April 25, 2017 until August 27, 2019, when this Court granted him summary judgment on all of his claims. With respect to the Eighth Amendment claim, Plaintiff seeks damages from July 2009 until August 27, 2019.

## II.   Defendants Should Be Precluded from Admitting the Details of Mr. Reynolds's Crime into Evidence

Plaintiff's crime of conviction occurred in 1992. The specific facts concerning the crime have no relevance to the constitutionality of the conditions in which Defendants confined Plaintiff, and even if there were some marginal relevance, it would be outweighed by the danger of unfair prejudice. Rule 609 also bars admission of those facts for impeachment purposes.

### A.   The Facts of Plaintiff's Crime Are Inadmissible Under Rules 401 and 403

Plaintiff's crime of conviction is relevant only insofar as it relates to Defendants' reasons for keeping Plaintiff in isolated confinement. Defendants based that decision wholly on the statute of conviction and the length of sentence. Further details of Plaintiff's crime are thus irrelevant.

The record makes clear that Defendants placed Plaintiff at Northern because of his security classification. That placement in turn determined the conditions of his confinement. Defendants determined Plaintiff's security classification by calculating

his "Overall Risk Level," as defined in the Connecticut Department of Correction Objective Classification Manual.[2] The seven factors that determine an inmate's overall risk level are: 1. Escape Profile; 2. Severity/Violence of the current offense; 3. History of Violence; 4. Length of sentence; 5. Presence of pending charges and/or detainers; 6. Discipline history; and 7. Security Risk Group membership. *See* Dkt. 121-24 (Classification Manual) at 6. Only two of those categories relate to Plaintiff's crime—"severity/violence of the current offense" and "length of sentence."

The underlying facts of an inmate's crime have no bearing on either category. Defendants determined the seriousness and level of violence of an offense according to the statute under which the inmate is confined. The two crimes for which Plaintiff was convicted—Murder and Capital Felony—automatically result in a Level 4 for seriousness of offense. *Id.* at 10. Consistent with the manual, Defendants always classified Plaintiff as a Level 4 for seriousness of offense. *See* Dkt. 121-25 (Reynolds Classification Documents). A sentence of death likewise results in an automatic Level 5 rating for length of sentence. Dkt. 121-24 at 20. Plaintiff's classification review sheets again confirm the automatic nature of the classification. Dkt. 121-25.

In sum, there is no evidence that any facts underlying the crime motivated Defendants to keep Plaintiff in isolated confinement at Northern.

The relevant information for the jury to consider is 1) identification of the crime of Plaintiff's conviction: one count of capital felony and one count of murder; and 2) his sentence. No other details of that crime, including the identity of the victim, are relevant.

---

[2] Pursuant to the manual, "The overall classification profile of the inmate will determine the appropriate facility assignment, supervisory approach, housing assignment, accessibility to the community, and program or job placement. Although the objective classification instrument may not determine the specific facility, housing, or program assignment, the ratings will determine eligibility for these assignments and in most cases effectively place the inmate in the best available location." Dkt. 121-24 at 3.

Nor are those details relevant to Plaintiff's equal protection claim. Plaintiff is similarly situated to Eduardo Santiago and Terry Johnson because "all three prisoners: (1) were convicted of murder and initially sentenced to death; and (2) after their sentences of death were reversed, were resentenced to life in prison without the possibility of release." *Reynolds v. Quiros*, 990 F.3d 286, 300–01 (2d Cir. 2021). Any argument that the circumstances of Plaintiff's crime of conviction justify treating him differently from Santiago and Johnson is precluded as a matter of law. The Second Circuit ruled on this very issue, concluding that "we see no differences between the underlying crimes of conviction in the instant case sufficient to justify discrepant treatment." *Id.* at 301. That ruling governs these proceedings as law of the case. *See, e.g., United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("The law of the case doctrine …. requires a trial court to follow an appellate court's previous ruling on an issue in the same case.").

The facts of Plaintiff's crime are irrelevant and, therefore, inadmissible. Fed. R. Evid. 401. But as we now explain, even if those facts had some marginal relevance, that relevance would be outweighed by the grave danger of unfair prejudice. Fed. R. Evid. 403. Plaintiff was convicted of fatally shooting a Waterbury police officer while carrying drugs. In the current political climate, the issue of police-civilian violence is both contentious and polarizing. There is a risk that testimony about murder of a police officer would bias members of the jury against Plaintiff. On balance, those facts should be excluded.

## B.   The Facts of the Crime Are Inadmissible Under Rule 609

Defendants should not be permitted to present evidence of the factual circumstances of Plaintiff's crime of conviction for impeachment purposes. Although the Federal Rules mandate the admission of criminal convictions that were punishable by death, Fed. R. Evid. 609(a)(1)(A), this mandate extends only to "the essential facts of the conviction, including the nature or statutory name of each

offense, its date, and the sentence imposed . . . subject to balancing under Rule 403." *See United States v. Estrada*, 430 F.3d 606, 616 (2d Cir. 2005). A court has discretion "to limit, under Rule 609(a), evidence of the underlying facts or details of a crime of which a witness was convicted." *Id*. That limitation is proper here because Plaintiff's crime of conviction did not involve any dishonest act or false statement that would cast doubt on his character for truthfulness. Details of the crime will not help the jury evaluate Plaintiff's honesty. Moreover, any connection between that crime and Plaintiff's truthfulness is attenuated to extinction by the thirty years that have elapsed since the crime.

For the same reasons, any evidence of Plaintiff's prior arrests or convictions is inadmissible.[3] Defendants propose exhibits—Plaintiff's "master file" and his presentence investigation report—that likely contain details of Plaintiff's prior criminal history. Federal Rule of Evidence 609 creates a presumption that evidence of criminal acts will be excluded if more than ten years have passed since the witness's conviction or release from confinement. That bar applies to Plaintiff's prior criminal history, which necessarily occurred prior to his 1992 arrest. Under Rule 609(b), such evidence is admissible to attack the credibility of a witness only if, as applicable here, "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." That standard is not satisfied here because Plaintiff's prior criminal history bears no relation to his conditions of confinement. Those conditions were determined wholly by Plaintiff's sentence for his crime of conviction. The Second Circuit rule, announced repeatedly, is that "'convictions over ten years old be admitted very rarely and only in exceptional circumstances.'" *Scotto v. Brady*, 410 F. App'x 355, 360 (2d Cir. 2010) (quoting *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993)). No such

---

[3] Plaintiff's criminal record includes prior convictions for armed burglary and violations of parole, as well as arrests for drug charges.

exceptional circumstances exist with respect to unrelated events that occurred more than three decades ago. No evidence or testimony of Plaintiff's pre-1992 criminal record should be admitted.

### III. Defendants Should Be Precluded from Introducing Evidence of Plaintiff's Disciplinary History More than Ten Years Before the Liability Period

Evidence of Plaintiff's disciplinary record from the time more than ten years before the liability period[4]—i.e., before July 1999—is inadmissible under Rules 401, 403, and 608.

Plaintiff's ancient disciplinary record has no bearing on Defendants' decision to house him in prolonged isolated confinement. As noted above, Defendants *automatically* classified Plaintiff as a risk level 5 because of his sentence. *Supra*, 6-7. Plaintiff's classification documents demonstrate that he consistently received the lowest (best) score of 1 for the category of discipline. *See* Dkt. 121-25. Plaintiff's disciplinary history for some reasonable period prior to the liability period is relevant insofar as it bears on the legitimacy of the treatment imposed on him during the liability period. For the same reason, treatment after the liability period is irrelevant.

We flag a 1998 disciplinary incident. That year, Plaintiff pled guilty to a violation of "Contraband Class A" based on his possession of the headband of headphones; he had sharpened one end to use as a screwdriver for his electronics. *See* Dkt. 132-6 (Supplemental Declaration of Richard Reynolds) ¶ 2. He was punished, principally with seven days of punitive segregation. Dkt. 121-35 (Reynolds Disciplinary History). *Id.* Defendants have claimed that it was a homemade weapon, Dkt. 117-27 ¶ 40. Elsewhere they have described it as a "shank." *See* Ex. 1[5] (April 2010 Death Row Review). But there is no evidence that Plaintiff intended to use the

---

[4] The liability period is July 2009 to August 2019.
[5] All exhibits cited by Plaintiffs are attached to the Declaration of Tyler Finn filed alongside this motion.

band object as a weapon. Given the flexibility of headphone bands it would be less suitable for that purpose than, for example, a pen or pencil. In any case, there is no plausible connection between that ancient incident and Defendants' imposition of isolated confinement for the next twenty-one years. Because the (nonexistent) relevance of any long-prior disciplinary incidents is substantially outweighed by the potential for prejudice, this evidence should be precluded pursuant to Rule 403.

Nor is Plaintiff's pre-1999 disciplinary history admissible for impeachment purposes. Rule 608 limits the admissibility of prior bad acts in order to attack a witness's character for truthfulness. "[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Testimony about Plaintiff's possession of contraband has no bearing on his character for truthfulness. Indeed, *none* of Plaintiff's infractions involved lying or other deceptive behavior. Possession of contraband is far afield from the behavior which courts have found to be probative of truthfulness or untruthfulness.[6] Defendants should be barred from introducing any such evidence.

This Court should limit evidence of Plaintiff's disciplinary history to the period from July 1999 to August 2019.

---

[6] *See Hynes v. Coughlin*, 79 F.3d 285, 293–94 (2d Cir. 1996) ("*See generally* 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6117 (1993). Under this Rule, we have upheld, for example, cross-examination into an attorney's disbarment, *see United States v. Weichert*, 783 F.2d 23, 25 (2d Cir.) *cert. denied*, 479 U.S. 831, 107 S. Ct. 117, 93 L.Ed.2d 64 (1986), into a witness's failure to disclose a prior arrest on his bar application, *see United States v. Schatzle*, 901 F.2d 252, 255–56 (2d Cir.1990), and into a prior finding by an Immigration Judge that the witness's testimony in a deportation proceeding was not credible, *see United States v. Bagaric*, 706 F.2d 42, 65 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S. Ct. 133, 78 L.Ed.2d 128 (1983*); see also United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995) (upholding cross-examination about a defendant's alleged acts of fraud, bribery, and embezzlement).").

## IV.     Defendants' Expert Saathoff Should be Excluded from Offering Any Opinion About "Solitary Confinement" or Plaintiff's Psychological Condition

Defendants should be precluded from eliciting any testimony from their proposed medical expert Dr. Gregory Saathoff that the special circumstances unit at Northern did not represent a "solitary confinement environment." Dr. Saathoff's testimony is not "the product of reliable principles and methods" nor will it "help the trier of fact to understand the evidence or determine a fact in issue," Fed. R. Evid. 702. Rule 702 thus mandates exclusion of any such opinion. Even more fundamentally, Plaintiff does not insist on the term "solitary confinement." "Isolated confinement," the term more recently adopted by the State of Connecticut, fits the bill.[7]

In any case, Dr. Saathoff has neither the qualifications nor a factual basis to form a reliable opinion concerning whether Plaintiff was housed in conditions of "solitary confinement." A party offering expert testimony must establish that (1) the expert is qualified; (2) the testimony is based on sufficient facts or data; and (3) the testimony is the product of reliable principles and methods. *See* Fed. R. Evid. 702; *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Dr. Saathoff's opinion fails that test for at least three reasons.

*First*, conditions of confinement fall outside his area of expertise, which is limited to medical questions. Dr. Saathoff is a psychiatrist by profession whose practice focuses on mental-health evaluations and treatment for prisoners. Dkt. 117-10 at 2 (Saathoff's Expert Report). Earlier in this case he purported to provide an opinion "within a reasonable degree of *medical certainty* that the special

---

[7] Connecticut General Statute § 18-96b prohibits placement of a person in "isolated confinement" for more than fifteen consecutive days. Conn Gen. Stat. § 18-96b(e)(2). The statute defines "isolated confinement" to mean "any form of confinement of an incarcerated person within a cell" with less than four hours per day of time out of cell. *Id.* § 18-96b(a)(7)(A).

circumstances unit at [Northern] does not represent a solitary confinement environment." *Id.* at 8 ¶ 22 (emphasis added). Yet in deposition, Dr. Saathoff conceded that whether conditions constitute solitary confinement is "not a medical question." Dkt. 132-2, 271:5-10. His report likewise fails to explain how his background in psychiatry qualifies him to assess prison conditions. His testimony on the subject is therefore inadmissible as expert evidence. *See N.K. v. Abbott Labs.*, 2017 WL 2241507 (E.D.N.Y. May 22, 2017) (noting that "[a]n expert, although generally qualified, may not be competent to render opinions under the circumstances of a particular case which are outside the expert's area of expertise."); *see also Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 202 (D. Conn. 2014) (calling on courts to "exclude testimony that uses the scrim of expertise to obscure a lay impression about a case"). In sum, Dr. Saathoff's medical expertise does not qualify him to opine on conditions of confinement.

*Second,* Dr. Saathoff's opinion lacks sufficient factual foundation. His opinion is based entirely on one day-long site visit to Northern in June of 2018. Dkt. 117-10 at 3 ¶ 8. Dr. Saathoff did not speak to a single inmate at Northern during that visit. Instead, he spent most of his day in the warden's conference room, speaking with prison leadership and watching inmates on television monitors. *Id.* at 45. As a result, his descriptions of the conditions at Northern are based largely on interviews with prison officials. *Id.* at 46-47. For example, Dr. Saathoff conceded in his deposition that he relied upon correctional officials for a description of the current state of heat, noise, and mental health care at Northern. Dkt. 132-2 at 210:15-211:3. He never entered a cell at One West—the housing unit where special-circumstances prisoners like Plaintiff were held at the time—to evaluate the noise. *Id.* at 168:18-169:9. His erroneous conclusion that inmates can communicate through crevices in their cell walls was based on an experiment conducted in One East, an unoccupied unit on the

other side of the building. *Id.*[8] The bulk of Dr. Saathoff's "findings" simply parrot information provided by Defendants and their agents. And Defendants of course had an incentive to put a positive spin on the conditions. Admitting such an opinion would authorize repeating hearsay evidence to the jury. That is not permitted. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *United States v. Rubi-Gonzalez*, 311 F. App'x 483, 487 (2d Cir. 2009) ("testimony violated Fed. R. Evid. 703 by transmitting hearsay evidence directly to the jury"). Nor did Dr. Saathoff provide any indication that experts in the field of corrections "would reasonably rely" on descriptions from prison officials to form opinions on solitary confinement. Fed. R. Evid. 703 (delineating the proper bases for an expert opinion).

*Third*, Dr. Saathoff's opinion will not help the jury "understand the evidence or [] determine a fact in issue." Fed. R. Evid. 702(a). His medical background does not equip him to opine on solitary confinement. And the term "solitary confinement" has no bearing on any of Plaintiff's constitutional claims. It has no defined meaning in Eighth or Fourteenth Amendment jurisprudence. Dr. Saathoff does not define the term either. An opinion about solitary confinement will not help the jury determine if the conditions constituted an atypical and significant hardship or if they violated contemporary standards of decency. Nor would such an opinion help the jury decide whether Plaintiff's conditions differed from those in which Santiago and Johnson were housed. Moreover, Dr Saathoff's opinion concerns only the conditions as of June 2018. It will not assist the jury in assessing the conditions at Northern during the nine preceding years, when Defendants imposed more restrictions.

---

[8] For that reason, Dr. Saathoff should also be precluded from testifying that inmates in different cells can converse with each other.

## V.     Defendants Should Be Precluded From Offering Any Opinion About Plaintiff's Psychological Condition

Defendants should also be precluded from offering any opinion about Plaintiff's psychological condition. Defendants intend to call three witnesses to testify about Plaintiff's mental health: Dr. Mark Frayne, Dr. Gerald Gagne, and Dr. Gregory Saathoff. None of these men has ever evaluated Plaintiff's mental health. Any opinion on the subject would be speculative, in violation of Rule 702's reliability requirements.

### A.     Dr. Saathoff Should Be Precluding From Opining on Plaintiff's Health

Dr. Saathoff should not be permitted to testify about Plaintiff's psychological or physical condition" *See* Dkt. 132-2 at 190:14-191:24 (testifying that Plaintiff has "not psychologically or physically deteriorated within the Special Circumstances Unit"). Dr. Saathoff has never spoken with Plaintiff, let alone evaluated him. *Id.* There is no evidence that Plaintiff has ever been evaluated psychologically during his incarceration. As a result, Dr. Saathoff "was not able to access any psychological or neuropsychological testing" of Plaintiff. Dkt. 117-10 at 3 ¶ 10. He based his opinion instead on three factors: 1) Plaintiff's refusal to seek mental health services at Northern; 2) review of Plaintiff's *pro se* pleadings and inmate requests; and 3) visual observations of Plaintiff that Dr. Saathoff concedes provided him "only an extremely limited picture of his current level of function." *Id.* at 38. Even if Dr. Saathoff could cobble together a reliable opinion about Plaintiff's *current* mental state from these sources, he would still lack any baseline from which to measure any deterioration. He conceded as much in his deposition. Dkt. 132-2 at 270:24-271:4.

Dr. Saathoff cannot reliably base a psychological opinion on the limited evidence that was available to him. Contrast his opinion with the methodology for such opinions that is "routinely accepted under *Daubert*"—"a medical history interview, patient observation, a physical examination, and administration of

standard psychological tests such as the Mini-Mental State Examination (MMSE)." *Qube Films Ltd. v. Padell*, 2016 WL 888791, at *2 (S.D.N.Y. Mar. 1, 2016); *see also Israel v. Spring Indus., Inc.*, 2006 WL 3196956, at *10 (E.D.N.Y. Nov. 3, 2006) ("[P]ersonal interviews, a medical record review, clinical rating scales, and background facts" are "the type of methodology employed to form a reliable psychiatric opinion."). It is true that the law does not provide a definitive checklist for a reliable psychological evaluation. Yet Rule 702 requires that an opinion be based on "reliable principles and methods." Fed. R. Evid. 702(b). Dr. Saathoff cannot come close to meeting that standard. His opinion should be excluded for lack of reliability.

### B.    Dr. Gagne Should Be Precluded From Opining on Plaintiff's Health

For similar reasons, Dr. Gerard Gagne lacks the factual basis to testify as to Plaintiff's mental health during the relevant time period. Like Dr. Saathoff, Dr. Gagne has never met Plaintiff. Dkt. 129-3 (Gagne Deposition) 145:22-146:25. He also testified that he is not familiar with Plaintiff's medical records. *Id.* 146:5-13. In fact, Dr. Gagne volunteered that his knowledge of Plaintiff is "[p]eripheral[]." *Id.* 145:24-25. He therefore lacks the personal knowledge required to testify as a percipient witness. Fed. R. Evid. 602. For the same reasons, he cannot provide lay opinion testimony about Plaintiff's psychological health. Fed. R. Evid. 701 (lay opinion must be "rationally based on the witness's perception" and cannot be based on "scientific" or "specialized knowledge"). A reliable opinion about an individual's psychological state must, by definition, be based on specialized knowledge.

Nor can Dr. Gagne offer expert opinion as to Plaintiff's mental state. Such an opinion could not meet the required standards of reliability because it is based only on a review of Plaintiff's medical records. Fed. R. Evid. 702(b) (expert testimony must be based on "sufficient facts or data"). It is undisputed that those records are the only evidence that were available to Dr. Gagne. In a declaration submitted in opposition

to summary judgment, Dr. Gagne opined that "Mr. Reynolds does not present with post-traumatic stress order" that he does not have "suicidal ideations," and that he is not "at-risk for self-harm or other significant mental health events." Dkt. 117-8 ¶¶ 59, 65. Dr. Gagne attested that his opinions were based wholly on a review of Plaintiff's medical and clinical records from Northern. *See id.* As described above, a review of medical records is not a reliable basis for a psychological diagnosis. That is especially true in this case because Plaintiff's Department of Correction Medical File contains no formal psychological evaluation. *See generally* Dkt. 117-11 (Richard Reynolds Medical Records). The clinical and mental health sections of that file indicate that Plaintiff has declined to submit himself to a psychological evaluation while incarcerated. *Id.* at 112-168. Observations about Plaintiff's mental state appear only as part of a 1995 intake screening and in his clinical record. Neither suffices as a factual basis for a psychological diagnosis. The former consists of visual observations and basic questions about Plaintiff's medical history. *Id.* at 18. The clinical records note only that Plaintiff "says he is ok," *id.* at 170, and appear to be based on brief observations of Plaintiff "seen from cell door," *id.* at 181-187. An entry from November 8, 2000 describes the 10–15-minute session with Plaintiff as "by far the longest dialogue" with mental health staff "in at least 4+ years." *Id.* at 187. These scraps of evidence cannot form the basis of a reliable opinion from Dr. Gagne.

### C.   Dr. Frayne Should Be Precluded From Opining on Plaintiff's Health

A psychological opinion from Dr. Mark Frayne is inadmissible for the same reasons. Unlike Dr. Saathoff and Dr. Gagne, Dr. Frayne has actually met Plaintiff. Ex. 2 (Frayne Dep.) 141:23-144:24. He purports to base his opinions on "first hand observations of Mr. Reynolds" as well as a review of his medical records. Dkt. 117-9 (Frayne Declaration) ¶ 6. But the nature of these first-hand observations did not allow Frayne to form a reliable opinion as to Plaintiff's mental health. Although Dr.

Frayne would tour the One West Housing unit on a regular basis, Plaintiff declined to come out of his cell. *See* Ex. 2 at 145:25-146:18. Indeed, Dr. Frayne testified that Plaintiff had not communicated with him for the previous *12 years*. *Id.* at 140:19-141:10; *see also id.* at 148:5-6 ("I haven't had a private interview with him or interview because he hasn't allowed me to."). Dr. Frayne gave that testimony in 2018, and began work at Northern in 2006, Dkt. 117-9 ¶ 2. He was reassigned from Northern shortly thereafter. *Id.* ¶ 4. Thus, he has never communicated with Plaintiff, much less conducted an evaluation of him. Nor does Dr. Frayne have personal knowledge of Plaintiff's mental state beyond his review of medical records. Such skimpy information does not meet the requirements for expert opinion outlined in Rule 702. Dr. Frayne's testimony should be excluded.

## VI.    Plaintiff's Medical Records Should Be Excluded

Defendants should be precluded from introducing Plaintiff's Department of Correction Medical File. They seek to introduce more than 450 pages of Plaintiff's medical records, spanning nearly three decades. *See* Dkt. 117-11 (Plaintiff's Medical Records). The Federal Rules of Evidence bar admission of this exhibit for at least two reasons.

*First*, these records should be excluded as irrelevant under Rule 402. None of the medical documents that Defendants seek to introduce relates to any issue in dispute in this case. Plaintiff does not contend that he became mentally ill as a result of his conditions of confinement. He does not base his Eighth Amendment claim on a deprivation of mental-health services. Nor does he premise his Equal Protection claim on any differences in the availability of mental-health services between Northern and the facility in which Johnson and Santiago were housed—MacDougall-Walker. Plaintiff's mental illness *vel non*—as opposed to his suffering and emotional distress—is not at issue in this trial. As a result, these records are irrelevant to any of Plaintiff's claims.

*Second*, introduction of these records would cause undue delay and prejudice in violation of Rule 403. Admitting such lengthy records will invariably delay trial. *See Harris v. Donohue*, 2017 WL 3638452, at *3 (N.D.N.Y. Aug. 23, 2017) (excluding medical records covering a five-year period, as they were "so voluminous that they would consume an inordinate amount of the court's and jury's time in sorting through and interpreting them."); *see also Hodges v. Keane*, 886 F. Supp. 352, 357 (S.D.N.Y. 1995) ("Because of their volume and scope, [Plaintiff's 600-page medical] records are likely to confuse the jury and represent a waste of judicial resources."). Additionally, the introduction of hundreds of pages of Plaintiff's medical records would be unfairly prejudicial at trial. A number of the files contain sensitive personal information that is irrelevant to Plaintiff's claims. *See, e.g.,* Dkt. 117-11 at 19 (documenting past sexually transmitted infections); *id.* at 80 (request for treatment for a rash); *id.* at 127 (documenting Plaintiff's involvement in hunger strike years before the liability period). Evidence about any of the above issues would only distract the jury from the relevant issues in this case.

## VII. Defendants Should Be Precluded from Claiming that the Conditions Are Part of Plaintiff's Criminal Sentence

Defendants should not be allowed to argue to the jury that Plaintiff's prolonged isolation formed part of the punishment for his crime of conviction. That argument is wrong as a matter of fact and precluded as a matter of law. It is fundamental that Plaintiff's only authorized punishment at the time of his conviction was death. That was his sentence. *See* Conn. Gen. Stat. § 53a-46a(f) ("the court shall sentence the defendant to death").[9]

---

[9] After Plaintiff's death sentence was vacated, the sentencing court resentenced him to "life without possibility of release." Dkt. 121-43 at 7 (Transcript of April 21, 2017 Sentencing Hearing). The sentencing court expressly *declined* to rule on whether Conn. Gen. Stat. § 18-10b applied to Plaintiff. *See id.* at 6-7.

His sentence was not "harsh prison conditions followed by death." The Department of Corrections recognized that fact, at least on paper. Its official stance was, appropriately, that the treatment of prisoners awaiting execution should be "*humane*," Dkt. 121-6 at 2 (Northern Inmate Handbook), a description that does not fit the conditions Defendants imposed on Plaintiff.

This Court's ruling on Plaintiff's bill of attainder claim and the Second Circuit's affirmance of that ruling further preclude any argument that the challenged conditions of confinement formed any part of Plaintiff's sentence. The Court of Appeals held that Conn. Gen. Stat. § 18-10(b) was "plainly punitive" and intended to "newly punish [Plaintiff]." *Reynolds v. Quiros*, 990 F.3d 286, 298 (2d Cir. 2021). That statute codified the very conditions that Plaintiff challenges in this litigation—the lack of recreation time, segregation from the general population and the prohibition on physical contact during social visits. That decision thus recognized that the conditions constituted punishment that went beyond his criminal sentence. The Second Circuit expressly stated that "[a]t the time of Reynolds' conviction, a permanent and unreviewable assignment to the Special Circumstances unit was not a punishment provided for by the laws of Connecticut." *Id.* at 299. The same is true of Northern's death row, where the conditions were not meaningfully different.

For similar reasons, Defendants have no basis to argue that Plaintiff's criminal trial provided sufficient due process for his conditions of confinement. This Court rejected that argument. Dkt. 155 at 31 ("Reynolds' conditions of confinement were not part of his underlying criminal sentence."). Only a hearing that specifically concerned conditions of confinement would satisfy the Due Process Clause. Defendants should not be permitted to argue otherwise.

## VIII.  Defendants Should be Barred From Presenting Testimony on Conditions of Confinement from Six Fact Witnesses in Addition to Defendants

Defendants' intention to call *six* witnesses to testify on conditions of confinement—on top of the four named Defendants—violates Rule 403's prohibition against needlessly cumulative testimony. *See* Fed. R. Evid. 403 ("court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … *undue delay, wasting time, or needlessly presenting cumulative evidence.*" (emphasis added)). Defendants have announced that each of Gregorio Robles, Brian Jackson, James Barton, Andrew Cameron, Michael Maloney, and William Mulligan will testify as to the conditions of confinement at Northern. This redundant testimony will not help the jury determine the relevant facts. It will just needlessly extend the trial. Accordingly, the Court should exercise its discretion under Rule 403 to limit defense testimony on conditions of confinement to one witness beyond the four named defendants.

There would inevitably be significant repetition in the testimony of these witnesses. Gregorio Robles, a unit manager of the One West housing unit at Northern, Brian Jackson, an administrative captain at Northern, and William Mulligan, a former Deputy Warden at Northern, will each testify "as to the conditions of confinement at Northern during the relevant timeframe." Defendants have provided no explanation as to why they need to call three witnesses on the same subject—especially when Defendants Quiros and Maldonado, both former wardens of Northern, will be able to provide the same testimony about those conditions. Nor do Defendants explain why they need to call correctional maintenance supervisor James Barton to testify as the physical layout and temperature of Northern when each of the aforementioned witnesses would be qualified to provide such testimony. The same is true of recreation supervisor Andrew Cameron and electronic technician Michael Maloney, who are offered to testify about recreation opportunities and noise levels,

respectively. Absent an explanation of how these six witnesses will "meaningfully supplement" Defendants' own testimony, they should be excluded. *Rella v. Westchester BMW, Inc.*, 2022 WL 1711695, at *2 (S.D.N.Y. May 27, 2022) (excluding testimony from two belatedly disclosed witnesses as needlessly cumulative).

The fact that *none* of these witnesses was previously disclosed or made available for deposition during the discovery period provides further support for their exclusion. Because Plaintiff has had no opportunity to seek discovery from these witnesses, he would be prejudiced by their inclusion. *See id.* ("late disclosure of a witness in close proximity to trial 'is plainly prejudicial' to the party against who[m] the testimony would be offered"); *EMA Fin., LLC v. Joey N.Y., Inc.*, 2021 WL 2822565, at *2 (S.D.N.Y. June 9, 2021) (precluding testimony of witness identified "less than a month before trial").

The four defendants will be able to testify extensively about the conditions of confinement at Northern during the relevant period. Because this testimony is sufficient to assist the jury to determine the facts in dispute, further testimony would be needlessly cumulative. *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990) (affirming exclusion of expert witness as cumulative). Defendants should be limited to calling one additional witness to provide testimony on conditions of confinement.

## IX. Testimony About Plaintiff's Sentencing and Resentencing Would Be Needlessly Cumulative

This Court should preclude Defendants from calling Department of Corrections Record Specialist Michelle Deveau to testify as to "Plaintiff's sentence to death and resentencing after the repeal of the death penalty." As indicated by Ms. Deveau's declaration in support of Defendants' motion for summary judgment, she will testify that Plaintiff was sentenced to death on April 13, 1995 and re-sentenced to life without possibility of release on April 21, 2017. Dkt. 117-2 ¶¶ 9-10. As she is a

records specialist, her testimony will be based on a review of Department of Corrections records—she has no knowledge other than through her review of state records. Yet the parties have already agreed to stipulate to the facts about Plaintiff's sentencing that are contained in these records, as evidenced by the joint pretrial memorandum that is filed contemporaneously with this motion. Further testimony on this undisputed subject would be needlessly cumulative. Fed. R. Evid. 403. The stipulation will tell the jury the entire story about Plaintiff's sentencing, and Ms. Deveau's testimony will only replicate that stipulation. It should therefore be excluded. *See Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (affirming exclusion of evidence that defendants were not named insureds on an insurance policy "as cumulative and wasteful of the court's and the jury's time because the parties entered into a stipulation to that fact").

## X.    Defendants Should Be Barred from Presenting Two Witnesses on DOC Classification Procedures and Records

Rule 403's prohibition on cumulative evidence also bars Defendants from calling two witnesses on the issue of "DOC classification procedures and records." Defendants propose to call both David Maiga, the *former* Director of Offender Classification and Population Management at the Department of Correction, and David Snyder, the *current* holder of that position, to testify on the same subject.

Because the parties do not dispute the content of the DOC's classification procedures, testimony from two witnesses on this subject is unnecessary. Throughout the liability period, the classification was governed by the DOC's classification manual. Defendants last amended that manual in July 2016 to automatically classify inmates on special circumstances to an overall risk level 5. Dkt. 121-21 (Revision to Administrative Directive 9.2) Plaintiff is aware of no evidence that these procedures were otherwise changed during the relevant time frame. David Maiga not only signed that amendment but was also the classification director as recently as May 18, 2017—

when Plaintiff was "reclassified" as a special circumstances inmate. *See* Dkt. 121-34 (Memo from David Maiga to Plaintiff). Mr. Maiga remained in his position until June of this year. Duplicative testimony from Mr. Maiga's successor would only waste the jury's time.

## XI.     Defendants Should Be Barred from Referring to the Book *Clockers*

The book *Clockers*, with the title visible and prominent, appears in one photo of Plaintiff's cell that Defendants appended as an exhibit to their summary judgment motion. *See* Dkt. 117-6 at 13. *Clockers* is a 1992 book by Richard Price about Brooklyn drug dealers, which was subsequently adapted into a movie by Spike Lee. *See State v. Alexander*, 264 624 A.2d 48, 53 n.2 (N.J. App. Div. 1993). The term "clockers" is slang for street dealers of cocaine. *United States v. Bethea*, 2022 WL 1553393, at *1 (D.N.J. May 17, 2022).

Plaintiff's possession of this book is inadmissible under both Rule 401 and 403. On the one hand, Plaintiff's choice of reading material has no bearing on the appropriateness of prolonged isolated confinement, but connecting him to a book about Brooklyn drug dealers (it also includes a murder.) may well prejudice him in the eyes of the jury. The photograph can easily be edited by blurring the title of the book.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion *in limine* should be granted in full.

Dated: August 12, 2022                                   /s/ *Tyler Finn*
                                                                      Tyler Finn
                                                                      Susman Godfrey LLP
                                                                      1301 Avenue of the Americas
                                                                      32nd Floor
                                                                      New York, NY 10019
                                                                      (212) 729-2016
                                                                      (212) 336-8340 Fax
                                                                      phv20328

tfinn@susmangodfrey.com

David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com

*Counsel for Plaintiff Richard Reynolds*