### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

RICHARD REYNOLDS,
     Plaintiff,

v.

LEO ARNONE, et al.,
     Defendants.

No. 3:13-cv-1465 (SRU)

### <u>ORDER ON MOTIONS FOR POSTTRIAL RELIEF</u>

Richard Reynolds is presently serving a sentence of life imprisonment without the possibility of release in the custody of the Connecticut Department of Correction. He spent 26 years of that incarceration in segregation, isolated in his prison cell for 22 to 24 hours per day. He brought the instant case in 2013 principally to challenge the constitutionality of the conditions of his confinement between 2009 and 2019.

After a trial in which the jury found for the plaintiff on one count and for the defendants on the other counts, both parties seek posttrial relief. The plaintiff has filed two motions requesting a new trial: the first on the Fourteenth Amendment due process claim with respect to the timeframe of 2010 to 2017 and the second on the Eighth Amendment claim with respect to the timeframe of 2010 to 2019. The defendants have filed a motion for judgment as a matter of law, advancing multiple arguments including, chiefly, qualified immunity.

For the reasons set forth below, the plaintiff's motions for a new trial are **granted**—not only for the reasons set forth in those motions, but also for additional reasons discussed below. The plaintiff shall be granted a new trial not only on the Fourteenth Amendment due process claim for 2010 through 2017, but also on the Eighth Amendment claim from 2010 to 2019. Doc. Nos. 298, 337.

The defendants' motion for judgment as a matter of law is **granted in part and denied in part**. Specifically, the motion is granted to the extent that the defendants move for judgment as a matter of law regarding Maldonado's personal involvement in the 2017 to 2019 due process violation. Doc. No. 277.

## I.     Background

This case has a lengthy procedural history. Reynolds was convicted of the murder of a police officer and sentenced to death in 1995. The Connecticut Department of Correction subsequently housed him in the manner it housed other death row prisoners at that time—in segregation, that is, near isolation. In 2012 the Connecticut Legislature abolished the death penalty—but only prospectively. The state also enacted Connecticut General Statutes Section 18-10b ("Section 18-10b"), which created a new classification, "special circumstances high security status," for, *inter alia*, prisoners "in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012 . . . for which a sentence of death is imposed . . . and such inmate's sentence is . . . reduced to a sentence of life imprisonment without the possibility of release." Conn. Gen. Stat. § 18-10b(a). In 2015, the Connecticut Supreme Court abolished the death penalty retroactively. *State of Conn. v. Santiago*, 318 Conn. 1, 118-19 (2015). Reynolds was then resentenced in 2016 to life imprisonment without the possibility of release. *See Reynolds v. Comm'r of Corr.*, 321 Conn. 750, 765 (2016) (vacating Reynolds' death sentence). After Reynolds was resentenced to life imprisonment without the possibility of release, the Connecticut Department of Correction ("DOC") began housing him as a "Special Circumstances" prisoner in purported compliance with the terms of Section 18-10b. In practice, that meant that Reynolds continued to be housed in segregation and spent 22 to 24 hours per day isolated in his prison cell.

Reynolds brought this action in 2013, initially *pro se* but later represented by counsel. Doc. No. 1. He raised claims pursuant to Section 1983 against seven DOC officials: Angel Quiros, Leo Arnone, Edward Maldonado, Gerard Gagne, Mark Frayne, Scott Semple, and William Faneuff. *See id.*; Doc. No. 71-1 at 4-5. Reynolds claimed violations of his constitutional rights under the Bill of Attainder and Ex Post Facto Clause of Article I, Section 10; the Eighth Amendment; and the Fourteenth Amendment Due Process and Equal Protection clauses. The parties cross-moved for summary judgment in 2018. In a 2019 Order, I granted Reynolds' motion for summary judgment and denied the defendants' motion for summary judgment. Doc. No. 155. The defendants appealed that ruling. Doc. No. 160.

In a 2021 decision, the Second Circuit affirmed in part and vacated and remanded in part the order on the motions for summary judgment. The Second Circuit affirmed the judgment to the extent that it held that Section 18-10b was an unconstitutional bill of attainder and that the defendants violated Reynolds' Fourteenth Amendment right to Equal Protection. With respect to Reynolds' Eighth Amendment and Fourteenth Amendment due process claims, the Second Circuit determined that there were disputed issues of material fact that precluded summary judgment. *Reynolds v. Quiros*, 990 F.3d 286, 302 (2d Cir. 2021).

Following remand, the case was tried in December 2022. Doc. Nos. 259-267. The jury found for the defendants on the Eighth Amendment claim, for the defendants on the Fourteenth Amendment due process claim from 2009 to 2017, and for the plaintiff on the due process claim from 2017 to 2019. Doc. No. 268. The jury awarded Reynolds nominal damages both for the due process claim, as well as for the equal protection claim. *Id.*

After the trial, the parties filed posttrial motions. Defs.' Mot. for J. as a Matter of Law, Doc. No. 277; Pl.'s Mots. for a New Trial, Doc. Nos. 298, 337. The plaintiff filed a motion for a

new trial on the Fourteenth Amendment Due Process claim for the 2010 through 2017

timeframe.  Doc. No. 298.  The defendant filed a motion for judgment as a matter of law on all

claims.  Doc. No. 277.  After I issued a notice stating that I was considering whether to grant a

new trial on the plaintiff's Eighth Amendment claim, he filed a motion for a new trial on the

Eighth Amendment claim for the 2010 through 2019 timeframe.  Doc. Nos. 308, 337.

## II.    Plaintiff's Motion for a New Trial

### A.  Legal Standard

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a

new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for

which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ.

P. 59(a)(1)(A).  When a party moving for a new trial does so "on the grounds that the verdict was

against the weight of the evidence," the court can "weigh the evidence" and is not required to

"view it in the light most favorable to the verdict winner."  *DLC Management Corp. v. Town of

Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998) (cleaned up).  A court should only grant a new

trial if "[the trial court] is convinced that the jury has reached a seriously erroneous result or that

the verdict is a miscarriage of justice."  *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir.

2006) (internal citation and quotation marks omitted).

### B.  Due Process Claim

Reynolds moves for a new trial because, he contends, the evidence of a due process

violation during the timeframe of 2010 through 2017 is overwhelming.  I agree.

The Due Process Clause of the Fourteenth Amendment "protects persons against

deprivations of life, liberty, or property."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  A state

therefore cannot deprive a citizen of "life, liberty, and property . . . except pursuant to

constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541

(1985).  To prevail on his due process claim at trial, Reynolds had to prove two elements: first,

that "there exists a liberty or property interest of which [he] ha[d] been deprived, and if so,"

second, that "the procedures followed by the State" were constitutionally insufficient.  *Swarthout

v. Cook*, 562 U.S. 216, 219 (2011) (per curiam); *Green v. Caron*, 2021 WL 2723112, at *2 (D.

Conn. July 1, 2021).

    1.  *Due Process Prong One*

    The first element of a due process claim is whether a plaintiff was deprived of a protected

liberty or property interest.  As a general matter, a prisoner does not have a liberty interest in a

particular assigned classification.  *See Torres v. Howell*, 2006 WL 1525942, at *15-16 (D. Conn.

May 30, 2006) (collecting cases).  A prisoner, however, can have a liberty interest in being free

from "restraint which . . . imposes atypical and significant hardship . . . in relation to the ordinary

incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v.

Austin*, 545 U.S. 209, 223 (2005) ("After *Sandin*, it is clear that the touchstone of the inquiry into

the existence of a protected, state-created liberty interest in avoiding restrictive conditions of

confinement is . . . the nature of those conditions themselves in relation to the ordinary incidents

of prison life.") (internal citation and quotation marks omitted).  The conditions of confinement

associated with Reynolds' prison classification are therefore relevant to the determination

whether his classification triggered a liberty interest.[1]  *See, e.g.*, *Wilkinson*, 545 U.S. at 223-24

---

[1] The relevance of Reynolds' conditions of confinement to his due process claim is further underscored by the Second Circuit's earlier decision in this matter, which held that issues of material fact regarding the nature of Reynolds' conditions precluded summary judgment on Reynolds' due process claim.  *Reynolds v. Quiros*, 990 F.3d 286, 302 (2d Cir. 2021).

(holding that prisoners had a "liberty interest in avoiding assignment" to a particular maximum-security facility because that assignment would "impose an atypical and significant hardship").

Determining whether a hardship is "atypical and significant" depends on the totality of the circumstances. *Sealy v. Giltner*, 197 F.3d 578, 585-88 (2d Cir. 1999) (assessing plaintiff's conditions of confinement). In assessing "atypicality," courts have drawn comparisons against the conditions afforded to the general population within a prison system, as well as against the conditions for those in routine administrative confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Sandin*, 515 U.S. at 485-86 (comparing conditions to those of "inmates in administrative segregation and protective custody" as well as to "inmates in the general population").

The *duration* of confinement in restrictive conditions is a factor that courts deem especially relevant in determining whether a liberty interest has been shown to exist. *See, e.g.*, *Sandin*, 515 U.S. at 485-86 (comparing the "duration" and "degree of restriction" of confinement); *Colon v. Howard*, 215 F.3d 227, 230-32 (2d Cir. 2000); *see also Sims v. Artuz*, 230 F.3d 14, 23-24 (2d Cir. 2000). In *Proctor*, the Second Circuit held that a prisoner's "thirteen years in Ad Seg with no release date in sight" is a "substantial" interest, "more so than Helms's [of *Hewitt v. Helms*] interest in avoiding a temporary Ad Seg term awaiting a hearing." *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) (referencing *Hewitt v. Helms*, 459 U.S. 460 (1983)). The Court in *Proctor* also approvingly cited the Third Circuit decision in *Mims v. Shapp*, 744 F.2d 946 (3d Cir. 1984), for its holding that an inmate's "potentially limitless" term of confinement in administrative segregation "has 'a more significant interest for due process analysis than that attributed to [Helms].'" *Proctor*, 846 F.3d at 610 (quoting *Mims*, 744 F.3d at 951-52). Furthermore, in *Colon v. Howard*, the Second Circuit, considering the liberty interest

of a prisoner in isolative confinement, based its hardship determination on the duration of the

prisoner's confinement in those conditions.  The Second Circuit held that "wherever the

durational line is ultimately drawn" for measuring hardship, "305 days satisfies the standard."

*Colon*, 215 F.3d at 232-33; *see also Fludd v. Fischer*, 568 F. App'x 70, 72-73 (2d Cir. 2014).

The Second Circuit further explained that although "[t]he longest confinement in normal SHU

conditions that we have ruled was not shown to meet the *Sandin* standard was 101 days," a

confinement period "of less than 101 days could be shown on a record more fully developed

. . . to constitute an atypical and severe hardship."  *Colon*, 215 F.3d at 231, 232 n.5 (2d Cir.

2000); *see also Sims*, 230 F.3d at 23 ("Although we have not established a bright-line rule as to

how lengthy a SHU confinement will be considered atypical and significant . . . we have

characterized segregative sentences of 125-288 days as 'relatively long,' and thus necessitating

'specific articulation of . . . factual findings' before the district court could properly term the

confinement atypical or [significant].") (internal citations omitted).  The *duration* of confinement

in determining certain conditions is therefore a significant factor in whether those confinement

conditions trigger a liberty interest.

### 2.  *Evidence at Trial Regarding Due Process Prong One*

The jury found that all three defendants had violated Reynolds' due process rights during

the period from May 2017 through August 2019.  *See* Jury Verdict, Doc. No. 268 at 5.  The

evidence at trial also showed that Reynolds' confinement conditions between 2017 and 2019

were not meaningfully different (and perhaps were less onerous[2]) than his confinement

conditions from 2010 through 2017.

---

[2] At trial, Reynolds testified that he began gaining certain privileges in 2016, such as gym, group meals, and group
recreation.  Reynolds Test., Doc. No. 289 at 152-53.  Reynolds was permitted to go to the gym after 2018.  Reynolds
Test., Doc. No. 284 at 213.  Reynolds also testified that group meals were reinstated in 2016.  *Id.*

Throughout the years 2010 to 2017, Reynolds was confined in isolation in his cell for 22 hours a day except for Sunday, when he was held 24 hours a day in isolation.  Arnone Test., Doc. No. 286 at 100, 106; Quiros Test., Doc. No. 286 at 227; Reynolds Test., Doc. No. 284 at 151.[3] With respect to Reynolds' social contact with other inmates, evidence at trial showed that inmates at Northern could shout at other isolated inmates through the air vents; however, they often would yell over each other, and their voices would be heard in cells at different tiers within the unit.  Reynolds Test., Doc. No. 289 at 146-49; *see also* Pl.'s Trial Ex. 19 at 5 (showing the air vents in the unit).[4]

Plaintiff's Trial Exhibit 19, along with a demonstrative exhibit displayed at trial, showed that Reynolds' cell was small.  Pl.'s Trial Ex. 19 at 6-10; *see also* Pl.'s Trial Ex 15; Pl.'s Trial Ex. K.  Reynolds' cells at Northern were all "12' [by] 7' in [their] greatest dimensions." Stipulated Fact No. 18.  The cells contained "a triangular wall in one corner reducing those dimensions," along with a "metal door that was kept locked when the inmate was inside."  *Id.* By comparison, the three comparator cells presented at trial were 12'8.5" by 7'1", 13'2" by 7.5", and 11'6" by 8'1", respectively.  Pl.'s Trial Ex. L at 1, 5, 11.  Although all three cells would be considered by an ordinary person's standards to be small rooms, Reynolds' cell was the smallest of the four cells about which evidence was presented at trial.

The appearance and lighting of cells at Northern contributed to the unpleasant character of those cells.  Photos of a cell at Northern and of Reynolds' cell show that Reynolds' cell had stained and cracked gray concrete floors and walls, along with metal furnishings.  *See* Pl.'s Trial Ex. 15; Pl.'s Trial Ex. K; Reynolds Test., Doc. No. 284 at 169-170, 178.  Reynolds' cell also let

---

[3] The page numbers referred to in citations to trial testimony are determined using the CM/ECF pagination located at the top of the document page.
[4] For consistency, the page numbers referred to in citations to plaintiff's trial exhibits are determined using the page number of the pdf file as opposed to any numbering within the exhibit.

in little natural light.  Reynolds' cell has a window to the outside that is "approximately 3.5" x

35"" and "does not open."  Stipulated Fact No. 21.  The door to Reynolds' cell has a window of

"approximately 4" x 30"" and "does not open."  Stipulated Fact No. 19.  By comparison, at least

two of the three comparator cells are noticeably less gray in color than Reynolds' cell.  One cell

has white painted walls, blue and green metal furnishings, a white toilet, an orange chair, and

green floors.  Pl.'s Trial Ex. L at 2-4.  Another cell has white painted walls, gray concrete floors,

beige metal furnishings, a metal sink and toilet, and a green chair.  *Id.* at 6-10.  Additionally,

Plaintiff's Exhibit 27 shows the cell of Santiago, a comparator inmate.  That cell was brightly lit

by a relatively wide window and had relatively clean, white painted walls.  Pl.'s Trial Ex. 27.

What little outdoor time Reynolds had was spent in a cage that was, in fact, largely

indoor—small and enclosed in concrete, opening only to the outside through a metal cage

ceiling.  Pl.'s Trial Ex. J at 1-3, 12-20.  Inmates at Northern were given coats during cold

weather, but in cold weather those coats were often frozen stiff and rendered unwearable.

Reynolds Test., Doc. No. 284 at 162-63.  Indoor recreation time for Northern inmates took place

in a room enclosed in glass and concrete walls, with metal tables.  Pl.'s Trial Ex. J at 4-11; Pl.'s

Trial Ex. 19 at 4; *see also* Reynolds Test., Doc. No. 284 at 168.

A restraint policy was also in effect at Northern from 2010 through 2018, imposing

stricter restrictions on movement and therefore additional hardship.  *See* Pl.'s Trial Ex. 12;

Quiros Test., Doc. No. 286 at 183-85; Robles Test., Doc. No. 287 at 180-81.  The policy required

prisoners to be handcuffed behind their backs when they were moving outside of their cells for

routine activities, including when they were showering, in the recreation yard, on social visits,

social calls, and in the dayrooms.  Pl.'s Trial Ex. 12 at 1.  The policy stated that the restraints

would be "removed once the inmate is secured in the area."  *Id.*  Full restraints would be used at

all times for "professional visits"—including attorneys, legal calls, medical and mental health appointments, and video conferences. *Id.* Those restraints included handcuffs, leg-irons, and tether chains. *Id.* Those restraints would not be removed during professional visits. *Id.* Additionally, there was a third category for out-of-unit movement within the facility, for which death row prisoners would have to be fully restrained behind their backs with handcuffs, leg-irons, and tether chains and remain in those restraints at all times. *Id.*

Evidence at trial supported the fact that Northern had an unpleasant smell and was sometimes uncomfortably loud. Regarding noise levels, stipulated facts established that, at two points during the period between October 22, 2018 and November 2, 2018, the noise level in the cell adjacent to Reynolds' cell reached 115.7 and 105.3 decibels. Stipulated Fact Nos. 23-27. By comparison, "[a] rock concert is about 110 decibels." Stipulated Fact No. 26. Regarding smell, Reynolds described Northern as smelling like body odor, dirt, grime, and occasionally feces. Reynolds Test., Doc. No. 289 at 145. That account was corroborated by the testimony of Eduardo Santiago, who described Northern as smelling like body odor, feces, and urine. Santiago Test., Doc. No. 286 at 21-23. Quiros also testified that on occasion when he toured Northern, it would smell like feces because an inmate "was in the act of putting feces on the wall." Quiros Test., Doc. No. 286 at 188-89.

Additionally, the duration of Reynolds' confinement under conditions on death row was atypical in comparison to the duration of time that other restricted statuses spent in those conditions. Reynolds spent 26 years in isolated confinement at Northern. Reynolds Test., Doc. No. 284 at 181. Quiros testified at trial that "other restrictive status programs" at Northern, including "administrative segregation," were all "progressions based, driven [by] good behavior and that the offender participated in the program. . . . [Quiros had] the mindset that these

individuals were there temporar[ily] and going back out to general population."  Quiros Test.,

Doc. No. 286 at 171.  He testified, however, that death row was different.  *Id*. at 171-72.

Taken together, evidence presented at trial regarding the conditions of Reynolds'

confinement, especially given the duration for which Reynolds endured those conditions,

overwhelmingly weighed in favor of a finding that Reynolds had established a protected liberty

interest.

### 3.  *Due Process Prong Two*

In addition to establishing at trial that his conditions of confinement gave rise to a liberty

interest, Reynolds also showed that the procedures he was afforded in the 2010-2017 timeframe

were constitutionally inadequate.  Under *Hewitt*, once an individual is confined in administrative

segregation, "[p]rison officials must engage in some sort of periodic review of the confinement

of such inmates."  *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983).  Under *Proctor*, those reviews

must also be meaningful.  *Proctor v. LeClaire*, 846 F.3d 597, 614 (2d Cir. 2017).  Meaningful

means, among other things, not pretextual.  *Id.* at 609, 612, 614 ("The Due Process Clause, of

course, commands a process, not a particular result.  But, when process is nominally afforded to

inmates over a significant period of time without any hint of success it may raise questions in a

reasonable jury's mind about whether that process has been meaningful as it relates to Proctor.");

*id.* at 601 (due process protections are to "ensure that a state prison facility does not use Ad Seg

as a pretext to commit an inmate to the SHU indefinitely") (citations omitted).

Meaningful periodic reviews under *Proctor* must "at least satisfy" three criteria:  (1) "the

reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg

confinement is justified"; (2) "the reviewing officials must evaluate whether the justification for

Ad Seg exists at the time of the review or will exist in the future, and consider new relevant

evidence as it becomes available"; and (3) "the reviewing officials must maintain institutional

safety and security (or another valid administrative justification) as their guiding principles

throughout an inmate's Ad Seg term." *Proctor*, 846 F.3d at 610-11.

4.  *Evidence at Trial Regarding Due Process Prong Two*

Evidence presented at trial showed that the reviews Reynolds received from 2010 through

2017 were not meaningful periodic reviews in compliance with *Hewitt* and *Proctor*.  For

example, Arnone testified that "death row inmates were not given periodic individualized

reviews."  Arnone Test., Doc. No. 286 at 136.  Moreover, the weight of the evidence at trial

overwhelmingly showed that Reynolds' classification reviews did not meet *Proctor* criteria one

and two—that is, whether Reynolds' confinement was "actually evaluate[d]," and whether the

reviewing officials "evaluate[d] whether the justification for Ad Seg exist[ed] at the time of the

review or will exist in the future, and consider[ed] new relevant evidence."  *Proctor*, 846 F.3d at

610-11.

Although Reynolds was given occasional classification reviews, those reviews were

plainly not meaningful.  *See* Pl.'s Trial Ex. E.  The classification review sheets included little to

no comments.  *Id.*  In those sheets, Reynolds was given seven risk scores based on seven factors:

escape, length of confinement, discipline, sev/viol offense, detainers, security risk group, and

violence history.  *Id.* at 2.  Each category was given a score of 1 through 5.  If any of the

categories was a 5, an inmate was given an overall category of 5 and placed in a level 5

maximum security prison.  *Id.*  Northern was a level 5 maximum security prison facility.  *See*

Stipulated Fact No. 15.

For example, on February 27, 2018, Reynolds was rated a 1 for escape, 1 for discipline, 1

for detainers, 1 for security risk group, 1 for violence history, 4 for severity or violence of the

offense, and 5 for length of confinement.  Pl.'s Trial Ex. E at 8.  In every classification review, Reynolds was "automatic[ally]" given a 5 score for length of confinement because he was on death row.  Quiros Test., Doc. No. 286 at 222-23.  In other words, regardless of the other six factors that were to be evaluated on the classification review sheet, Reynolds always had an overall level of 5, and therefore was housed in maximum security at Northern, solely because he was a death row inmate.  *Id.* at 225 (stating that having a level 5 overall score meant Reynolds would be housed at Northern).

All of Reynolds' classification review sheets presented at trial classified him as an overall level 5, with little by way of notes or elaboration.  *See generally* Pl.'s Trial Ex. E.  Most review sheets included commentary along the lines of, "RR" or "regular review" complete, no changes. *Id.* at 1, 5.  But one of the classification review sheets from January 7, 2010 stands out in particular—in that review, the reviewing official did not evaluate or fill out Reynolds' risk scores at all.  *Id.* at 46.  The official simply wrote "5" under "Overall," and wrote at the bottom, "RR compl; no OAP necessary; sentenced to death."  *Id.*

Reynolds' classification reviews suffer from the same deficiencies as the reviews in *Proctor*.  There, the Second Circuit cast doubt on inmate reviews that were "repetitive and rote," where "[t]he years of virtually identical reports . . . suggest . . . that Proctor's reviewers treated the process as satisfied by boilerplate explanations instead of a forthright review."  *Proctor*, 846 F.3d at 613.  The Second Circuit stated that documentation of those reviews "raise[] . . . questions about whether Proctor's . . . reviews have been designed to evaluate or to perpetuate his Ad Seg term."  *Id.*

The evidence at trial regarding Reynolds' classification reviews weighed decisively in favor of a finding that those reviews did not comply with *Proctor* criteria one and two.  The

evidence also indicated that the classification reviews were merely formalities and not "forthright reviews[s]." *Id.* Accordingly, to the extent that the jury did not find a due process violation in the 2010 through 2017 timeframe, that outcome was "seriously erroneous." *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006).

C. Defendants' Personal Involvement

For Reynolds to meet his burden at trial of proving that the defendants were guilty of violating his due process rights, he needed to prove not only that his constitutional rights were violated, but also that the defendants were personally involved in that violation.

1. *Legal Standard for Personal Involvement*

Before examining the evidence of personal involvement that was presented at trial, an articulation of the legal standard for personal involvement is warranted. In their posttrial briefs, the parties disagree about the holding and effect of the Second Circuit's opinion in *Tangreti v. Bachman*, which articulated a new standard for evaluating the personal involvement of supervisory officials. 983 F.3d 609 (2d Cir. 2020).

Even before *Tangreti*, personal involvement has long been "a prerequisite to an award of damages under [section] 1983" in this Circuit. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (collecting cases). In the 1977 case *Duchesne v. Sugarman*, the Second Circuit held that a supervisory official's "affirmative policy-making," which may have caused misconduct by other individuals, suffices as personal involvement. 566 F.2d 817, 831 (2d Cir. 1977). In the 1986 case *Williams v. Smith*, the Second Circuit set forth four types of personal involvement:

> The defendant may have directly participated in the infraction . . . A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong . . . A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue . . . Lastly, a supervisory official may

14

be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

781 F.2d 319, 323-24 (2d Cir. 1986) (collecting cases).  The 1995 decision in *Colon v. Coughlin* added to *Williams*' list, outlining a list of five ways that personal involvement may be established:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995).

*Tangreti*, decided in 2020, abrogated the five-category test in *Colon* and replaced it with a more simplified standard.  983 F.3d at 618.  *Tangreti* principally held that "there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  *Tangreti* further held that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary."  983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted).  It should be emphasized that *Tangreti* did not immunize individuals who serve in supervisory capacities from liability under Section 1983 for their own conduct, nor did it unsettle clearly-established law holding supervisory officials liable for their own unconstitutional conduct.  *Tangreti* instead simply held that "the *mens rea* required of [those officials] to be held liable . . . can be no less than the *mens rea* required of anyone else . . . . The test for [supervisors] is the same as the test for everyone else."  *Id.* at 618.

15

Comparing the simplified *Tangreti* standard to the *Colon* five-category test, it is apparent that *Colon* factor four likely does not survive *Tangreti*. Factor four, that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts," contemplates a type of vicarious liability under which supervisors could be held liable for the conduct of their subordinates. *Colon*, 58 F.3d at 873. *Colon* factor four would hold liable an official whose *mens rea* is established only regarding their manner of supervising a subordinate, and not in regards to the official's unconstitutional conduct itself. Apart from *Colon* factor 4, all the other *Colon* factors survive *Tangreti*, because all of the other *Colon* factors contemplate intentional conduct on the part of the supervisory official. That is not to say that *Tangreti* permits courts to apply the *Colon* test, but only that *Tangreti*'s abrogation of *Colon* was an abrogation of the *test* itself, and not an abrogation of liability for all the conduct described in that test.

In addition to analyzing the text of the *Tangreti* opinion itself, the effect of *Tangreti* can also be understood by examining *Iqbal*, which it follows; other circuit decisions, which it joins; and other district court decisions within this Circuit, that apply it.

a.  Understanding the Effect of *Tangreti* by Examining *Iqbal*

*Tangreti* was an application of *Iqbal*. *Tangreti*, 983 F.3d at 617 ("*Iqbal* cast doubt on the continued viability of the special standards for supervisory liability set forth in *Colon*."). The effect of *Tangreti*, therefore, can be understood against the backdrop of *Iqbal*, the precedent that it followed.

In *Iqbal*, the plaintiffs sought to bring *Bivens* claims against the United States Attorney General and Director of the Federal Bureau of Investigation ("FBI"). 556 U.S. 662, 666-68 (2009). The *Iqbal* plaintiffs alleged that those defendants had created a policy of arresting and detaining Muslim men and of "approv[ing]" an FBI policy of detaining those men in "highly

restrictive conditions of confinement." *Id*. at 669. Specifically, the *Iqbal* plaintiffs alleged that the Attorney General was the "principal architect of the policy," and the FBI Director was "instrumental in its adoption, promulgation, and implementation." *Id*. (cleaned up).

The Supreme Court in *Iqbal* ultimately held that the plaintiffs' allegations were implausible because the plaintiffs had not alleged enough facts showing that the defendants "purposefully housed detainees [in the restrictive conditions] due to their race, religion, or national origin." *Id*. at 682-83. In other words, the plaintiffs' allegations were insufficient to support the inference of "purposeful discrimination" by the defendants. *Id*. The Court further explained that, if the plaintiffs had wanted to "prevail on [their] theory," their "complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin." *Id*. at 682. It thus appears that, according to the Court, the plaintiffs could have brought viable claims against those defendants for the unconstitutional creation of and implementation of a policy—so long as they alleged sufficient facts to make their claims plausible and to meet the *mens rea* requirement for their claims. *See id.* at 682-83.

*Iqbal* held that it is insufficient to allege vicarious-liability involvement to show "personal involvement." The Court "reject[ed]" the *Iqbal* plaintiffs' argument that the defendants "can be liable for knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," or that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 677 (internal citation and quotation marks omitted). The Court clarified that the defendant officials "may not be held accountable for the misdeeds of their agents," explaining that "[i]n a § 1983 suit or a *Bivens* action—where masters do not answer for

the torts of their servants—the term 'supervisory liability' is a misnomer. . . . [E]ach Government

official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

Thus, *Iqbal*, the precedent that *Tangreti* followed, chiefly stands for the proposition that

government officials cannot be liable solely for the conduct of their subordinates. *Iqbal* does not

foreclose supervisory officials' liability for their own unconstitutional conduct, and in fact

expressly discusses the possibility of a supervisory official being held liable for "purposefully

adopt[ing]" an unconstitutional policy. *Id.* at 682.

> b.   Understanding *Tangreti* Through the Circuit Decisions it Joins

The Second Circuit wrote in *Tangreti* that it was "join[ing]" other "circuits in holding

that after *Iqbal*, there is no special rule for supervisory liability." 983 F.3d at 618. Specifically,

*Tangreti* quoted *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), and *Porro v. Barnes*, 624

F.3d 1322 (10th Cir. 2010). *Id.* It also cited to other circuit decisions that "endorsed [the] view"

of *Dodds* and *Porro*. *Id.* at 618, 618 n.6 (citing *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534-

35 (8th Cir. 2009); *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012); *OSU Student All. v.

Ray*, 699 F.3d 1053, 1073 n.15 (9th Cir. 2012); and *Carnaby v. City of Houston*, 636 F.3d 183,

189 (5th Cir. 2011)). Therefore, *Tangreti* can better be understood by examining each of the

cases that *Tangreti* purported to "join."

The Tenth Circuit's decision in *Dodds v. Richardson* held that "[w]hile *Iqbal* may very

well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in

ways we do not need to address to resolve this case, we do not believe it altered the Supreme

Court's previously enunciated § 1983 causation and personal involvement analysis." 614 F.3d

1185, 1200 (10th Cir. 2010). The Tenth Circuit further concluded that "the following basis of §

1983 liability survived [*Iqbal*] . . . : § 1983 allows a plaintiff to impose liability upon a

defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." *Id.* at 1199 (cleaned up). The Tenth Circuit in *Dodds* therefore held that supervisors who create, implement, or "possess[] responsibility for the continued operation of a policy" are sufficiently personally involved to be held liable after *Iqbal*. *Id.*

*Porro*, another Tenth Circuit decision, set forth a personal involvement standard similar to the one articulated in *Tangreti*: "To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate [the plaintiff's legal] rights." *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010) (cleaned up). "Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else." *Id.* at 1328. *Porro* does not expressly explain, as *Dodds* does, that liability for creation or implementation of a policy survives *Iqbal*; yet it is worth noting that there is no indication that the Tenth Circuit's articulations of the law in *Porro* and *Dodds* are inconsistent. Indeed, the Second Circuit in *Targreti* expressly joined both decisions and adopted *Porro*'s language virtually verbatim. *Tangreti*, 983 F.3d at 618.

The other circuit decisions cited by *Tangreti* are similarly consistent with one another. The Fifth Circuit in *Carnaby v. City of Houston* held that a police officer was not liable for failing to supervise other officers on the scene, where those other officers allegedly used force. 636 F.3d 183, 187-89 (5th Cir. 2011). The Fifth Circuit explained that "[u]nder § 1983 . . . a government official can be held liable only for his own misconduct. . . . Beyond his own conduct, the extent of his liability as a supervisor is similar to that of a municipality that

implements an unconstitutional policy." *Id*. at 189.  Because there was "no evidence that [the police officer] established any sort of policy during [the incident at issue]," the Fifth Circuit held that the police officer was properly determined not to be liable for the conduct of the other officers.  *Id*.

*Vance v. Rumsfeld*, an *en banc* Seventh Circuit decision, held that the Secretary of Defense could not be sued under a supervisory liability theory for misconduct by military personnel without evidence of the Secretary of Defense's intent.  701 F.3d 193, 205 (7th Cir. 2012).  The Seventh Circuit explained that "*Iqbal* held that knowledge of subordinates' misconduct is not enough for liability" and that "supervisors are not vicariously liable for their subordinates' transgressions."  *Id*. at 204.  Instead, "[t]he supervisor must want the forbidden outcome to occur. Deliberate indifference to a known risk is a form of intent."  *Id*. at 204.  In addition to *Carnaby* and *Vance*, *Tangreti* also cited *Nelson*, an Eighth Circuit *en banc* decision. *Nelson v. Corr. Med. Servs*., 583 F.3d 522 (8th Cir. 2009).  In that case, the Eighth Circuit held that the director of the Department of Correction was not liable for "failing to ensure that proper policies and customs were implemented with respect to the restraint of female inmates in labor." *Id*. at 534-35.  The Eighth Circuit further explained that "[i]n a § 1983 case an official is only liable for . . . his own misconduct and is not accountable for the misdeeds of [his] agents under a theory such as respondeat superior or supervisor liability.  *Id*. at 534-35 (quoting *Iqbal*, 556 U.S. at 667) (internal quotation marks omitted).  "[The official] is thus liable only if he personally displayed deliberate indifference to the [relevant] hazards."  *Id*. at 535.

The circuit decisions that *Tangreti* cited and "join[ed]" thus all issued similar post-*Iqbal* supervisory liability standards.  *Tangreti*, 983 F.3d at 618.  Most notably, some of those decisions cited by *Tangreti* made it clear that certain forms of supervisory conduct, such as the

creation or implementation of policies, survive *Iqbal*. *See, e.g.*, *Dodds*, 614 F.3d at 1199-1200;

*Carnaby*, 636 F.3d at 189. The Second Circuit's endorsement of those circuits' decisions

strongly supports the inference that liability for that kind of supervisory conduct also survives

*Tangreti* and *Iqbal* in this Circuit.

In summary, the *Tangreti* decision, when understood in the context under which it was

issued, stands for the proposition that, to sustain a constitutional claim against a government

official in a supervisory position, the government official themselves—and not merely their

subordinates—must have engaged in unconstitutional conduct. *Tangreti* did not immunize

government officials who serve in supervisory roles from Section 1983 liability. *Tangreti* did

not unsettle clearly established law that supervisory officials may be held liable for their own

conduct. Nor did *Tangreti* hold that a government official in a supervisory position could not be

held liable for their own conduct with respect to creating, adopting, or enforcing an

unconstitutional policy.

### 2. *Evidence at Trial Regarding Each Defendant's Personal Involvement*

As I will discuss in further detail below, the personal involvement of Semple, Quiros, and

Maldonado in the conduct giving rise to the due process violation from 2010 through 2017 was

established at trial.

#### a. Semple

Turning first to Semple, evidence at trial demonstrated Semple's personal involvement in

actions that violated Reynolds' due process rights between 2014 and 2017. Semple served as

Commissioner of the DOC from 2014 through 2018. Stipulated Fact No. 3.

Testimony at trial established that "the commissioner of corrections has the ultimate

authority to determine classification procedures within the department." Maiga Test., Doc. No.

21

288 at 118.  Reynolds' "automatic" categorization as a level 5 inmate was due to "Administrative Directive 9.2."  Quiros Test., Doc. No. 286 at 223-225; Pl.'s Trial Ex. 6 at 10 ¶ 12.C. (Administrative Directive 9.2 section that indicates the conditions under which inmates shall be automatically classified as level 5).  Administrative Directive 9.2 was approved by the commissioner.  Pl.'s Trial Ex. 6 at 1.  Administrative Directive 9.2 can also be revised with the approval of the commissioner.  Pl.'s Trial Ex. 7 at 1 (showing 2016 revision to Administrative Directive 9.2).  In 2016, after the death penalty was abolished retroactively in Connecticut, Semple revised Administrative Directive 9.2 to ensure that former death row inmates would remain automatically classified as level 5 inmates.  Pl.'s Trial Ex. 7 at 1.  Finally, testimony at trial further showed that the commissioner can intervene in any classification decision.  Maiga Test., Doc. No. 288 at 119-20.

The evidence presented at trial therefore conclusively established that Semple was personally involved in denying death row and former death row inmates—categories that included Reynolds—meaningful review of their level 5 classifications.  Semple was involved by not implementing DOC policies for meaningful review of Reynolds' level 5 classification during his term as commissioner.  He was also involved in deciding to continue existing DOC policies without revising them.  Finally, he was involved in denying Reynolds meaningful review for his classification in 2016, by revising Administrative Directive 9.2 after the death penalty was retroactively abolished.

Accordingly, the evidence at trial regarding Semple's authority, his acts—including his decisions to act and to refrain from acting—strongly support the inference that Semple had a culpable state of mind with respect to Reynolds' due process claim within the period of 2014 to 2017.

b.   Quiros

Evidence presented at trial also established Quiros's involvement in Reynolds' due

process claim during the period 2010 to 2017.  Quiros served as warden of Northern at the

beginning of 2010.  Quiros Test., Doc. No. 286 at 161, 214.  Quiros then became a district

administrator in the DOC in May 2011 and served in that position until 2019.  *Id.* at 213-14;

Stipulated Fact No. 6.  As district administrator, Quiros specifically supervised Northern from

2012-2017 and from 2018-2019.  Quiros Test., Doc. No. 286 at 214-25.

Quiros was aware of the conditions that triggered Reynolds' due process liberty interest

and implemented many of those conditions himself.  Regarding his awareness, Quiros testified

that, as warden, he would "tour the facility just about every day."  Quiros Test., Doc. No. 286 at

165-66.  He further testified that his "tours consisted of stopping at every cell and addressing any

issue that the population may have."  *Id*. at 186.  The tours would often take "up to two and a

half hours to three hours," and he would see about "192" inmates.  *Id*.  Regarding his

involvement in implementing those conditions, Quiros signed unit directives governing

recreational activities, out-of-cell time, group activities, and availability of job opportunities and

did not recommend changes to those policies.  *Id*. at 237-38, 241-42.  Evidence at trial also

showed that Quiros formally recommended the imposition of a restrictive restraint policy at

Northern.  Quiros Test., Doc. No. 286 at 184 (Quiros "drafted a recommendation to [his] boss,

the district administrator," to "put the death row population in full restraints any time they came

out of their cells." Then, after the policy was approved, he "proceed[ed] with the restraint

policy."); *id.* at 201; Pl.'s Trial Ex. A at 1-3 (Quiros's write-up of recommendations to the

District Administrator regarding death row inmate restraint policy).

Moreover, evidence at trial showed that Quiros knew that Reynolds' classification was

based solely on Reynolds' sentence.  Indeed, Quiros testified to that effect at trial.  Quiros Test.,

Doc. No. 286 at 223-25.  Additionally, Quiros testified that he would speak to Reynolds when touring facilities, and that he "reviewed the files of . . . the ten death row offenders that [he] had" in order "to be well informed of . . . their cases."  *Id*. at 175, 187-88, 230.  It is therefore only reasonable to infer that Quiros was aware that Reynolds was not the kind of inmate who had notable mental health or disciplinary issues that would warrant segregation under ordinary circumstances.

Furthermore, as warden of Northern, Quiros was personally involved in administering the policy that denied Reynolds meaningful review of his conditions of confinement.  Administrative Directive 9.2 provided that "The Unit Administrator[5] shall be responsible for administering the classification procedures under this Directive."  Pl.'s Trial Ex. 6 at 2 ¶ 5.  Testimony at trial also established that wardens approve unit directives and post orders.  Maldonado Test., Doc. No. 287 at 25.  Unit directives were the policies that governed inmate recreational activities, out-of-cell time, group activities, and the availability of job opportunities.  Quiros Test., Doc. No. 286 at 237-38, 241-42.  Thus, although Quiros was not personally involved in drafting the language of Administrative Directive 9.2, which automatically classified Reynolds as a level 5 inmate, Quiros's involvement in the directive's *implementation* gave meaning to Reynolds' classification as a "level 5" inmate.  By implementing the conditions that constitute "level 5" incarceration at Northern, Quiros imposed a set of confinement conditions on Reynolds that Quiros knew Reynolds had no procedural means to challenge.  In his administration of Administrative Directive 9.2, Quiros was therefore personally involved in denying Reynolds procedural review for conditions that imposed on Reynolds an atypical and significant hardship.  *Cf. Edwards v.*

---

[5] A "Unit Administrator" is a Correctional Warden. *See* Conn. Dept. of Corr., Administrative Directive 1.3 at ¶ 3(i) (June 29, 2018), https://portal.ct.gov/-/media/doc/pdf/ad/ad01/ad0103_20200615.pdf?rev=b64b11c2f1e24a05802ba 72d56e0bb4d&hash=3170471DB7ED30B6F31596DF9D9F7ECA (last visited Mar. 27, 2025).

*Quiros*, 986 F.3d 187, 192-93 (2d Cir. 2021) (holding that jury had sufficient basis to find personal involvement for warden defendant where evidence at trial showed he knew about the risk to the plaintiff's health posed by a restraint policy, "testified that he had endorsed the prison's policy," and "presented himself to the jury as a hands-on warden who kept close tabs on the inmates").

       c.  Maldonado

The evidence at trial also established Maldonado's personal involvement in the conduct giving rise to Reynolds' due process claim for the period 2011 through 2017. Maldonado was warden of Northern from 2011 through January 1, 2013. Stipulated Fact No. 8.

Maldonado was aware of the conditions that triggered Reynolds' due process liberty interest and was involved in the implementation of those conditions. Maldonado testified to knowing Reynolds and that Reynolds "was an inmate who wasn't displaying any issues at the moment." Maldonado Test., Doc. No. 287 at 42. He further testified that "all inmates present an equal security risk regardless" of their classification level, and that Reynolds' restrictive housing was "based purely on the length of his sentence rather than any of his behavior in prison." *Id.* at 44, 46.

In addition, Maldonado testified that, as warden of Northern, he signed off on all unit directives for Northern. Maldonado Test., Doc. No. 287 at 25. Those policies included the policy that death row inmates cannot have jobs, recreation policies that required separation of inmates, a policy for in-cell meals for death row inmates, and a policy mandating a maximum of two hours of out-of-cell time for death row inmates. *Id.* at 26-28. Maldonado "reviewed" policies he inherited from Quiros when he became warden. *Id*. at 25-26. Maldonado also

testified that he could have changed a policy by "fill[ing] out a form and submit[ing] it to the public information office." *Id.* at 28.

There was evidence presented at trial of at least one instance in which Maldonado decided whether to change DOC policies. That was Maldonado's decision to continue Quiros's restraint policy. In 2013, Maldonado received an inmate request form from Reynolds, in which Reynolds requested to be removed from restraints, arguing that his behavior had not warranted the imposition of restraints. Maldonado Test., Doc. No. 286 at 277-78; Pl.'s Trial Ex. 14. Maldonado responded by informing Reynolds that no hearing would be held regarding Reynolds' restraint status because Reynolds was on death row. Maldonado Test., Doc. No. 286 at 278-81; Ex. 14. During his testimony at trial, Maldonado defended his decision to continue the restraint policy, citing safety. Maldonado Test., Doc. No. 286 at 281.

In addition, like Quiros, Maldonado was also personally involved as a warden in administering the policy that denied Reynolds meaningful review of his conditions of confinement. As previously discussed, Administrative Directive 9.2 provided that "[t]he Unit Administrator shall be responsible for administering the classification procedures under this Directive." Pl.'s Trial Ex 6 at 2 ¶ 5. Wardens approve unit directives and post orders. Maldonado Test., Doc. No. 287 at 25. Unit directives governed many characteristics of confinement conditions, including inmate recreational activities, out-of-cell time, group activities, and the availability of job opportunities. Quiros Test., Doc. No. 286 at 237-38. Like Quiros, Maldonado's role in administering Administrative Directive 9.2 defined many of the restrictions and conditions associated with a level 5 classification. That means that, like Quiros, Maldonado implemented confinement conditions that Maldonado knew Reynolds could not procedurally challenge.

26

Accordingly, the evidence at trial supported a finding that Maldonado was personally involved in acts giving rise to Reynolds' due process claim between 2011 and 2017. To the extent that Maldonado continued unconstitutional conditions and prison policies, the evidence showed that the decision to continue those conditions and policies was a conscious one.

As previously noted, a court may grant a new trial if the court "is convinced that the jury has reached a seriously erroneous result." *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006). Here, the evidence at trial decisively showed that Reynolds' due process rights were violated between 2010 and 2017, and the evidence established Semple's, Quiros's, and Maldonado's personal involvement in that deprivation. Accordingly, I conclude that the jury's verdict that none of the three defendants was guilty of violating Reynolds' due process rights between 2010 and 2017 was a "seriously erroneous result." *Id.*

### D. Qualified Immunity

Although the jury seriously erred in its verdict regarding Reynolds' due process claim from 2010 to 2017, before granting Reynolds a new trial on that claim, I must determine whether the defendants are entitled to qualified immunity. "Qualified immunity . . . is an entitlement not to stand trial under certain circumstances." *Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985). "[T]he availability of qualified immunity should be decided by a court 'at the earliest possible stage in litigation.'" *Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 17 (E.D.N.Y. 2013) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). "Qualified immunity protects officials from damages liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, . . . or if it was objectively reasonable for [the officer] to believe that his actions were lawful at the time of the challenged act." *Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y. Aug. 15, 2018) (quoting *Mullenix*

*v. Luna*, 577 U.S. 7, 11 (2015); *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016)) (cleaned up).

### 1. *Whether the Right Was Clearly Established*

Based on my review of the precedent that binds this Court, I conclude that Reynolds' due process right was clearly established prior to 2010. It was clearly established in 1995 that atypical and significant hardship in relation to the ordinary incidents of prison life triggers a liberty interest, thereby entitling someone to process. *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484). In addition, it was clearly established in 2004 that "[f]actors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998).

In 1999, it was clearly established that, with respect to atypicality, "[b]oth the conditions and their duration must be considered . . . since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). Likewise, it was clearly established in 2000 that "the duration of [segregated housing unit] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir.

2000); *see also Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (per curiam) ("The length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s 'atypical and significant hardship' test.").

In 2000, it was clearly established in the Second Circuit that, in measuring hardship, "305 days" of segregated housing unit conditions "satisfies" the hardship standard. *Colon*, 215 F.3d at 231. Furthermore, in 2003, the Second Circuit held that it was clearly established that ten years of isolated confinement triggered due process protection. *Hanrahan*, 331 F.3d at 99 ("Whatever confusion *Sandin* may have left in its wake, defendants do not argue, nor could a credible argument be made, that it was not clearly established at the time of the alleged violations that disciplinary punishment, consisting of ten years of solitary confinement, triggered due process protection."). Moreover, it was clearly established in 2005 that a prisoner could possess a "liberty interest in avoiding assignment" to a particular maximum-security facility because that assignment would "impose an atypical and significant hardship." *Wilkinson*, 545 U.S. at 224.

In 1976, the Supreme Court clearly established that when process is due, it must be "meaningful." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Second Circuit made it clear in 2001 that the *Mathews v. Eldridge* meaningfulness requirement applied with respect to prisoners' due process rights. *See Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001) ("Although the hearing requirement for placement in administrative segregation may be met by an 'informal, nonadversar[ial]' proceeding . . . it is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner.'") (quoting *Mathews*, 424 U.S. at 333 (1976)). Furthermore, it was clearly established in 1983 that individuals

confined in administrative segregation are entitled to periodic reviews. *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (stating that once an individual is confined in administrative segregation, "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates.").

### 2. *Whether the Defendants Were Objectively Reasonable*

With the clearly established prong satisfied, I next turn to whether the defendants' conduct was objectively reasonable. For the reasons that follow, I conclude that it was not.

First, it was not reasonable for the defendants to believe that Reynolds' classification reviews were meaningful. Evidence at trial showed that the defendants knew that the classification process for Reynolds was automatic. Quiros, for example, himself testified that Reynolds was automatically a level 5 inmate and housed at Northern. Quiros Test., Doc. No. 286 at 223, 225. Although a prisoner in Reynolds' position would not necessarily be entitled to formal procedures identical to those used in other, non-prison contexts, the automatic classification process imposed and implemented by the defendants was certainly not a "meaningful" review, as required by clearly established law. *See Hewitt v. Helms*, 459 U.S. at 475-76 (1983); *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, it would not have been objectively reasonable for the defendants to believe that they afforded Reynolds meaningful reviews of his classification or confinement conditions.

Moreover, it was not objectively reasonable for the defendants to continue housing Reynolds in restrictive conditions without review. Evidence at trial established that housing

death row inmates in segregation for the remainder of their lives is not justified by security

reasons. *See, e.g.*, Arnone Test., Doc. No. 286 at 136 (former DOC commissioner testifying that

"there is no security rationale that would justify housing someone in segregation for the rest of

his life"); Maldonado Test., Doc. No. 287 at 44 (testifying that "all inmates present an equal

security risk regardless of whether they're a Level 1 or a Level 5").

Moreover, isolating inmates indefinitely without review solely due to their sentences is

not supported by the prison penological interests that courts ordinarily consider to be legitimate

and reasonable. Consider, for example, *Pell v. Procunier*, where the Supreme Court recognized:

> An important function of the corrections system is the deterrence of crime. The
> premise is that by confining criminal offenders in a facility where they are isolated
> from the rest of society, a condition that most people presumably find undesirable,
> they and others will be deterred from committing additional criminal offenses. This
> isolation, of course, also serves a protective function by quarantining criminal
> offenders for a given period of time while, it is hoped, the rehabilitative processes
> of the corrections system work to correct the offender's demonstrated criminal
> proclivity. Thus, since most offenders will eventually return to society, another
> paramount objective of the corrections system is the rehabilitation of those
> committed to its custody.

417 U.S. 817, 822-23 (1974); *see also Hudson v. Palmer*, 468 U.S. 517, 547-49 (1984) (Stevens,

J., concurring in part) (holding that "[i]t is well-settled that the discretion accorded prison

officials is not absolute," and "[a] prisoner retains those constitutional rights not inconsistent

with legitimate penological objectives"; and ruling that a seizure of a prisoner's property was not

penologically justified because the property did not pose a "threat to institutional security").

Moreover, at trial, the defendants' individual justifications for Reynolds' restrictive

conditions of confinement and lack of process were often contradictory. In defense of Reynolds'

level 5 classification, Quiros testified that he "could state with confidence as a warden and as a

commissioner that the severity of the violence of the current charge that brought [death row

inmates] into incarceration outweighs the violent history of our classification system." Quiros

Test., Doc. No. 286 at 220.  Reynolds' classification review documents show that the severity of the violence for his underlying charge is captured in a separate category, however. *See generally* Pl.'s Trial Ex. E.  In that category, the severity and violence of Reynolds' underlying offense is classified as a level 4—and a level 4 classification would have put Reynolds in general population.  Pl.'s Trial Ex. E; Quiros Test., Doc. No. 286 at 221.  Upon hearing that information, Quiros corrected himself during his testimony to say that Reynolds was more likely to commit violence due to the length of his confinement.  Quiros Test., Doc. No. 286 at 222-23.

Additionally, during his testimony, Semple stated that it was technically within his authority to change the classification manual to, for example, make Reynolds' length of his sentence a level 4 instead of a level 5.  Semple Test., Doc. No. 289 at 128.  Semple testified, however, that he would not change the policies because he "would rely on the people with the expertise to guide [him]."  *Id.*  Semple, however, further testified that he had never asked anybody in his department about the policy of giving a level 5 length-of-sentence rating for death row inmates and whether that policy made sense.  *Id.* at 129.  At the same time, in seeming contradiction, Semple testified that "Northern is not an appropriate place to house an individual that stops being a threat to staff[,] themselves[,] and other inmates."  Semple Test., Doc. No. 289 at 136.

Maldonado's testimony at trial was similarly incongruous.  Maldonado testified that Reynolds "was an inmate who wasn't displaying any issues" and that his restrictive conditions of confinement were "based purely on the length of his sentence rather than any of his behavior in prison."  Maldonado Test., Doc. No. 287 at 42, 46.  He further testified that "all inmates present an equal security risk regardless of whether they're a Level 1 or a Level 5."  *Id.* at 44.  He also agreed that "administratively," managing death row was more difficult, but in terms of "the

actual behavior of death row inmates as a population, they're not more difficult to manage than other inmates." *Id.* at 44-45.

Accordingly, because Reynolds' due process rights were clearly established in 2010, and the defendants were not objectively reasonable in depriving him of those rights, the defendants are not entitled to qualified immunity for the due process claim during the 2010-2017 period.

Reynolds' motion for a new trial on the 2010-2017 due process claim is thus **granted**.

## III. New Trial on the Eighth Amendment Claim

As discussed above, the plaintiff is granted a new trial on the due process claim for the period 2010 to 2017. For the following reasons, I conclude that a new trial is also warranted for the Eighth Amendment claim for the period 2010-2019.

### A. Legal Standards

1. *Granting a Motion for New Trial for a Reason Not Stated in the Motion*

Federal Rule of Civil Procedure 59(d) provides that "[a]fter giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion." Fed. R. Civ. P. 59(d). *See Kelly v. Moore*, 376 F.3d 481, 483-84 (5th Cir. 2004) ("Rule 59(d) draws a distinction between a ruling on the court's *own* motion and a ruling based on a reason not contained in the *party's* motion. . . . [T]he ten-day period does not apply to a decision based on a reason not stated in a timely filed Rule 59(b) motion."); *Murphy v. City of Long Beach,* 914 F.2d 183, 186 n.5, 187-88 (9th Cir. 1990) ("The court's control over a trial is illustrated by the court's *sua sponte* power to grant a new trial on grounds not alleged by a party."); *Holt v. Pennsylvania*, 2015 WL 4944032, at *30 n.55 (E.D. Pa. Aug. 19, 2015) (granting new trial based on a reason not stated in a party's motion for new trial), *aff'd in part, rev'd in part on other grounds*, 683 F. App'x. 151 (3d Cir. 2017); *Swanson v. Roehl Transp.,*

*Inc*., 2010 WL 3702589, at *4, *6 (E.D. Tex. Sept. 15, 2010) ("Although Plaintiff did not specifically request a new trial solely on the issue of damages in its motion for new trial, the Court finds that a new trial on damages is required in the interest of justice . . . ."). "If a motion for new trial is pending, the court may grant the motion for reasons not stated in the motion provided that the motion is timely and the court gives the parties notice and an opportunity to be heard . . . ." 12 Moore's Federal Practice - Civil § 59.11 (2025). The Court is not limited to the 28-day deadline that would otherwise apply "[w]hen the court acts on its own initiative." *Id.*; *see* 1966 Advisory Committee Note to Fed. R. Civ. P. 59; *Peterman v. Chicago R.I. & P.R. Co*., 493 F.2d 88, 91-92 (8th Cir. 1974) (holding that when a party does not timely file a motion for a new trial, a court is held to the deadline in Fed. R. Civ. P. 59 for granting a new trial on the court's initiative).

### 2.  *The Eighth Amendment's Protection Against Cruel and Unusual Punishment*

It is axiomatic that, during his incarceration, a convicted prisoner forfeits certain liberties ordinarily protected by the Constitution. Nevertheless, "[w]hatever rights [a convicted prisoner] may lose at the prison gates . . . the full protections of the [E]ighth [A]mendment most certainly remain in force." *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979) (Kennedy, J.); *accord Michenfelder v. Sumner*, 860 F.2d 328, 335 (9th Cir. 1988).

The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .' against which [courts] must evaluate penal measures." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). "Even those prisoners at the 'bottom of the social heap. . . . have, nonetheless, a human dignity.'" *Madrid v. Gomez*, 889 F. Supp. 1146, 1244 (N.D. Cal. 1995) (quoting *Toussaint v. McCarthy*, 926 F.2d 800, 801 (9th Cir. 1990), *cert. denied*, 502 U.S. 874 (1991));

*see also Graham v. Florida*, 560 U.S. 48, 59 (2010) (referring to "the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes.").  In recognition of that essential human dignity, the government retains certain "obligation[s]" with respect to the care it must provide for those it incarcerates.  *Estelle*, 429 U.S. at 103 (discussing the government's obligation to provide medical care).  Indeed, the Supreme Court has recognized a "common-law view that '(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'"  *Id.* at 103-04 (quoting *Spicer v. Williamson*, 191 N.C. 487, 490 (1926)).  In addition to that affirmative caretaking obligation, "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' or which 'involve the unnecessary and wanton infliction of pain'" are "repugnant to the Eighth Amendment."  *Estelle*, 429 U.S. at 102-03 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  To prevail on an Eighth Amendment conditions of confinement claim, a plaintiff must establish both an objective and subjective element.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

The objective element concerns whether the deprivation was sufficiently serious.  *Id.* (discussing *Rhodes v. Chapman*, 452 U.S. 337 (1981)).  Although "the Constitution 'does not mandate comfortable prisons,' . . . prisoners may not be denied 'the minimal civilized measure of life's necessities.'"  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Rhodes*, 452 U.S. at 347, 349 (1981)).  To satisfy the objective element, a prisoner plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency."  *Phelps*, 308 F.3d at 185 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33, 35-36 (1993); *Rhodes*, 452 U.S. at 347).  "Some conditions of confinement may establish an Eighth Amendment violation 'in

combination' [with one another] when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." *Wilson*, 501 U.S. 294, 304 (1991) (emphasis removed).

The subjective prong, on the other hand, relates to whether the "officials act[ed] with a sufficiently culpable state of mind." *Id*. at 298. That culpable state of mind must amount to "obduracy and wantonness, not inadvertence or error in good faith." *Whitley v. Albers*, 475 U.S. 319 (1986). An official's "deliberate indifference" to the needs of an incarcerated person "would constitute wantonness." *Wilson*, 501 U.S. at 302-03 (stating that the "deliberate indifference" standard in *Estelle*, which concerned an Eighth Amendment claim regarding deprivation of medical care, applies to "conditions of confinement, failure to attend to [a prisoner's] medical needs, or a combination of both") (internal citation omitted). The subjective prong may be satisfied if a "prison official . . . [knew] of, and disregard[ed] an excessive risk to inmate health or safety," and "[e]vidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient" to establish actual knowledge. *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)). "The long duration of a cruel prison condition may make it easier to *establish* knowledge and hence some form of intent," but it does not extinguish the requirement that the intent element be met. *Wilson*, 501 U.S. at 300-01 (emphasis in original).

B. <u>Weight of the Trial Evidence Regarding the Eighth Amendment Claim</u>

I have reviewed the trial record in this case and, for following reasons, I find that the weight of the evidence strongly favored a plaintiff's verdict on the Eighth Amendment claim, and that the jury's verdict at trial was "a miscarriage of justice." *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006).

1.  *Reynolds Satisfied the Objective Element*

As articulated above, for Reynolds to prove the elements of his Eighth Amendment claim at trial, he would have had to present evidence satisfying both the objective and subjective prong of his Eighth Amendment claim.  I will first address the objective prong.

It was undisputed at trial that Reynolds' conditions of confinement on death row consisted of isolation in his cell for all but two hours a day from Monday through Saturday, and all day on Sunday.  Arnone Test., Doc. No. 286 at 100, 106; Quiros Test., Doc. No. 286 at 226-27; Reynolds Test., Doc. No. 284 at 151.  Reynolds was confined in those conditions for the entirety of the liability timeframe, and for a total of 26 years.  Reynolds' Test., Doc. No. 284 at 181.  The only social interaction Reynolds had when he was inside his cell was the possibility of "conversations" with prisoners in nearby cells, yelling at each other through the cell HVAC vents.  Doc. No. 289 at 146-49.

A demonstrative exhibit at trial showed the 12-foot by 7-foot dimensions of Reynolds' cell, highlighting its small size.  Multiple exhibits at trial showed that the cell was largely gray in color, with gray metal furnishings.  Pl.'s Trial Ex. 19 at 6-10; Pl.'s Trial Ex. 15; Reynolds Test., Doc. No. 284 at 168-170; *see also* Arnone Test. Doc. No. 286 at 103 (stating the facility "probably could use some pastel colors and paint").  Reynolds had a narrow window to the outside.  Stipulated Fact No. 19.

The limited "outdoor" time Reynolds was allowed took place in a concrete enclosure, open to the outside only through its metal cage roof.  Reynolds Test., Doc. No. 284 at 156-61.  Reynolds would spend his outdoor time in an individual cage within that enclosure, and other prisoners could occupy other cages within the same enclosure.  *Id.*  For a number of years, death row inmates were not allowed to see other inmates during their out-of-cell time.  *Id.* at 217.  Reynolds would spend his indoor recreation time alone in a room surrounded by glass and

concrete walls, with metal tables.  Pl.'s Trial Ex. J at 4-11; Pl.'s Trial Ex. 19 at 3-4; Reynolds

Test., Doc. No. 284 at 168, 217.

During the timeframe that the restraint policy was in place at Northern, death row

prisoners were required to be handcuffed behind their backs when moving outside of their cells,

including when going to the showers, recreation yard, social visits, and social phone calls.  Pl.'s

Trial Ex. 12.  For professional visits, including legal and medical visits, Reynolds was required

to wear handcuffs, leg-irons, and tether chains.  *Id*.  When moving outside of his unit within the

facility, Reynolds was required to be fully restrained behind his back with handcuffs, leg-irons,

and tether chains.  *Id*.

There was additional evidence at trial that the prison indoor and outdoor space was not

always clean, would smell of feces and other unpleasant odors, was subject to poorly regulated

temperature, and would at times be quite loud.  Reynolds Test., Doc. No. 289 at 145-46;

Santiago Test., Doc. No. 286 at 18-21; Quiros Test., Doc. No. 286 188-89; Johnson Test., Doc.

No. 285 at 107; Stipulated Facts Nos. 23-27; O'Herron Test., Doc. No. 285 at 150-51.

The plaintiff also presented evidence at trial indicating that Reynolds' conditions were

considered harsh by both societal and correctional standards.  Horn testified that solitary

confinement with out-of-cell time limited to two hours a day, six days a week, plus 15-minute

showers, constitutes "extreme social isolation."  Horn Test., Doc. No. 284 at 88-89.  Horn

testified that from a penological perspective, extreme social isolation is "debilitating."  Horn

Test., Doc. No. 284 at 91.  Additionally, during his testimony, Arnone acknowledged that "being

sent to Northern was the harshest punishment that the Department of Corrections had during

[his] tenure as commissioner."  Arnone, Test., Doc. No. 286 at 135.

Taken together, Reynolds' long-term conditions of confinement were plainly "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102 (internal citation and quotation marks omitted). Reynolds' in-cell isolation alone is sufficient to establish that he was deprived of the identifiable human need of minimal social interaction and environmental stimulation. The other evidence at trial regarding the hardships to which he was subjected only further reinforce the severity of that deprivation. *See Wilson*, 501 U.S. at 304-05.

Minimal social interaction and environmental stimulation are basic and identifiable human needs. The human need for social interaction was established at trial. *See* Saathoff Test., Doc. No. 289 at 28-31 (testifying that the ability to communicate is important to a person's mental health). The testimony of multiple witnesses regarding the negative impact of Northern's conditions of confinement point to the negative impact of prolonged solitary confinement. Dr. Frayne testified that it is "very impressive" how Reynolds was able to "manage the time being inside," referring to Reynolds' ability to manage himself mentally and emotionally for decades in isolated confinement. Frayne Test., Doc. No. 287 at 101-05, 119. Semple testified in the affirmative that prolonged stay in restrictive housing can result in mental health issues or make those issues worse. Semple Test., Doc. No. 289 at 138-39. Additionally, Santiago and Johnson both testified to experiencing negative psychological symptoms as a result of their time at Northern, housed in the same conditions Reynolds experienced. *See* Johnson Test., Doc. No. 285 at 108-09 (testifying that his five years at Northern made him "paranoid" and anxious and that he had to take medication for those symptoms for years after leaving the facility); Santiago Test., Doc. No. 286 at 26-27 (testifying that when he was housed in Northern, his anxiety and panic attacks increased in frequency and he felt a sense of "helpless[ness]").

The negative effects of social and environmental deprivation through segregated confinement have also been documented in legal scholarship.  *See* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 530-31 (1997) ("Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses. . . . There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."); *id*. at 503-506 (discussing "Psychological Literature on the Importance of Social Contact and Support").  The exceedingly limited social interaction Reynolds received is not sufficient to protect against the negative psychological effects of social isolation. *See id*. at 497 (defining the article's use of the term "solitary confinement" as "segregation from the general population of prisoners for a punitive purpose that virtually always imposes severe restrictions in movement and activity within the segregated unit itself"; stating that "solitary confinement or punitive segregation includes at least partial social isolation and partial reduction of certain forms of stimulation, as compared to general population prisoners"; and explaining that the authors "examine[d] a broad range of solitary-like conditions—not just the harshest or most extreme versions . . . [to conduct] a conservative test of their negative effects").

The Supreme Court recognized the harms of solitary confinement as early as 1890, when the Court recognized the severity and risk of psychological and medical harm posed by isolated confinement.  *See In re Medley*, 134 U.S. 160, 168 (1890) ("[E]xperience demonstrated" that,

when confined in isolation, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.").  In *In re Medley*, the Court considered a statute that imposed the following conditions, which the court referred to as "solitary confinement":  incarceration in "a place where imprisonment always implies disgrace," as contrasted with "the ordinary county prison . . . where [the prisoner] and his friends reside; where they may, under the control of the sheriff, see him and visit him; where the sheriff and his attendants must see him; where his religious adviser and his legal counsel may often visit him without any hindrance of law on the subject."  *Id*. at 168-69.  The fact that the statute left open the possibility for "certain persons" to "be allowed access to" the prisoner "in accordance with prison regulations" was "but a small mitigation of this solitary confinement."  *Id*. at 169.

    *In re Medley* is, of course, not the only recognition by the Supreme Court of the severe harms of prolonged solitary confinement.  In *Hutto v. Finney*, the Supreme Court wrote that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards" and "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." 437 U.S. 678, 685-86 (1978).  Additionally, in her statement in *Apodaca v. Raemisch*, Justice Sotomayor wrote that "[c]ourts and corrections officials must . . . remain alert to the clear constitutional problems raised by keeping prisoners . . . in 'near-total isolation' from the living world . . . in what comes perilously close to a penal tomb."  586 U.S. 931, 937 (2018) (statement of Sotomayor, J., regarding the denial of certiorari) (quoting *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J.,

concurring)).  In *Ruiz v. Texas*, Justice Breyer wrote that "[i]f extended solitary confinement alone raises serious constitutional questions, then 20 years of solitary confinement, all the while under threat of execution, must raise similar questions, and to a rare degree, and with particular intensity."  580 U.S. 1191, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution of sentence of death).  Justice Breyer also wrote, in *Glossip v. Gross*, that "it is well documented that such prolonged solitary confinement," of "22 hours or more per day," causes "numerous deleterious harms."  *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting).  Furthermore, Justice Kennedy in *Davis v. Ayala* wrote that "[y]ears on end of near-total isolation exact a terrible price."  576 U.S. 257, 289 (2015) (Kennedy, J., concurring).

Numerous other courts within and outside of this Circuit have recognized the harm of confinement in isolation.  *See, e.g.*, *United States v. D.W*., 198 F. Supp. 3d 18, 75, 90-94 (E.D.N.Y. 2016) (discussing in detail the negative effects of solitary confinement, which the court defines broadly to include restrictive housing and segregated housing); *Peoples v. Annucci*, 180 F. Supp. 3d 294, 298-300 (S.D.N.Y. 2016) (discussing the negative effects of solitary confinement, which the court defines as confinement in one's cell for 22 hours per day or more); *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").  *See also, e.g.*, *Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) (noting "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement," along with physical consequences); *Williams v. Sec'y Pennsylvania Dep't of Corr*., 848 F.3d 549, 563 (3d Cir. 2017) ("Numerous studies on the impact of solitary confinement show that these conditions are extremely hazardous to well-being."); *Davenport v. DeRobertis*, 844 F.2d 1310,

1316 (7th Cir. 1988) (acknowledging that "there is plenty of medical and psychological literature concerning the ill effects of solitary confinement (of which segregation is a variant)"); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) ("[P]rolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment . . . depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement."); *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1239 (N.D. Fla. 2019) ("Courts have recognized exercise, social interaction, and environmental stimulation as basic human needs subject to deprivation."); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777-79 (M.D. Pa. 2016) (discussing health risks of prolonged solitary confinement); *Shoatz v. Wetzel*, 2016 WL 595337, at *8 (W.D. Pa. Feb. 12, 2016) ("[T]he cumulative effect of over 22 years in consecutive solitary confinement constitutes a sufficiently serious deprivation of at least one basic human need, including but not limited to sleep, exercise, social contact and environmental stimulation."); *Ashker v. Brown*, 2013 WL 1435148, at *5 (N.D. Cal. Apr. 9, 2013) (recognizing risk of harm posed by "prolonged social isolation and lack of environmental stimuli"); *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678-79 (M.D. La. 2007) ("recognizing social interaction and environmental stimulation [are] basic human needs" deprived by isolated confinement); *Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) ("Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances."); *Morris v. Travisono*, 549 F. Supp. 291, 294-95 (D.R.I. 1982), *aff'd*, 707 F.2d 28 (1st Cir. 1983) (discussing the "debilitating effect" of "solitary confinement for an extended period of time" on a prisoner).

Courts have further recognized that isolated confinement is a particularly serious deprivation when the isolation is prolonged.  *See. e.g.*, *Glossip*, 576 U.S. at 926 (Breyer, J., dissenting) (noting the harm of "prolonged solitary confinement," of "22 hours or more per day"); *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015) (stating that whether isolated confinement violates the Eighth Amendment "depends on the duration and the conditions of the confinement"); *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974) (stating that when solitary confinement is "imposed inappropriately or for too long a period, even the permissible forms of solitary confinement might violate the Eighth Amendment"); *see also Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (holding that, for purposes of the right to due process, "the duration of [segregated housing unit] confinement is a distinct factor").

Specifically, the Fourth Circuit upheld a ruling that the conditions of confinement for Virginia's death row inmates violated the Eighth Amendment.  *Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019), *as amended* (May 6, 2019).  The Virginia inmates' conditions were very similar to those Reynolds experienced: the plaintiffs spent years alone in small cells in which they were held for 23 to 24 hours a day.[6]  *Id.* at 353-54.  They had "no access to congregate religious, educational, or social programming."  *Id.* at 357 (internal quotation marks and citation omitted).  Despite access to television in their cell and being allowed to leave their cells to perform institutional jobs, the conditions violated the Eighth Amendment because the conditions posed a substantial risk of serious psychological and emotional harm.  *Id.* at 354, 364, 368.  The Fourth Circuit discussed its reasoning at length, pointing to "[n]umerous studies reveal[ing] that

---

[6] None of the plaintiffs, however, spent as much as 13 years on death row—less than half the amount of time Reynolds endured his conditions.  *Porter v. Clarke*, 290 F. Supp. 3d 518, 522 (E.D. Va. 2018), *aff'd but criticized*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019) ("Plaintiffs . . .  have respectively spent over ten, twelve, and six years on death row, and former plaintiff Ricky Gray ("Gray") had spent more than ten years on death row before being executed in January 2017.").

prolonged detention of inmates in conditions akin to those Plaintiffs faced on Virginia's death

row also leads to psychological deterioration, including declines in mental functioning,

difficulties in thinking, concentration and memory problems, and problems with impulse

control." *Id.* at 356 (internal citation and quotation marks omitted).

That prolonged solitary confinement without adequate justification "violates

contemporary standards of decency" also accords with commonsense principles in our society.

The mental health effects of isolation, for even days at a time, was readily observable to any

individual who had to socially isolate due to the COVID-19 pandemic.  Further, in our society, it

would be considered socially unacceptable and cruel to isolate *a dog* indefinitely and without

legitimate justification—let alone another human being.  Confining a dog to a crate on a

temporary basis or for training purposes would be considered socially acceptable, much like

perhaps the occasional and temporary use of segregated housing may not run afoul of the Eighth

Amendment.  On the other hand, keeping a dog in a small crate indoors for its entire life, letting

the dog out of the crate only a few times a week for short periods of time, never letting the dog

outdoors other than within a concrete cage, regardless of whether the dog is misbehaving or

otherwise needs to be crated, would undoubtedly be considered censurable animal cruelty.  It is

apparent, then, that confinement conditions that our society would consider unacceptably cruel

for an animal "[dis]respect the human attributes" of an incarcerated person like Reynolds.

*Graham v. Florida*, 560 U.S. 48, 59 (2010).[7]

---

[7] Reynolds' conditions of confinement cannot be justified by the severity of his underlying offense and his capital sentence.  The Eighth Amendment also prohibits punishments that "are incompatible with the evolving standards of decency" and punishments that "involve the unnecessary and wanton infliction of pain."  *Estelle*, 429 at 102-03 (internal citations and quotation marks omitted).  Those Eighth Amendment prohibitions are distinct from the prohibition on grossly disproportionate punishments.  *See id.* at 103 n.7 (distinguishing among Eighth Amendment principles).  Even a prisoner sentenced to death has a right—as he awaits execution—not to be subjected to deliberate indifference to his serious medical needs and not to be subjected to excessive force.  Likewise, proportionality to the underlying conviction or sentence is not an absolute defense to an Eighth Amendment conditions of confinement claim.

As previously noted, the hours per day and total number of years that Reynolds spent in segregated confinement was an undisputed fact at trial. Reynolds' in-cell confinement for 22 hours per day on Monday through Saturday and 24 hours a day on Sunday, for 26 years, is sufficient alone to satisfy the objective element of Reynolds' Eighth Amendment claim. The other evidence presented by the plaintiff showing the harshness of Reynolds' confinement conditions only serve to reinforce the seriousness of the deprivation. To the extent that the jury found otherwise, that finding was manifestly against the weight of the evidence.

### 2. *Reynolds Satisfied the Subjective Element*

The evidence at trial also weighed heavily in favor of a jury finding that Reynolds satisfied the subjective element of his Eighth Amendment claim against all three of the defendants. Specifically, the trial evidence showed that the defendants were personally involved in the imposition of Reynolds' harsh conditions of confinement. Furthermore, their conduct served no legitimate penological interest and their state of mind was at a minimum one of deliberate indifference to the risk those conditions posed to Reynolds.

#### a. The Defendants' Personal Involvement

The legal standard for personal involvement is discussed at length in Section II.C.1., *supra*. In short, the standard requires that, to sustain a constitutional claim against a government official who supervises others, a plaintiff must show the official directly engaged in unconstitutional conduct. The evidence at trial demonstrated that each defendant made distinct, calculated choices to continually impose Reynolds' confinement conditions.

First, all three defendants were personally involved in housing Reynolds in onerous conditions. Turning first to Semple, it was undisputed at trial that Semple was Commissioner of the DOC from 2014 to 2018. Stipulated Fact No. 3. Reynolds' automatic categorization as a

46

level 5 inmate, which led to his housing at Northern, was due to "Administrative Directive 9.2."

Quiros Test., Doc. No. 286 at 223, 225; Pl.'s Trial Ex. 6 at 10 ¶ 12.C. (Administrative Directive

9.2 section indicating the conditions under which inmates shall be automatically classified as

level 5). Administrative Directive 9.2 is approved by the commissioner and can be revised with

the approval of the commissioner. Pl.'s Trial Ex. 6 at 1; Pl.'s Trial Ex. 7 at 1 (showing 2016

revision to Administrative Directive 9.2). In 2016, after the death penalty was abolished

retroactively in Connecticut, Semple revised Administrative Directive 9.2 to ensure that former

death row inmates like Reynolds would remain automatically classified as level 5 inmates. Pl.'s

Trial Ex. 7 at 1. He did so even though the pertinent state statute did not mandate that automatic

classification. *See infra* Section III.E.2.c. (discussing what Section 18-10b required with respect

to Reynolds' conditions of confinement). After Reynolds' sentence was reduced to life, Semple

made the decision to place Reynolds on Special Circumstances High Security Status, even

though he separately determined that Reynolds did not need to be placed in administrative

segregation or protective custody status. *See* Pl.'s Trial Ex. 22. Finally, testimony at trial also

showed that the commissioner can intervene in any classification decision. Maiga Test., Doc.

No. 288 at 119-20. Semple was therefore personally involved in creating an automatic status for

Reynolds associated with harsh conditions of confinement and classifying him with that status.

Semple Test., Doc. No. 289 at 127-29. Moreover, Semple was aware of the harsh conditions to

which Reynolds was subjected because he testified to touring Northern. Semple Test., Doc. No.

289 at 87-89.

Quiros was warden at Northern in the beginning of 2010. Quiros Test., Doc. No. 286 at

161, 213-14. Quiros later supervised Northern as District Administrator from 2012 through 2017

and from 2018 through 2019. *Id.* at 215. Quiros testified that, as warden, he would tour

Northern every day, and he would regularly review the files of the ten death row offenders and familiarize himself with their cases. *Id.* at 165-66, 174-75. Quiros further testified that he continued touring Northern as district administrator. *Id*. at 187. Moreover, Quiros testified that he spoke to Reynolds when touring the facilities. *Id*. at 230. Quiros therefore knew Reynolds and was aware of Reynolds' daily conditions of confinement. Evidence at trial also showed that Quiros was personally involved in shaping Reynolds' conditions of confinement. Quiros approved of unit directives governing many aspects of Reynolds' confinement, including recreational activities, out-of-cell time, group activities, and availability of job opportunities. *Id.* at 237-38; *see also* Maldonado Test., Doc. No. 287 at 24-26. Quiros was also chiefly involved in the creation and implementation of Northern's restrictive restraint policy. Quiros Test., Doc. No. 286 at 184, 201, 204-06; Pl.'s Trial Ex. A.

Maldonado was warden of Northern from 2011 to January 1, 2013. Stipulated Fact No. 8. Like Quiros, Maldonado, as warden of Northern, approved of unit directives that set the conditions at Northern. Maldonado Test., Doc. No. 287 at 25-26. Maldonado also had the ability to recommend changes to Reynolds' confinement conditions. *Id.* at 22-23. Evidence at trial also showed that Maldonado consciously continued the restraint policy at Northern, and Maldonado testified in defense of his decision to continue the policy. Maldonado Test., Doc. No. 286 at 278-81.

Defendants argue that "none of the Defendants created the conditions on death row or special circumstances[,]" they simply continued the conditions already in place at Northern. Defs.' Opp., Doc. No. 343 at 5. However, as explained above, each defendant knew about Reynolds' confinement conditions, directly acted to continue imposing those conditions, and were deliberately indifferent to the risk of serious harm the conditions created. Enforcing a

policy creating the conditions of confinement is sufficient to establish personal involvement in

an Eighth Amendment violation resulting from those conditions. *Edwards v. Quiros*, 986 F.3d

187, 192-94 (2d Cir. 2021) (holding a defendant warden's knowledge and endorsement of a

prison's policy sufficient to establish Eighth Amendment liability). The individual choices each

defendant made, despite being fully informed about the harsh conditions to which Reynolds was

subjected, demonstrate the requisite "obduracy and wantonness" to establish culpability. *Whitley

v. Albers*, 475 U.S. 312, 319 (1986).

> b. Lack of Legitimate Penological Justification

In addition to establishing their personal involvement, the evidence at trial also proved

that the defendants' conduct was without legitimate penological justification. Harsh conditions

of confinement that lack legitimate penological justification violate the Constitution. *Hope v.

Pelzer*, 536 U.S. 730, 737-38 (2002). Moreover, even to the extent that a prison official may

have legitimate penological reasons for their conduct, those reasons are not entitled to

"mechanical deference" in the Eighth Amendment context. *Johnson v. California*, 543 U.S. 499,

511 (2005) (quoting *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979)).

At trial, Horn testified that it is understood in the corrections community that a person's

"behavior" is the only factor appropriate for assessing whether and for how long a prisoner

should be placed in social isolation. Horn Test., Doc. No. 284 at 96. Horn further testified that

from a correctional understanding, "inmates sentenced to death do not typically pose, for that

reason alone, an immediate threat to safety and/or security of the public, staff or other inmates."

*Id*. at 83. Horn testified:

> It is not the job of a corrections administrator when an individual enters a prison to
> say, well, this individual embezzled $10,000 from their employer, they're not really
> dangerous and I'll treat them one way, but the next individual who walks in is a
> child molester so I'm going to treat him or her more harshly. That is not our job.

> Our job is to treat each individual who is committed to our custody fairly, consistent with the individual characteristics that they present, and we have a duty of care, almost an irrevocable duty of care to every individual who is committed to our custody.

*Id.* at 60.  Arnone testified that the mission of the DOC was to provide "safe, secure and humane living conditions" for prisoners in the DOC's custody, including for those "who are awaiting capital punishment."  Arnone Test., Doc. No. 286 at 131.

Horn provided further testimony regarding several correctional associations and international principles, in support of the contention that correctional officials were aware that solitary confinement was societally discouraged.  *See* Horn Test., Doc. No. 284 at 61-87. Semple agreed that the conditions of confinement for death row and special circumstances prisoners were inconsistent with certain of those principles.  Semple Test., Doc. No. 289 at 138. Additionally, Horn testified that in 2013, the Association of State Correctional Administrators, which included the commissioner of corrections of each state, adopted a resolution and guiding principles regarding housing prisoners in restrictive isolating conditions.  Horn Test., Doc. No. 284 at 72.  According to Horn, the organization adopted a policy in 2013 that stated that isolated confinement "should be used only when no alternative is available and . . . the decision to use it should be based on individualized assessments."  *Id*. at 74.  Semple also testified that he was involved in national correctional associations and knew of the principles regarding solitary confinement about which Horn had testified.  *See* Semple Test., Doc. No. 289 at 75-76, 126. Semple, who was commissioner after 2013, was therefore aware that his professional peers supported limiting the use of isolated confinement.  *See* Stipulated Fact No. 3.

The defendants' decision to house Reynolds in isolated confinement at Northern lacked a valid penological purpose.  In a video presented at trial, Arnone described Northern as a place to which prisoners were sent as punishment for their behavior, such as "if they lay their hands on a

staff member."  Pl.'s Trial Ex. 18.  He stated that the Department of Correction "developed

[Northern]" to incentivize people to improve their behavior so that they "could get back into

general population."  *Id.*  Furthermore, Semple testified that as a general matter, Northern is an

inappropriate place to house a prisoner who is not a threat to the staff, himself, and other

inmates.  Semple Test., Doc. No. 289 at 136.

Nevertheless, multiple witnesses testified that as long as a prisoner's sentence was death

(or originally death), there was nothing the prisoner could do to avoid being rated as an overall

risk level 5 and therefore housed at Northern.  *See* Maiga Test., Doc. No. 288 at 129-30; Quiros

Test., Doc. No. 286 at 225.  To the extent that the seriousness of the prisoner's conviction or the

length of their sentence *could* correlate with their likelihood of attempting escape, committing

disciplinary infractions, or engaging in violence, however, all of those behavioral risks are

*already* captured in separate categories in the classification forms.  *See* Pl.'s Trial Ex. 10.

Evidence at trial showed that Reynolds was virtually always rated the lowest category, 1, on

escape, discipline, detainers, security risk group, and violence history.  *Id.*  Reynolds was also

virtually always rated a 4 on the severity and violence of his underlying offense.  *Id.*  It is only

the length of Reynolds' confinement that put him at a level 5 and subjected him to the conditions

of confinement he experienced.  *Id.*  When asked at trial, the defendants were frequently unable

to justify Reynolds' classification as a level 5 inmate without referring to other risks that the

DOC consistently scored Reynolds as the lowest risk level possible, such as likelihood of escape

and propensity for violence.  Quiros Test., Doc. No. 286 at 220-24 (when pressed on providing a

basis for classifying death row inmates at level 5 automatically based on the length of their

sentence, irrespective of their other risk scores, Quiros testified "[i]t's been a 5 my entire

career"); Semple Test., Doc. No. 289 at 124-25 ("I accept the fact that Mr. Reynolds did not

present a problem during the . . . the period of time that's in question, . . . [but] I didn't view . . .

the conditions of confinement [at Northern] as problematic at the time.").  It was thus

exceedingly apparent at trial that the defendants could not name a single, valid penological

justification for their manner of housing Reynolds.[8]

Other courts evaluating analogous factual scenarios have ruled similarly.  In *Morris*, the

District of Rhode Island dismissed prison officials' argument that the plaintiff prisoner's solitary

confinement was justified by the plaintiff prisoner's underlying violent offense.  *Morris v.

Travisono*, 549 F. Supp. 291, 296 (D.R.I. 1982), *aff'd*, 707 F.2d 28 (1st Cir. 1983).  The plaintiff

prisoner in *Morris* had been convicted of murdering a prison guard, and the defendants had

refused to place the prisoner in general population, contending that he was dangerous and not

capable of rehabilitation.  *Id.* at 292-93, 296.  Instead, the defendants kept him in solitary

confinement for eight and a half years, without meaningfully evaluating him.  *Id.* at 292, 296.

The *Morris* Court concluded that the plaintiff prisoner had "been kept in isolation not for his

dangerous propensities, but because he was convicted of the murder of a prison guard," and

"[t]here is simply no explanation why an inmate whose disciplinary record for the last several

years reveals no violent behavior would be any more difficult to control than other inmates."  *Id.*

at 296.  The Court then concluded that the defendants had violated the Eighth Amendment rights

of the plaintiff prisoner, writing that "the conditions of the plaintiff's confinement, when

considered in light of the lack of a legitimate justification supporting it, are as barbarous as the

---

[8] Additionally, the defendants' conduct cannot be justified by some independent interest they may have, as prison officials, in punishing Reynolds.  "The maxim that people are sent to prison as punishment not for punishment" is relevant here.  *United States. ex rel. Wolfish v. Levi*, 439 F. Supp. 114, 153 (S.D.N.Y. 1977).  There is no "suggestion" that the "statutory powers [of jailers] were meant to embrace [the] profound responsibility" of "determining forms of punishment."  *Id.*  Prison officials cannot apply their own penological interests to justify punishing an inmate in a manner not called for by the sentence imposed.  *See* Order on Mot. in Lim., Doc. No. 254 at 4 ("[T]he defendants cannot argue that retribution is a valid penological interest for a jailor or prison.  Retribution is a valid penological interest of the sentencing court.").

filthy physical conditions that have been consistently condemned in other prison cases." *Id.* at 297.

In *Kelly v. Brewer*, the Eighth Circuit explained that the constitutionality of segregated confinement "depends," in part, "upon the existence of a valid and subsisting reason or reasons for the segregation." 525 F.2d at 400. The *Kelly* Court wrote that "[i]t goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate *or desires to punish him for past misconduct*." *Id.* (emphasis added). The Court further wrote "the reason or reasons for the segregation must not only be valid at the outset *but must continue to subsist during the period of the segregation*." *Id.* (emphasis added).

In *Wilkerson v. Stalder*, the Middle District of Louisiana held that "[t]o keep the convicted inmate confined indefinitely based solely on the fact of the original conviction for killing the guard is constitutionally infirm." 639 F. Supp. 2d 654, 681 (M.D. La. 2007).

Additionally, in *Johnson v. Wetzel*, the Middle District of Pennsylvania considered prison official defendants' argument that the defendants' confinement of the plaintiff prisoner in solitary confinement was justified by "a legitimate penological rationale." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 780 (M.D. Pa. 2016). The court wrote:

> It is hardly a revelation that prisoners sentenced to life in prison without the possibility of parole contemplate, at least momentarily, opportunities to escape. There is no penal institution in this country where whimsical or even serious thoughts of escape do not cross the minds of inmates…daily. But to confine an inmate to isolation indefinitely, absent a tenable threat, cannot be justified under the guise of institutional security.

*Id.* at 781. On that basis, the court concluded that the defendants had been deliberately indifferent to the prisoner plaintiff's mental health by housing him in restrictive confinement indefinitely. *Id.*

c.   Deliberate Indifference to Risk of Serious Harm

Finally, the risk of harm posed to Reynolds' health and safety was obvious, and the defendants were deliberately indifferent to that risk.  The well-documented risk to health posed by prolonged solitary confinement is discussed in greater detail above.  *See Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019) ("[T]he extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm 'was so obvious that it had to have been known.'") (quoting *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015)).  The defendants testified at trial that they did not have reason to believe that the confinement conditions were harmful to Reynolds because Reynolds often appeared healthy and well.  *See, e.g.*, Semple Test., Doc. No. 289 at 103-04; Maldonado Test., Doc. No. 286 at 271.  "An express intent to inflict unnecessary pain," however, "is not required."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing *Estelle*, 429 U.S. at 104).  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act *believing that harm actually would befall an inmate*; it is enough that the official acted or failed to act despite his knowledge of a substantial *risk* of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (emphasis added); *see also Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ("We do not agree . . . that the 'wantonness' of conduct depends upon its effect upon the prisoner.").

Testimony at trial demonstrated the defendants *were* aware of the potential risks of restrictive housing.  For example, Semple testified on cross-examination about his "understanding" that prolonged restrictive housing confinement can create mental health issues.  Semple Test., Doc. No. 289 at 138-39.  Arnone indicated his awareness of the dangers of prolonged segregation, including that long term segregation can be harmful to a person's mental health.  Arnone Test., Doc. No. 286 at 577-78.

54

The law also entitles the jury to find the defendants' subjective knowledge of the risk of harm to Reynolds. Evidence demonstrating "a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)). A factfinder can use circumstantial or inferential evidence to find a government official "had the requisite knowledge of a substantial risk." *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (quoting Farmer, 511 U.S. at 839-42). *See also Porter v. Clarke*, 923 F.3d at 361 ("Additionally, the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm was so obvious that it had to have been known.") (internal quotation marks and citations omitted). Because the plaintiff proved at trial that there was an obvious risk of serious harm to Reynolds, the defendants' conscious disregard of that risk is sufficient.[9]

The evidence at trial therefore weighed heavily in favor of a finding that all three defendants were personally involved in imposing Reynolds' conditions of confinement. By housing him in isolating conditions for a prolonged period of time, they acted with deliberate indifference to a risk of serious harm to him, and their conduct lacked any valid penological justification. For those reasons, the evidence weighed heavily in favor of a verdict that the defendants violated Reynolds' rights under the Eighth Amendment. Thus, on the basis of the evidence presented at trial, the jury's verdict for the defendants on the Eighth Amendment claim was a "miscarriage of justice." *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006).

---

[9] Even before trial, Reynolds presented adequate evidence at summary judgment to find the defendants knew or reasonably should have known about the serious risk of harm to him, establishing the subjective element of his Eighth Amendment claim. Order on Mot. for Summ. J., Doc. No. 155 at 16-19.

C.  Erroneous Evidentiary Ruling

Before the commencement of trial, I ruled that evidence concerning whether Reynolds' conditions of confinement fit the definition of "solitary confinement" was not relevant.  *See, e.g.*, Pretrial Conference Tr., Doc. No. 249 at 22 ("[T]he parties disagree about the definition of solitary confinement.  That's not even a legal issue that matters.  Nothing turns on the definition of solitary confinement.  What matters is the conditions of his confinement."); *id.* at 72 (ruling that defendants' proposed witness's testimony about whether Reynolds' conditions of confinement were "solitary confinement" was "irrelevant"); *id.* at 83 (stating that I would instruct the jury "that whether they find the definition of solitary confinement meets the conditions is irrelevant").  *See also* Mem. of Decision on Expert Test., Doc. No. 253 at 3 (ruling that "evidence introduced by the parties is not necessarily relevant solely because it shows that Reynolds' confinement conditions fit or did not fit the definition of 'solitary confinement'").

"[A] court's failure to admit highly probative evidence that is likely to have a profound impact on the outcome of the trial may also be grounds for a new trial."  12 Moore's Federal Practice - Civil § 59.13 (2024).  "[T]o constitute grounds for a new trial, the erroneous evidentiary ruling must constitute a reversible error that affects a substantial right of a party." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 2008 WL 754113, at *2 (W.D.N.Y. Mar. 19, 2008). "Whether a 'substantial right' has been invaded is dependent on the circumstances of the case, and the proceedings will not be disturbed, on post-trial motion in the district court . . . unless any error of the court was truly harmful."  *Id.* (quoting 11 Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 2885 Admission or Exclusion of Evidence (2d ed. 1995)).

Here, I erred in ruling irrelevant the issue whether Reynolds' conditions of confinement constituted "solitary confinement."  The question whether Reynolds' conditions of confinement could be characterized by the term "solitary confinement" is highly probative of the issue

whether Reynolds' conditions of confinement violate "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard[s] of decency . . . ."). Although courts have long recognized the psychological and medical harm of solitary confinement, the appropriateness of the punishment is an issue that is nevertheless inextricably linked to medical research and evolving social norms regarding punishment. Prolonged solitary confinement therefore presents the precise issue contemplated by *Estelle*—a punishment that must be evaluated against "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle,* 429 U.S. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Even if a term like "solitary confinement" has no definite legal effect, the societal significance of the term makes it relevant to an Eighth Amendment analysis.

Moreover, my evidentiary ruling prejudiced Reynolds, who relied in part on evidence generally concerning "solitary confinement." For example, Reynolds presented as his first exhibit the Mandela Rules, which was a resolution that in part "prohibited . . . [i]ndefinite solitary confinement" and "[p]rolonged [i.e., greater than 15 days] solitary confinement" as "torture or other cruel, inhuman or degrading treatment or punishment." Pl.'s Trial Ex. 1 at 2-3. Reynolds, however, was not able to prove the applicability of those rules to the defendants' conduct at trial without presenting evidence that Reynolds' conditions fit the definition of "solitary confinement."

Furthermore, although the plaintiff does not need to prove that his conditions fit the definition of "solitary confinement" to establish an Eighth Amendment violation, evidence

supporting that conclusion may have strongly supported a plaintiff's verdict on the Eighth

Amendment claim.  Proving that Reynolds' confinement conditions could be characterized as

"solitary confinement" would have helped Reynolds meet the objective element of his Eighth

Amendment claim, particularly in light of case law holding that, as a matter of law, prolonged

solitary confinement satisfies the objective element of an Eighth Amendment claim.  *See, e.g.*,

*Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988) ("[T]here is plenty of medical and

psychological literature concerning the ill effects of solitary confinement (of which segregation

is a variant) . . . ."); *Morris v. Travisono*, 549 F. Supp. 291, 295 (D.R.I. 1982), *aff'd*, 707 F.2d 28

(1st Cir. 1983) (discussing the "debilitating effect" of "solitary confinement for an extended

period of time" on a prisoner); *see also Ruiz v. Texas*, 580 U.S. 1191, 1247 (2017) (Breyer, J.,

dissenting denial of stay of execution of sentence of death) ("If extended solitary confinement

alone raises serious constitutional questions, then 20 years of solitary confinement, all the while

under threat of execution, must raise similar questions, and to a rare degree, and with particular

intensity."); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting) ("[I]t is well

documented that such prolonged solitary confinement," of "22 hours or more per day," causes

"numerous deleterious harms.").

The evidentiary ruling regarding the relevance of the term "solitary confinement" also

may have impacted Reynolds' ability to prove the subjective element of his Eighth Amendment

claim.  Whether the defendants knew or had reason to know that Reynolds' confinement

conditions fit the layman's definition of "solitary confinement" is probative of whether they had

the requisite state of mind.  *See Porter*, 923 F.3d at 361 ("[T]he extensive scholarly literature

describing and quantifying the adverse mental health effects of prolonged solitary confinement

that has emerged in recent years provides circumstantial evidence that the risk of such harm was

so obvious that it had to have been known.") (internal quotation marks and citations omitted).  It is also relevant to the issue whether the defendants were deliberately indifference to the *risk* of harm posed by the confinement conditions in which they housed Reynolds.

Because I erred in ruling that evidence regarding the definition of "solitary confinement" was irrelevant, and because that ruling was harmful to the plaintiff's ability to prove an element of his Eighth Amendment claim, a new trial on the Eighth Amendment claim is warranted.

### D.  Inadequate Jury Charge

A new trial is warranted when the jury instructions "taken as a whole, . . . gave a misleading impression or inadequate understanding of the law."  *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017) (quoting *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir. 1993)).  "[W]here the 'lack of instruction undoubtedly left the jury confused' about a 'potentially dispositive' issue in the case," a new trial "is properly granted."  *Restivo*, 846 F.3d at 572 (quoting *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992)).

Further, "[a]n erroneous jury instruction requires a new trial, unless the error is harmless."  *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (citing *Rasanen v. Doe*, 723 F.3d 325, 331-32 (2d Cir. 2013)).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Restivo*, 846 F.3d 547, 569 (2d Cir. 2017) (quoting *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013)).  "An error is harmless only when we are persuaded it did not influence the jury's verdict."  *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 56 (2d Cir. 2012) (internal citation and quotation marks omitted).

Reynolds argues four components of the jury instructions misled the jury on the correct legal standard and left the jury confused about potentially dispositive issues in the case:  (1) the

lack of instruction on solitary confinement; (2) the lack of instruction on the meaning of

"contemporary standards of decency;" (3) an incomplete instruction on the burden of proof on

the Eighth Amendment's subjective prong; and (4) the jury instruction on prison officials'

discretion to impose restrictions on prisoners.  Pl.'s Mot. for a New Trial, Doc. No. 337 at 13-18.

I agree that the jury instructions, along with the factors discussed above, likely misled or

confused the jury on potentially dispositive issues regarding Reynolds' Eighth Amendment claim

and did not adequately inform the jury on the law.  Although the Eighth Amendment violation

could not have been established solely by a determination that Reynolds' conditions constituted

solitary confinement, it would have allowed the jury to more holistically evaluate Reynolds'

claims.  Further, including a definition of solitary confinement along with an instruction on

"contemporary standards of decency" would have more adequately informed the jury on the law

defining Eighth Amendment violations.

Whether prison officials' actions violate "contemporary standards of decency" is a

hallmark in analyzing Eighth Amendment claims.  *See Trop v. Dulles*, 356 U.S. 86, 100-01,

(1958) ("[T]he words of the [Eighth] Amendment are not precise, and . . . their scope is not

static. The [Eighth] Amendment must draw its meaning from the evolving standards of decency

that mark the progress of a maturing society."); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)

("Thus, an assessment of contemporary values concerning the infliction of a challenged sanction

is relevant to the application of the Eighth Amendment. . . . It requires . . . that we look to

objective indicia that reflect the public attitude toward a given sanction."); *Estelle v. Gamble*,

429 U.S. 97, 103 (1976) ("The infliction of such unnecessary suffering is inconsistent with

contemporary standards of decency as manifested in modern legislation. . . ."); *Helling v.*

*McKinney*, 509 U.S. 25, 36 (1993) ("[W]ith respect to the objective factor, determining whether

60

McKinney's conditions of confinement violate the Eighth Amendment . . . also requires a court

to assess whether society considers the risk that the prisoner complains of to be so grave that it

violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In

other words, the prisoner must show that the risk of which he complains is not one that today's

society chooses to tolerate.") (emphasis in original).

Instructions defining "solitary confinement" and "contemporary standards of decency"

would have provided the jury necessary context in properly evaluating evidence and testimony

and would have likely influenced the jury's verdict.  *See Roper v. Simmons*, 543 U.S. 551, 551

(2005) ("[T]his Court has established the propriety and affirmed the necessity of referring to the

evolving standards of decency that mark the progress of a maturing society to determine which

punishments are so disproportionate as to be cruel and unusual.") (internal citation and quotation

marks omitted).  That includes testimony from Martin Horn on standards promulgated by the

United Nations and the American Correctional Institution and testimony from defendants on the

reasoning behind keeping prisoners in isolated conditions.  Horn Test., Doc. No. 284 at 68-76;

Arnone Test., Doc. No. 286 at 141.

Additionally, omitting an instruction on the clearly established law permitting the jury to

infer an official's awareness of a risk from the risk's obviousness mislead the jury on the correct

legal standard and gave the jury an inadequate understanding of the law.  *See Hope v. Pelzer*, 536

U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact

that the risk of harm is obvious."); *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a

prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence, . . . and a

factfinder may conclude that a prison official knew of a substantial risk from the very fact that

the risk was obvious."); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk.") (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)); *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002). Failure to include an instruction permitting the jury to use circumstantial evidence in Reynolds' case likely influenced the jury's verdict on a dispositive issue: whether the evidence sufficiently proved the subjective prong of an Eighth Amendment violation.

Finally, the jury instructions likely misled the jury concerning the correct legal standard by not clarifying that the Eighth Amendment places limitations on the discretion prison officials hold. The jury instruction correctly stated that prison officials "have discretion to impose restrictions on a prisoner's movements and activities when the restriction is reasonably related to legitimate penological objectives or correctional goals, such as preventing escape or preventing injury to staff or other inmates." Jury Instrs., Doc. No. 270 at 15. However, further explication on that discretion was necessary to adequately inform the jury on the law. Eighth Amendment violations are evaluated under a "deliberate indifference" standard rather than a "reasonably related" standard. *Johnson v. California*, 543 U.S. 499, 511 (2005). *See also Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991) (extending the deliberate indifference standard to Eighth Amendment conditions of confinement claims). Even if the reasonably related standard was correctly included in the instruction, more explanation of that standard was necessary to avoid misleading the jury. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (describing the relevant factors in evaluating a prison's impingement on constitutional rights under the "reasonably related" standard, including the absence of ready alternatives). Including the "reasonably

related" language in the jury instruction on prison officials' discretion without additional elucidation erroneously misled the jury about the correct legal standard to apply.

The above exclusions from the jury instructions were not harmless. Each of the four excluded instructions, considered separately, likely influenced the jury's verdict. Viewing all four exclusions together, I strongly believe the jury instructions failed to adequately inform the jury of the correct legal standards to apply, misled their fact-finding, and swayed their verdict on Reynolds' Eighth Amendment claim.

Defendants' argument that Reynolds' waived any challenge to the jury instructions by not objecting at trial is unconvincing. Defs.' Opp'n, Doc. No. 343 at 23-25. I have "discretion to consider forfeited arguments." *Metro. Life Ins. Co. v. Webb*, No. 23-897, 2024 WL 3342449, at *1 (2d Cir. July 9, 2024). In the March 13, 2024 Notice, I indicated my interest in granting a new trial based, in part, on my concern that the jury charge "may have confused or misled the jury." Doc. No. 308 at 2, 4-5. Whether or not Reynolds waived his challenge to the specific jury instructions is not determinative in deciding to grant a new trial. Instead, I must evaluate the jury instructions according to the standards discussed above: whether the jury instructions were misleading, inadequate, confusing, or erroneous. *See Restivo*, 846 F.3d at 572; *Velez*, 730 F.3d at 134. *See also* Fed. R. Civ. P. 59(d) ("After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion.").

Therefore, the erroneous jury instructions also lead me to conclude that a new trial on Reynolds' Eighth Amendment claim is warranted.

E.  Qualified Immunity

As I articulated above, Reynolds deserves a new trial on the Eighth Amendment claim.

Before granting Reynolds that new trial, however, I must address whether the defendants are

entitled to qualified immunity on that claim.

As articulated in greater detail above, "[q]ualified immunity protects officials from

damages liability if their conduct 'does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known,' . . . or if it was 'objectively reasonable

for [the officer] to believe that his actions were lawful at the time of the challenged act.'"

*Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y. Aug. 15, 2018) (quoting *Mullenix v.

Luna*, 577 U.S. 7, 11 (2015); *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016)).

1.  *Whether the Right Was Clearly Established*

A right is clearly established if, "at the time of the challenged conduct . . . every

'reasonable official would [have understood] that what he [was] doing violate[d] that right.'"

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635,

640 (1987)).  There is no requirement that a right be "clearly established" through a binding

decision directly on point, "but existing precedent must have placed the statutory or

constitutional question beyond debate."  *Ashcroft*, 563 U.S. at 741.  The Supreme Court has

stated that "[o]fficers sued in a § 1983 civil action have the same fair notice right as do

defendants charged under 18 U.S.C. § 242," meaning that "officials can be on notice that their

conduct violates established law even in novel factual situations."  *Hope*, 536 U.S. at 731 (stating

that 18 U.S.C. § 242 "makes it a crime for a state official to act willfully and under color of law

to deprive a person of constitutional rights").  According to the Court, "the salient question . . . is

64

whether the state of the law [at the time of the defendants' conduct] gave [defendants] fair warning that [the plaintiff prisoner's] alleged treatment was unconstitutional." *Id.*

Reynolds' right not to be deprived of the identifiable human need of minimal human contact and environmental stimuli was "sufficiently clear that a reasonable official" who deprived Reynolds of that need "would understand" that he was doing so. *Anderson*, 483 U.S. at 640. *See also Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."); *Hope*, 536 U.S. at 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.") (citing *United States v. Lanier*, 520 U.S. 259, 261 (1997)).  The defendants therefore had fair notice that restricting Reynolds' human contact and environmental stimuli for an extensive period of time was a sufficiently serious deprivation under the Eighth Amendment.

It was clearly established during the relevant timeframe that harsh conditions of confinement that lack legitimate penological justification violate the Constitution. *Hope*, 536 U.S. at 737-38. *See also H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 390 (N.D.N.Y. 2020) ("[T]he Supreme Court indicated in 2002 . . . that the Eighth Amendment is violated by conditions that are totally without penological justification.").

According to the Supreme Court, the "valid penological objectives" that are within prison officials' discretion include "deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974); *Procunier v. Martinez*, 416 U.S. 396, 412 (1974)).  Even when

considering those valid penological objectives, however, the Supreme Court has clearly established that prison officials are not entitled to "[m]echanical deference to [their] findings" in the Eighth Amendment context because affording them that deference "would reduce [the Eighth Amendment] to a nullity in precisely the context where it is most necessary." *Johnson v. California*, 543 U.S. 499, 511 (2005) (quoting *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979)). The Supreme Court has held unconstitutional inflicting "unnecessary pain" and subjecting a prisoner "to a substantial risk of physical harm," when done not of "necessity," such as to preserve institutional safety, "but as punishment for prior conduct." *Hope*, 536 U.S. at 738, 745. Moreover, the Supreme Court has singled out isolated confinement in particular as a punishment "subject to scrutiny under Eighth Amendment standards." *Hutto*, 437 U.S. at 685. The defendants were therefore on notice that they could face Eighth Amendment liability for placing Reynolds in isolated confinement indefinitely, especially if that placement was not justified by valid penological reasons.

It was further clearly established at the time of the defendants' conduct that "[a]n express intent to inflict unnecessary pain is not required." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Nor is a "belie[f] that harm actually would befall an inmate" required. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). It was clearly established at the time of the defendants' conduct that each of the defendants could be liable for "act[ing] or fail[ing] to act despite his knowledge of a substantial risk of serious harm." *Id.* The defendants had fair notice that they could be liable even if they had no forthright intent to or belief that they were harming Reynolds, so long as they were aware of a risk of harm to Reynolds and were deliberately indifferent to that risk.

66

Although Reynolds alleges violations of clearly established rights, the contours of those rights cannot be determined without additional fact-finding by the jury.  Determining whether alleged Eighth Amendment violations, such as indefinite placement in solitary confinement, excessive noise, and extreme temperatures, violate clearly established law first requires "particularized findings made by the jury." *Walker v. Schult*, 45 F.4th 598, 619 (2d Cir. 2022). My evidentiary ruling during the first trial preventing evidence and argument on whether Reynolds' conditions amounted to solitary confinement also prevented the fact-finding necessary to determine qualified immunity.  Pretrial Conference Tr., Doc. No. 249 at 22-80.  Analyzing Reynolds' conditions according to legal standards on solitary confinement *is* relevant to the qualified immunity analysis.  A jury needs to find additional facts about Reynolds' conditions before I can decide whether clearly established law provided defendants sufficient notice of the Eighth Amendment violation.

### 2.  *Whether the Defendants Were Objectively Reasonable*

Determining the "objectively reasonable" prong of qualified immunity is a mixed question of law and fact.  *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) ("[W]hether a defendant official's conduct was objectively reasonable . . . is a mixed question of law and fact.").  If there is a dispute of material facts, "the factual questions must be resolved by the factfinder." *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (quoting *Kerman*, 374 F.3d at 109).  Specifically, juries resolve "what the facts were that the [official] faced or perceived." *Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003) (quoting *Warren v. Dwyer*, 906 F.2d 70, 77 (2d Cir. 1990) (Winter, J., dissenting)).  To determine whether qualified immunity attaches, the jury can be asked to determine the reasonableness of an official's conduct "from the actual circumstances" and "from any reasonable point of view, including even a factual

misperception, the officer may reasonably have harbored at the time the events took place."

*Warren*, 906 F.2d at 75-76 ("[T]he combination of instructions delivered by the district court . . .

accurately reflects the law.").[10]

When there are disputed issues of material fact regarding objective reasonableness, a jury

must return a verdict determining a plaintiff's constitutional right was violated by a government

official *before* deciding facts related to qualified immunity. *Stephenson*, 332 F.3d at 80 (2d Cir.

2003) ("If the jury returns a verdict of excessive force against Dingler, the court should then

decide the issue of qualified immunity."). "[I]mportantly, disputed material issues regarding the

reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of

the jury, while the reasonableness of an [official's] view of the law is decided by the district

court." *Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020). "Once the jury has resolved any

disputed facts that are material to the qualified immunity issue, the ultimate determination of

whether the officer's conduct was objectively reasonable is to be made by the court." *Zellner*,

494 F.3d at 368.

a.  Whether factual determinations must be made before granting qualified immunity

In 2018, the parties cross-moved for summary judgment.  Doc. No. 117; Doc No. 119.  I

denied defendants' motion, ruling, in part, they were not entitled to qualified immunity on any of

Reynolds' constitutional claims.  Doc. No. 155 at 45-48.  Defendants appealed.  Doc. No. 160.

---

[10] *See Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir. 1994) (listing factual disputes requiring qualified immunity to be decided by the jury) ("Specifically, there were conflicting accounts of the total duration of the detention, the plaintiffs' responsiveness to the police's instructions, the physical treatment of the plaintiffs once removed from their vehicle, the defendants' use of their weapons, and a number of other particulars. These disputes bear directly upon whether it was objectively reasonable for the officers to believe that they were acting lawfully. . . . The District Court should have let the jury (a) resolve these factual disputes and (b) based on its findings, decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law when they detained the plaintiffs.").

On appeal, the Second Circuit did not reach the issue of whether defendants are entitled to qualified immunity because disputed issues of material fact remained. *Reynolds v. Quiros*, 990 F.3d 286, 301-302 (2021) ("In vacating the judgment and the preliminary injunction of the District Court on these grounds—namely, that the District Court decided disputed issues of material facts in granting summary judgment to Reynolds—we express no view on the remaining arguments raised by Defendants on appeal, specifically, . . . whether, in the circumstances presented here, Defendants are entitled to qualified immunity."). Specifically, the Second Circuit noted the triable issues of fact regarding the amount of time Reynolds was confined to his cell each day and the lack of human interaction provided to him. *Id.* at 294-95 ("Defendants expressly dispute Reynolds' contentions that he is confined to his cell an average of 21 to 22 hours a day, and that other than limited recreation time, professional or medical visits, and short fifteen-minute increments [sic] to eat and shower . . . Reynolds will spend the remainder of his life alone in a small cell.") (internal citations and quotation marks omitted).

At Reynolds' first trial, the jury rendered a "not liable" verdict on Reynolds' Eighth Amendment claim. *See* Jury Verdict, Doc. No. 268 at 1-3. Therefore, the jury never answered the special interrogatories to determine whether defendants' conduct was objectively reasonable or unreasonable. Jury Interrogs., Doc. No. 271 at 1-2.

The factual determinations the jury must make in Reynolds' case are: (1) what were Reynolds' confinement conditions; (2) which conditions violated his Eighth Amendment rights; and (3) whether it was objectively reasonable for each defendant to believe the confinement conditions to which Reynolds was subjected did not violate his Eighth Amendment right to be free from cruel and unusual punishment.[11] *Calamia v. City of New York*, 879 F.2d 1025, 1036

---

[11] The conditions Reynolds alleges Defendants subjected him to include: two hours of recreation each day, six days a week; typically 22 hours a day in-cell time, excluding Sundays; the absence of congregate recreation; the absence

(2d Cir. 1989) (denying "judgment n.o.v. on the ground of qualified immunity") ("[T]he question here was whether it was objectively reasonable for Sutton to believe that his treatment of Calamia did not violate that right.  This was a matter as to which the facts were not undisputed, and hence it was a question to be answered by a properly instructed jury.").  After a jury makes those factual determinations, *then* I must determine as a matter of law, based on the jury's fact-finding, whether defendants are entitled to qualified immunity.  *Stephenson v. Doe*, 332 F.3d at 80-81.

The jury never reached the above questions in the first trial, because it determined Reynolds' Eighth Amendment rights were not violated.  Therefore, the same material issues of fact on which the Second Circuit remanded Reynolds' case prior to the first trial still exist.  A new trial must be granted because I find the jury's verdict against the weight of the evidence and "a miscarriage of justice."  *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 82 (2d Cir. 2006).  At the conclusion of the new trial, should the jury return a verdict on the Eighth Amendment claim in Reynolds' favor, the jury will answer special interrogatories to make the factual determinations necessary to decide qualified immunity for the entire liability period, 2010-2019.

> b.  Whether the evidence at the previous trial showed defendants conduct was objectively unreasonable

Notwithstanding the remaining, necessary fact-finding on qualified immunity, the evidence at the previous trial demonstrated defendants were objectively unreasonable.  The objectively reasonable prong of qualified immunity analysis turns on "objective factors"—what "a reasonably competent public official should know" regarding "the law governing his conduct."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982); *see also Bilida v. McCleod*, 211

---

of congregate meals; the absence of a picture program; the restraint policy; unsanitary conditions; excessive noise; extreme temperatures; and plumbing issues.  Doc. No. 344 at 19; Jury Interrogs., Doc. No. 271 at 1.

F.3d 166, 174 (1st Cir. 2000) ("The test is whether[,] under the circumstances that confronted the official, a reasonable official would understand that what he is doing violate[d] that right.") (internal citations and quotation marks omitted).  For the reasons set forth below, I conclude that the defendants were not objectively reasonable in their conduct.

First, it is not objectively reasonable for an official to create, approve of, or ensure the continuance of a policy that is unconstitutional on its face.  *See supra* Section II.C.1 (discussing the legal standard under *Tangreti*); *Stone #1 v. Annucci*, 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021) ("[W]here a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state—in this case, deliberate indifference—the Court is of the view that such official could be deemed to be personally involved in a constitutional violation.").  Thus, to the extent that any of the defendants were personally involved in the creation, approval, or continuance of a policy of housing Reynolds in a manner that violated the Eighth Amendment, those defendants were not objectively reasonable in effectuating that policy.

Evidence at trial also conclusively showed that the defendants' belief that they were housing Reynolds in solitary confinement pursuant to legitimate penological justifications was not objectively reasonable.[12]  Substantial evidence was presented at trial establishing what can be considered legitimate correctional goals and bases for housing individuals in restrictive housing.

---

[12] For example, Semple's testimony included the following exchange:  "[Plaintiff's counsel:] Well, assume for this question that Mr. Reynolds spent 22 hours a day in his cell, except on Sundays when he spent 24, or days when the weather was to[o] inclement to go into the yard when he might spend 23, and that that went on year after year and that he had no ability to touch a visitor and no ability to touch anyone else except possibly a lawyer if a lawyer visited, not to touch another human being.  He ate his meals in his cell.  And when he went out into a yard, it was a caged yard, small, as it's been described, with a high wall. . . .  [Semple:] Well, I agree that it is a long period of time.  But there [were] matters that needed to be addressed that were being applied from a safety and security perspective. . . .  I accept the fact that Mr. Reynolds did not present a problem during the course of his -- the period of time that's in question, the ten-year window, whatever, was it, 2009 to 2019."  Semple Test., Doc. No. 289 at 123-25.

*See, e.g.*, Horn Test., Doc. No. 284 at 96 (stating an incarcerated individual's aggressive or predatory behavior, not the offense for which they are incarcerated, is "the most appropriate way to assess whether [they] should be in extreme social isolation"); Semple Test., Doc. No. 289 at 80, 112-14 (stating that an incarcerated individual's behavior is an important determinate in what conditions they require and that administrative segregation was for "the more dangerous folks with a history of significant assault on another incarcerated person or staff member").

It was proven at trial that the defendants knew that Reynolds' other risk characteristics, such as disciplinary history and severity or violence of his underlying offense, could not alone justify his classification as level 5—that is why they scored Reynolds a 4 or below for every other category in their classification reviews. *See generally* Pl.'s Trial Ex. 10. Quiros and Maldonado testified to their familiarity with Reynolds' and other death row inmates' files. Quiros Test., Doc. No. 286 at 175, 177; Maldonado Test., Doc. No. 286 at 267-68. Semple purported to have conducted a reclassification review for Reynolds in 2017. Pl.'s Trial Ex. 22. The defendants were therefore aware of Reynolds' history and characteristics and knew that Reynolds did not need to be housed in prolonged solitary confinement to serve any legitimate penological purpose.

Further, defendants are not entitled to qualified immunity simply because they did not "create[] the conditions on death row or special circumstances" but merely "continued the conditions." Defs.' Opp'n, Doc. No. 343 at 5-7. Courts in this circuit have declined to grant qualified immunity in cases in which officials enforced or followed unconstitutional policies. *See, e.g.*, *Walsh v. Franco*, 849 F.2d 66, 68-70 (2d Cir. 1988) (stating a qualified immunity defense was preserved only if state correction officials' actions in following a policy were objectively reasonable); *Sorensen v. City of New York*, 42 F. App'x 507, 510-11 (2d Cir. 2002)

(affirming the denial of qualified immunity for lower-level officials enforcing policies); *Augustin v. Jablonsky*, 2001 WL 770839, at *10 (E.D.N.Y. Mar. 8, 2001) (noting individual officials may be held liable for enforcing a policy). On its own, following or continuing a policy is not sufficient to establish objective reasonableness for qualified immunity.

Evidence introduced at trial prevents me from granting defendants qualified immunity for Reynolds' Eighth Amendment claim for the entire liability period.

> c.    Whether defendants were objectively reasonable in interpreting and implementing Section 18-10b

Defendants have an additional qualified immunity argument for the 2017 through 2019 liability period because Section 18-10b was in place during that timeframe. Defendants could contend that during that timeframe, they were objectively reasonable in their interpretation and implementation of Section 18-10b.[13] I disagree.

Former Section 18-10b stated:

(a) "The Commissioner of Correction shall place an inmate on special circumstances high security status and **house the inmate in administrative segregation until a reclassification process is completed** under subsection (b) of this section . . .

(b) The commissioner shall establish a reclassification process for the purposes of this section. **The reclassification process shall include an assessment of the risk an inmate described in subsection (a) of this section poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody**. If the commissioner places such inmate in administrative segregation pursuant to such assessment, the commissioner shall require the inmate to complete the administrative segregation program operated by the commissioner.

(c) (1) **The commissioner shall place such inmate in a housing unit for the maximum security population if, after completion of such reclassification**

---

[13] Defendants raise this argument in their briefs supporting their motion for judgment as a matter of law, doc. no. 277 at 20-22, 35, and opposing Reynolds' motion for a new trial on his Fourteenth Amendment due process claim, doc. no. 306 at 17. However, defendants do not directly raise this argument in their opposition to Reynolds' motion for a new trial on the Eighth Amendment claim. Doc. No. 343. I address this argument because it is potentially applicable to Reynolds' Eighth Amendment claim.

**process, the commissioner determines such placement is appropriate**, provided the commissioner (A) maintains the inmate on special circumstances high security status, (B) houses the inmate separate from inmates who are not on special circumstances high security status, and (C) imposes conditions of confinement on such inmate which shall include, but not be limited to, conditions that require (i) that the inmate's movements be escorted or monitored, (ii) movement of the inmate to a new cell at least every ninety days, (iii) at least two searches of the inmate's cell each week, (iv) that no contact be permitted during the inmate's social visits, (v) that the inmate be assigned to work assignments that are within the assigned housing unit, and (vi) that the inmate be allowed no more than two hours of recreational activity per day.

(2) **The commissioner shall conduct an annual review of such inmate's conditions of confinement within such housing unit and the commissioner may, for compelling correctional management or safety reasons, modify any condition of confinement**, subject to the requirements of subparagraphs (A) to (C), inclusive, of subdivision (1) of this subsection.

Conn. Gen. Stat. § 18-10b (emphasis added).  As shown in the emphasized portions of the statute above, the only time in which the statute mandates that the commissioner house a "special circumstances high security status" inmate in restrictive, segregated housing is until the "reclassification process is completed."  Conn. Gen. Stat. § 18-10b(a).  Otherwise, the commissioner has discretion to determine whether placing the prisoner "in a housing unit for the maximum-security population" is *appropriate*."  Conn. Gen. Stat. § 18-10b(c) (emphasis added).  Section 18-10b therefore did not mandate Reynolds' prolonged solitary confinement, and the defendants were objectively unreasonable in interpreting it so.

Moreover, pursuant to the statute, the commissioner is required to "conduct an annual review" of any prisoner housed in the restrictive conditions described in section (c)(1) and consider whether there are any "compelling correctional management or safety reasons" that justify modifying the prisoner's confinement conditions.  Conn. Gen. Stat. § 18-10b(c)(2).  There is no evidence that Reynolds' confinement conditions were ever meaningfully evaluated by the defendants according to those standards.

For those additional reasons, the defendants are not entitled to qualified immunity for the Eighth Amendment claim from 2017 to 2019 on the basis of their interpretation of Section 18-10b.

## IV.    Defendants' Motion for Judgment as a Matter of Law

The defendants have filed a motion for judgment as a matter of law arguing, *inter alia*, that the defendants are entitled to qualified immunity for liability for the due process claim from 2017 to 2019.  *See generally* Doc. No. 277.

### A.  Legal Standard

#### 1.  *Standard for Motion for Judgment as a Matter of Law*

On a motion for judgment as a matter of law, a court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence."  *Ojeda v. Metro. Transport. Auth.*, 41 F.4th 56, 63 (2d Cir. 2022) (quoting *Black v. Finantra Cap., Inc.*, 418 F.3d 203, 208-09 (2d Cir. 2005).  A court should grant a motion for judgment as a matter of law "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it."  *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)) (cleaned up).

2. *Qualified Immunity Standard*

Courts are to make determinations regarding the objective reasonableness standard of qualified immunity "based on undisputed facts or factual findings made by the jury." *Dorceant v. Aquino*, 2018 WL 3869891, at \*5 (E.D.N.Y. Aug. 15, 2018). "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). Absent that request, the defendant "is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Id.*

"Clearly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (cleaned up). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). *See Doninger v. Niehoff*, 642 F.3d 334, 346 (2d Cir. 2011); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017) ("Requiring that precedent and subsequent disputes rest on identical facts would license state actors to violate constitutional rights with impunity simply by varying some irrelevant aspect of constitutional violations.").

B. The Defendants' Arguments

The defendants make several arguments in favor of granting qualified immunity on both Reynolds' due process claim from 2017 to 2019 and his equal protection claim. For the reasons discussed below, those arguments are unpersuasive.

1. *Personal Involvement*

The defendants move for judgment as a matter of law on the basis that the personal involvement of the defendants under *Tangreti* has not been established. They advance two arguments: first, that the jury was unreasonable in finding Maldonado and Quiros personally involved in the 2017 to 2019 timeframe; and, second, that the continuation of a policy or practice is insufficient for personal involvement.

The defendants do not specifically argue that personal involvement has not been established for Reynolds' equal protection claim, other than generally arguing that continuation of a policy is insufficient for personal involvement. Because the Second Circuit affirmed the defendants' liability for Reynolds' equal protection claim in a decision issued after *Tangreti*, I conclude that personal involvement under the *Tangreti* test was established at summary judgment with respect to the equal protection claim. *See generally Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021).

  a. Personal involvement of Maldonado and Quiros in Due Process claim from 2017-2019

First, the defendants argue that, as a matter of law, the jury was unreasonable in finding that Maldonado and Quiros were personally involved in the violation during the 2017 to 2019 period.

Maldonado became district administrator in 2016, and he served in that position for two years until he retired in January 2019. Maldonado Test., Doc. No. 287 at 12. He specifically was responsible for Northern from 2016 until the end of 2018. *Id.* at 24-25. He additionally testified to touring Northern "maybe three or four" times "a year." *Id.* at 12-13. Even when construing the evidence at trial in the light most favorable to Reynolds, I struggle to discern Maldonado's involvement during the 2017 to 2019 period in classifying Reynolds, shaping the

conditions of his confinement associated with his classification, or withholding from Reynolds any procedures he was due. Due to the dearth of evidence presented at trial establishing Maldonado's involvement in Reynolds' due process claim from 2017 to 2019, I conclude that a "reasonable and fair minded" jury could not have found Maldonado liable for that specific claim. *See Kinneary*, 601 F.3d at 155.

Quiros served as District Administrator for the DOC from 2011 to 2019. Stipulated Fact No. 6. In 2019, Quiros became deputy commissioner of operation and rehabilitative services for the DOC. Quiros Test., Doc. No. 286 at 215. In that capacity, he was responsible for overseeing the director of population management. *Id.* at 216. During Quiros's term, in 2016, the director of population management issued a request for inclusion or revision to Administrative Directive 9.2 so that special circumstances inmates would be classified automatically as level 5 inmates. Pl.'s Trial Ex. 7. Of course, it would not be reasonable for the jury to find Quiros personally involved solely on the basis of his supervision of the director of population management, who requested that revision. *See Tangreti*, 983 F.3d at 618. Nevertheless, the fact that Quiros oversaw the director of population management, combined with other facts at trial can support the jury's inference about Quiros's knowledge and state of mind. Those other facts include Quiros's testimony that as deputy commissioner he would tour correctional facilities every Tuesday, including touring "every housing unit cell by cell." Quiros Test., Doc. No. 286 at 216.

Accordingly, it is undisputed that Quiros knew Reynolds, and the jury could reasonably infer Quiros's knowledge of Reynolds' conditions of confinement from 2017 to 2019 and lack of procedural redress for those conditions. Quiros also testified in defense of using length of confinement as a reason to confine someone under more restrictive conditions. Quiros Test., Doc. No. 286 at 222. Moreover, as "Deputy Commissioner," Quiros had the ability to

"interven[e] in any classification decision at any time." Pl.'s Trial Ex. 6 at 2 ¶ 5. Thus, the jury

could draw the inference that Quiros's decision not to intervene in Reynolds' classification

decisions or otherwise provide Reynolds the process he was due was a knowing and culpable act.

For those reasons, I conclude that the jury could reasonably have found Quiros personally

involved in the due process violation from 2017 to 2019, but could not have found Maldonado

personally involved during that period.

b.   Continuation of a Policy or Practice

The defendants further argue that it was not clearly established at the time of the acts at

issue that the defendants could violate Reynolds' rights by continuing a policy or practice.

As a preliminary matter, it was clearly established that an official can be held liable for

an omission. As previously discussed in greater detail in Section II.C.1., *Tangreti v. Bachman*

had the effect of articulating a new test for liability for officials serving in a supervisory capacity,

that is, by eliminating a special alternative test for supervisory liability. 983 F.3d 609, 618 (2d

Cir. 2020). *Tangreti* did not abrogate the *liability* of officials for unconstitutional conduct—it

merely abrogated the prior multipart *test* for supervisory liability. *Tangreti* thus did not unsettle

prior case law that clearly established that an official could be held liable for an omission—so

long as culpable *mens rea* for that omission is established. For example, it was clearly

established as of 1994 that a prison official could be held liable for violating the Eighth

Amendment through "'deliberate indifference' to a substantial risk of serious harm to an

inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Deliberately indifferent conduct

frequently involves an omission. *Tangreti*, of course, did not abrogate officials' liability for

deliberate indifference—especially because *Tangreti* itself concerned a deliberate indifference

claim. Instead, *Tangreti* held that an official with a supervisory role could be held liable for

79

deliberate indifference if she herself "personally knew of and disregarded an excessive risk to [the plaintiff's] health and safety." *Tangreti*, 983 F.3d at 619. Similarly, many due process claims inherently involve omissions and failures to act because they involve the *absence* of adequate process. It was clearly established that an official can be held liable for not affording a prisoner due process. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). A knowing continuation of a facially unconstitutional policy of withholding due process is therefore one such omission, the liability for which was not altered by *Tangreti.*

The defendants argue that the jury's responses to the jury interrogatories showed that the jury determined that each defendant had "continued" an unconstitutional policy or practice, and none of the three defendants had "engaged in a direct act that violated Mr. Reynolds' constitutional rights." Defs.' Mot. for J. as a Matter of Law, Doc. No. 277 at 3 (quoting Jury Interrogs., Doc. No. 271 at 3).

6. If you found a violation of Mr. Reynolds' due process rights by Defendant Quiros, was the basis of that finding that (choose all that apply):
   a. He engaged in a direct act that violated Mr. Reynolds' constitutional rights
   b. He continued a policy or practice that violated Mr. Reynolds' constitutional rights
   c. He created a policy or practice that violated Mr. Reynolds' constitutional rights
   d. He implemented a policy or practice that violated Mr. Reynolds' constitutional rights
   e. All of the above

Jury Interrogs., Doc. No. 271 at 3.

First, Reynolds is correct in contending that the above question, as worded, merely asked the jury for their *basis* for their finding of liability, and the question did not necessarily ask the jury to make a finding of fact regarding whether any defendant engaged in a direct act or created a policy. Pl.'s Opp., Doc. No. 301 at 11 n.4. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant

to request that the jury be asked the pertinent question.").  Nevertheless, jury interrogatory

number six is not dispositive of the issue of personal involvement because a jury could

reasonably find personal involvement based on continuation of a policy or practice, so long as

they find that the defendant had the required *mens rea*.  An equally reasonable interpretation of

the jury's response to interrogatory number six is that the jury found that the defendants

intentionally and unlawfully continued a policy or practice of denying Reynolds process, even

though they had a legal obligation to provide him with that process.  Accordingly, the jury's

finding of the defendants' personal involvement was not unreasonable.

### 2.  *Defendants' Entitlement to Qualified Immunity for the Due Process Claim*

#### a.  Was the Due Process Right Clearly Established

The defendants further argue that Reynolds' due process right was not clearly established

at the time of the violation.  They argue that:  (1) there is no case law clearly establishing that

former death row inmates are entitled to periodic process; (2) there is no clearly established

liberty interest derived from the statute, special circumstances, or from being on death row; and

(3) the Fourth Circuit's decision in *Prieto*, that no liberty interest stems from being on death row,

applies here.  *See* Defs.' Mot. for J. as a Matter of Law, Doc. No. 277 at 22-35.

"To be clearly established, a right must have been recognized in a particularized rather

than a general sense."  *Sira v. Morton*, 380 F.3d 57, 81 (2d Cir. 2004).  "[O]fficials can still be

on notice that their conduct violates established law even in novel factual circumstances," and

"previous cases" need not be "fundamentally similar" or have "materially similar facts."  *Hope v.

Pelzer*, 536 U.S. 730, 741 (2002) (internal citation and quotation marks omitted).  "[T]he very

act in question" does not have to have "previously been held unlawful" for "[t]he contours of the

right" to be "sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Doninger v. Niehoff*, 642 F.3d 334, 346 (2d Cir. 2011); *see also Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017) ("Requiring that precedent and subsequent disputes rest on identical facts would license state actors to violate constitutional rights with impunity simply by varying some irrelevant aspect of constitutional violations.").

"[T]he salient question . . . is whether the state of the law [at the time of the violative conduct] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope*, 536 U.S. at 741 (2002)

>    i.  Defendants' argument that there is no case law clearly establishing that former
>        death row inmates are entitled to periodic process

I am similarly unpersuaded by the defendants' argument that they should be granted qualified immunity due to the absence of case law clearly establishing that former death row inmates were entitled to periodic process. As a preliminary matter, between 2017 and 2019, Reynolds was confined to life without possibility of release, and his death row sentence was vacated. Accordingly, at no point during that period did Reynolds retain a formal legal status of "former death row inmate."

Furthermore, in this Circuit, the name given to a prisoner's classification does not, by itself, dictate whether that prisoner is entitled to due process. Indeed, in 1977, the Second Circuit wrote, "we have intimated that the differences in nomenclature among the various forms of punitive (or disciplinary) confinement should not be dispositive in determining whether minimal due process is required." *McKinnon v. Patterson*, 568 F.2d 930, 937 (2d Cir. 1977). *See also* Horn Test., Doc. No. 284 at 69 (testifying that "solitary confinement" is a term that can be used interchangeably with "restrictive housing, special housing, [and] segregation."). In addition, the terms describing restrictive and isolative statuses are defined consistently within this Circuit.

New York uses the term "segregated confinement," which means confinement to a cell "in excess of 17 hours per day."  Allen Riley & Yolanda Cany, *2023 Annual Report: Human Alternatives to Long-Term Solitary Confinement (HALT) Act*, N.Y. State Commission of Correction 3 (2023), https://scoc.ny.gov/system/files/documents/2023/12/scoc-2023-halt-annual-report.pdf (last visited Mar. 28, 2025); *Colon v. Howard*, 215 F.3d 227 (discussing due process rights of a New York inmate confined in a segregated housing unit for 23 hours a day). Vermont treats administrative segregation and disciplinary segregation as two separate categories. Disciplinary segregation is a temporary disciplinary measure, whereas administrative segregation is for inmates requiring high security confinement.  Vt. Agency of Hum. Servs., Dep't of Corr., Admin. Directive 410.03 Placement on Administrative Segregation 2 (2012), https://outside.vermont.gov/dept/DOC/Policies/Placement on Administrative Segregation Directive.pdf (last visited Mar. 28, 2025) (defining administrative segregation as "[a] form of separation from the general population when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates or to the security . . . .").  Individuals confined in segregation in Vermont—including both disciplinary and administrative segregation—"can be out of their cells a maximum of 6 hours a day."  Vt. Dep't of Corr., Segregation Report Fiscal Year 2023 1 (2023), https://doc.vermont.gov/sites/correct/files/documents/SegregationReport_FY23_Q2.pdf (last visited Mar. 28, 2025).

Moreover, the Connecticut Department of Correction Administrative Directives themselves interchange the terms used to describe inmates in restricted statuses.  For example, the version of Administrative Directive 9.2 in effect before the creation of the Special Circumstances Status referred to "Administrative Segregation" and "Overall Risk Level 5"

interchangeably, and that category included those who were on death row.  *See* Pl.'s Trial Ex. 6

at 10 ¶ 12.C.  When Administrative Directive 9.2 was revised in 2016, it created a category

called "Overall Risk Level 5/Murder with Special Circumstances."  Pl.'s Trial Ex. 7 at 1.  As

commissioner, Semple approved the request to create that category, and he testified to his

understanding that the Special Circumstances category required him to manage death row

inmates "status quo," meaning, managing them the same as when death row inmates fell under

the "Administrative Segregation" category.  *Id.*; Semple Test., Doc. No. 289 at 85-86.

Accordingly, it is not necessary that there be clearly established law stating that a former

death row inmate is entitled to periodic process.  A reasonable prison official would know that

clearly established law concerning the process afforded to inmates in administrative segregation

or other segregated housing would be applicable to death row and special circumstances inmates

confined in similar conditions.  *See Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y.

Aug. 15, 2018) (stating qualified immunity protects officials if it was objectively reasonable for

them to believe their actions were lawful).

ii.  <u>No clearly established law derived from mandatory language conferring such an interest</u>

Next, the defendants argue that Reynolds' due process right was not clearly established

because there was no state statute, regulation, or policy that created a liberty interest.  Defs.'

Mot. for J. as a Matter of Law, Doc. No. 277 at 25-26.  That argument is unavailing.

In 2005, the Supreme Court explained that *Sandin* had "abrogated the methodology of

parsing the language of particular regulations," which was the prior rule under *Hewitt v. Helms*,

459 U.S. 460 (1983).  *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005) (citing *Sandin v. Conner*,

515 U.S. 472, 482-83 (1995)).  In other words, *Sandin* held that a state creates a liberty interest

when it confines a person in conditions that impose an atypical and significant hardship

compared to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 484. Under *Sandin*, "it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484); *accord Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 571 (3d Cir. 2017) ("[W]e do not suggest that the profound liberty concerns raised by Plaintiffs' continued confinement on death row can be overcome by a carefully worded prison policy. State policy cannot undermine a constitutional interest.").

Furthermore, the Second Circuit decision in *Colon v. Howard* did not discuss a state statute or regulation when arriving at the conclusion that segregated confinement of a certain duration was sufficient to trigger due process protections. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Accordingly, after *Sandin*, liberty interests do not turn on state statutes and regulations. Instead, confinement that imposes an atypical and significant hardship alone is sufficient to establish a protected liberty interest. *Accord Perry v. Spencer*, 94 F.4th 136, 148 (1st Cir. 2024) (en banc).

### iii. It is not clearly established that conditions of confinement on special circumstances from 2017-2019 were "atypical and significant" hardship

Third, the defendants argue that it is not clearly established that the conditions under which Reynolds was confined in 2017 through 2019 constituted an atypical and significant hardship.

85

It is clearly established in the Second Circuit that when analyzing atypicality, courts should look both to the conditions in administrative segregation as well as to those in general population. *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999). The Second Circuit in *Sealey* acknowledged that both comparisons are "relevant to an inmate's liberty claim," but the Second Circuit did not state that both comparisons are *necessary*. *Id.* In *Sealey* itself, the Second Circuit faced a limited record after trial had concluded and therefore was unable to compare the inmate's confinement conditions to "conditions of administrative confinement at other New York prisons." *Id.* The Second Circuit nevertheless proceeded to compare the conditions only against those in general population. *Id.* Furthermore, in *Welch v. Bartlett*, also issued in 1999, the Second Circuit used the phrase "ordinary incidents of prison life" interchangeably with "conditions of general population confinement." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). In addition, in 2004, the Second Circuit held that "[f]actors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richard*s, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)).

Other clearly established law in this Circuit supports a determination that Reynolds' conditions consisted of atypical and significant hardship. In *Colon v. Howard*, the Second Circuit considered the 23-hour-per-day isolated confinement of a prisoner and determined that although "[t]here are no precise calipers to measure" that hardship, "wherever the durational line is ultimately drawn, 305 days satisfies the standard." 215 F.3d at 231. The Second Circuit further explained that although "[t]he longest confinement in normal SHU conditions that we

have ruled was not shown to meet the *Sandin* standard was 101 days," a confinement period "of less than 101 days could be shown on a record more fully developed . . . to constitute an atypical and severe hardship." *Id*. at 231, 232 n.5. By 2017, facts in the record showed that Reynolds had been confined in 22-hour-per-day isolated confinement for about two decades. *See* Reynolds Test., Doc. No. 284 at 181. As discussed in greater detail above, it is clearly established that the duration of confinement is a significant factor in a determination of atypical and significant hardship. *See Palmer*, 364 F.3d at 64; *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000). For example, in *Proctor*, decided in 2017, the Second Circuit held that a prisoner's "thirteen years in Ad Seg with no release date in sight" is a "substantial" interest, "more so than Helms's [of *Hewitt v. Helms*] interest in avoiding a temporary Ad Seg term awaiting a hearing." *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) (referencing *Helms*, 459 U.S. 460 (1983)).

The defendants further aver that the jury made a factual finding that Reynolds' conditions of confinement were not atypical and significant in relation to the conditions on administrative segregation and on the security risk group program in Connecticut. Defs.' Mot. for J. as a Matter of Law, Doc. No. 277 at 31-32 (citing Jury Interrogs., Doc. No. 271 at 3). The defendants specifically refer to jury interrogatory 10:

> 10. Was the basis of your verdict on the due process claim that the conditions on Death Row/Special Circumstances were atypical and significant in relation to (choose all that apply):
>   a. Conditions of confinement on general population
>   b. Conditions of confinement on Administrative Segregation in Connecticut DOC
>   c. Conditions of confinement on the Security Risk Group Program in Connecticut DOC
>   d. All of the above.

Jury Interrogs., Doc. No. 271 at 3. As worded, jury interrogatory 10 does not directly ask the jury whether Reynolds' conditions were atypical and significant in relation to administrative

segregation and the security risk group. "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). *See also Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995) ("[B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings.").

Furthermore, in the jury charge, regarding the liberty interest prong of the due process claim, the jury was instructed to "consider whether Mr. Reynolds was subjected to a significant hardship that was atypical in comparison to the hardships endured by prisoners in general population, including prisoners in administrative and protective confinement within the Department of Correction." Jury Instrs., Doc. No. 270 at 17. The jury's verdict, when read in concert with the instructions the jury followed, indicate the jury found that Reynolds' conditions of confinement were atypical in comparison to general population *and* administrative and protective confinement. *Id.* Moreover, as the charge was written, it is reasonable to infer that the jury interpreted the category of general population to be one that encompassed administrative and protective confinement. *See id.*

Even if the jury had made the factual finding that Reynolds' confinement was not atypical compared to administrative segregation, that finding would have been against the weight of the evidence. Evidence at trial demonstrated that there were only approximately ten death row and, later, Special Circumstances inmates—all of whom were confined at Northern. Quiros Test., Doc. No. 286 at 175. Arnone testified in the affirmative that "being sent to Northern was the harshest punishment that the Department of Corrections had" during his time as

commissioner.  Arnone Test., Doc. No. 286 at 135.  The evidence at trial also showed that "other restrictive status programs," including "administrative segregation," were all "progressions based, driven on good behavior and that the offender participated in the program . . .  with the mindset that [they] were there temporar[ily] and going back out to general population."  Quiros Test., Doc. No. 286 at 171.  *See also* Arnone Test., Doc. No. 286 at 135-36.  Death row, however, was different.  Quiros Test., Doc. No. 286 at 171-72; Arnone Test., Doc. No. 286 at 135-36.  Later, Special Circumstances Inmates were managed in the same manner as death row inmates.  Semple Test., Doc. No. 289 at 86-87.  Even though other restrictive confinements may have temporary periods of significant restrictions, it was only death row and, later, special circumstances, that imposed segregative confinement indefinitely.  Arnone Test., Doc. No. 286 at 106-07, 135-36; Quiros Test., Doc. No. 286 at 171-72.

I do not disagree with the defendants that perhaps a bright-line rule, which controlling courts have declined to implement, would make it clearer to officials whether their conduct imposes an atypical and significant hardship on a prisoner.  Nevertheless, the possibility of a clearer standard does not mean that the defendant officials here were not on notice that their conduct imposed an atypical and significant hardship.  Indeed, the defendants had ample notice from clearly established law that the facts here—particularly, the lengthy duration and indefinite character of Reynolds' segregative confinement—imposed an atypical and significant hardship.  *See Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (stating that to be clearly established, "in the light of pre-existing law the unlawfulness must be apparent.").

iv. <u>Not clearly established that reviews must be meaningful such that inmate must have opportunity to be removed from status</u>

The defendants further argue that they are entitled to qualified immunity because it was not clearly established that Reynolds' reviews had to be meaningful in the sense that he would have an opportunity to be removed from his status. That argument is unavailing.

It was clearly established at the time of the violation that where process is due, it must be "meaningful." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). It was also clearly established in 2001 that the *Mathews v. Eldridge* meaningfulness requirement applies to prisoners' due process rights. *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001). The defendants attempt to distinguish *Proctor* on the ground that *Proctor* concerned the procedural rights of an inmate held in a purportedly definite term of administrative segregation, whereas Reynolds was segregated for an indefinite term based on his Special Circumstances status. *See* 846 F.3d at 600-01. But *Proctor* states that "[i]t is well established that whenever process is constitutionally due, *no matter the context*, '[i]t ... must be granted at a meaningful time and in a meaningful manner.'" 846 F.3d at 609 (emphasis added) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Thus, so long as Reynolds had a protected liberty interest, it was clearly established that he was entitled to meaningful process, regardless of the factual context. Furthermore, even though the defendants are correct that there is no bright-line rule regarding what process Reynolds was due, it is clear that when a "process is nominally afforded to inmates over a significant period of time without any hint of success," that indicates that the process was not "meaningful." *Proctor*, 846 F.3d at 612. Therefore, even in the absence of a bright-line rule, the law is clearly established that nominal reviews with no opportunity for change are insufficient because "the unlawfulness" of such reviews is "apparent" under controlling precedent. *Wilson*, 526 U.S. at 614-15.

The second part of the defendants' argument is that it was not clearly established that "meaningful" process meant an opportunity to be removed from one's status. That argument rests in part on the assumption that Reynolds' due process claim challenges the process he was due with respect to his classification. But Reynolds' due process claim is not based on a denial of review of his Special Circumstances classification *per se*, but rather the conditions of confinement under which he was housed, which, in turn, were associated with his Special Circumstances status.

Moreover, contrary to the defendants' arguments, Reynolds' conditions of confinement were not a part of his sentence and were not expressly required by Section 18-10b. *See* Defs.' Mot. for J. as a Matter of Law, Doc. No. 277 at 33-34. Reynolds was sentenced to life without the possibility of release; he was not sentenced to Special Circumstances. *See Reynolds v. Comm'r of Corr.*, 321 Conn. 750, 765 (2016). Furthermore, the plain language of Section 18-10b does not mandate Reynolds' indefinite confinement in 22-hour-per-day isolation. The statute provided, in relevant part:

(a) "The Commissioner of Correction shall place an inmate on special circumstances high security status and **house the inmate in administrative segregation until a reclassification process is completed** under subsection (b) of this section . . .

(b) The commissioner shall establish a reclassification process for the purposes of this section. **The reclassification process shall include an assessment of the risk an inmate described in subsection (a) of this section poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody**. If the commissioner places such inmate in administrative segregation pursuant to such assessment, the commissioner shall require the inmate to complete the administrative segregation program operated by the commissioner.

(c) (1) **The commissioner shall place such inmate in a housing unit for the maximum security population if, after completion of such reclassification process, the commissioner determines such placement is appropriate**, provided the commissioner (A) maintains the inmate on special circumstances high security status, (B) houses the inmate separate from inmates who are not on special

circumstances high security status, and (C) imposes conditions of confinement on such inmate which shall include, but not be limited to, conditions that require (i) that the inmate's movements be escorted or monitored, (ii) movement of the inmate to a new cell at least every ninety days, (iii) at least two searches of the inmate's cell each week, (iv) that no contact be permitted during the inmate's social visits, (v) that the inmate be assigned to work assignments that are within the assigned housing unit, and (vi) that the inmate be allowed no more than two hours of recreational activity per day.

(2) **The commissioner shall conduct an annual review of such inmate's conditions of confinement within such housing unit and the commissioner may, for compelling correctional management or safety reasons, modify any condition of confinement**, subject to the requirements of subparagraphs (A) to (C), inclusive, of subdivision (1) of this subsection.

Conn. Gen. Stat. § 18-10b (emphasis added).  As a plain reading of section 18-10b shows, to the extent that the statute's plain language mandates Reynolds' placement in administrative segregation, that placement is not indefinite.  The statute sets forth two conditions under which Reynolds would be placed in administrative segregation: either until the commissioner conducts a reclassification process; or after the commissioner completes the reclassification process, if the commissioner determines that placement appropriate, and the commissioner shall review that placement annually.  *Id.*  Even to the extent that the list of confinement conditions in (c)(1) are interpreted to be mandated by statute, those conditions do not require an inmate to be isolated inside his cell for 22 hours a day, and 24 hours on Sunday.  *Id.*  In fact, no minimum hours of confinement are included in the statute and the conditions listed in the statute provide for the possibility that the inmate would be "assigned to work assignments that are within the assigned housing unit" and be permitted up to two hours of recreation per day.  *Id.*  Accordingly, because Section 18-10b does not mandate the most severe aspects of the conditions that Reynolds endured without meaningful review, *Proctor*'s procedural requirements are applicable.  *See Proctor*, 846 F.3d at 609-612.

It should also be noted that even if Section 18-10b *did* mandate Reynolds' conditions of confinement, Reynolds would still have a clearly established right to meaningful process.  That right, however, would be pursuant to a different kind of liberty interest.  If Section 18-10b imposed, for example, mandatory in-cell isolation for all prisoners in a certain category who are sentenced to life without possibility of release, then the conditions imposed by the statute would "exceed[] the sentence in . . . an unexpected manner as to give rise to protection by the Due Process Clause of its own force."  *Sandin*, 515 U.S. at 484.  *Cf. In re Medley*, 134 U.S. 160, 163-65, 171, (1890) (holding that, where prisoner was placed in solitary confinement pursuant to a statute that outlined the conditions of confinement for prisoners on death row, "solitary confinement . . . was an additional punishment" imposed by a statute passed after the time of the offense).  Reynolds would therefore have a liberty interest "aris[ing] from the Constitution itself, by reason of guarantees implicit in the word 'liberty.'"  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Because he would possess a liberty interest, he would be entitled to meaningful process. *See Proctor*, 846 F.3d at 609.

> b.  Whether Defendants were objectively reasonable in their reliance on Section 18-10b

The defendants further argue that their "reliance upon and execution of § 18-10b was objectively reasonable."  Defs.' Mot. for J. as a Matter of Law, Doc. No. 277 at 35.  In this Circuit, "enforcement of a presumptively valid statute creates a heavy presumption in favor of qualified immunity."  *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 104 (2d Cir. 2003).  The exception is if a statute "was so plainly unconstitutional and its enforcement so clearly unlawful, in light of all facts and circumstances, that the presumption in favor of qualified immunity is overcome."  *Id.*

Before undertaking that analysis, however, the chief question is whether the defendants did in fact comply with the plain language of Section 18-10b. Here, it is useful to compare the statutory language of Section 18-10b with the language of the Administrative Directives.

Section 18-10b requires the "Commissioner of Correction" to "place an inmate on special circumstances high security status and house the inmate in administrative segregation *until a reclassification process is completed* under subsection (b)." Conn. Gen. Stat. § 18-10b(a) (emphasis added). Subsection (b) requires the commissioner to "establish a reclassification process," which "shall include an assessment of the risk an inmate described in subsection (a) of this section poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody." *Id.* § 18-10b(b). Subsection (c)(1) further states, in part, that "[t]he commissioner shall place such inmate in a housing unit for the maximum security population if, *after completion of such reclassification process*, the commissioner determines such placement is appropriate." *Id.* § 18-10b(c)(1). Subsection (c)(2) provides that "[t]he commissioner shall conduct an annual review of such inmate's conditions of confinement within such housing unit and the commissioner may, for compelling correctional management or safety reasons, modify any condition of confinement." *Id.* § 18-10b(c)(2). The statutory language of Section 18-10b, therefore, mandates that the commissioner create a reclassification process that assesses the risk an inmate like Reynolds "poses to staff and other inmates" and that he implement that reclassification process *before* placing an inmate like Reynolds in maximum security in order to determine whether that placement is warranted.

By comparison, the following is the 2016 revision to Administrative Directive 9.2 implemented by the Connecticut Department of Correction after the enactment of Section 18-10b:

> ☒ I recommend the following inclusion or revision to the above referenced Administrative Directive (provide detailed explanation): Based on CGS Sec. 18-10b. **"Placement of inmate convicted of capital felony or murder with special circumstances. Reclassification. Annual review and report,"** the following inclusion is requested to protect the public, staff and inmate population:
>
> **Assignment to Overall Risk Level 5/Murder with Special Circumstance**
> An inmate shall be automatically placed on Special Circumstances High Security status with assignment to overall risk level 5 under any of the following conditions:
>
> 1.  The inmate is convicted of the class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, and sentenced to a term of life imprisonment without the possibility of release.
>
> 2.  The inmate is in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction, or (B) commuted to a sentence of life imprisonment without the possibility of release.

Pl.'s Trial Ex. 7 at 1.  As shown above, the Administrative Directive revision states that inmates like Reynolds "shall be automatically . . . assign[ed] to overall risk level 5" based on their previous, vacated death sentences for capital felonies.  *Id.*

The revision to Administrative Directive 9.2 is not a reasonable implementation of Section 18-10b.  Under the mandates of the statute, an assessment must *precede* the determination that an inmate like Reynolds should be placed in maximum security.  Even to the extent that the defendants conducted annual reviews assessing Reynolds' safety risk, they implemented the statute backwards.  Rather than making Reynolds' maximum security determination responsive to his reviews, the defendants made his reviews responsive to their prior determination that he be placed on maximum security.

The defendants further argue that "the Defendants are not lawyers," and "that they consulted with lawyers and experts who assured them that they were required to house and classify Plaintiff in the manner in which they did." Defs.' Reply, Doc. No. 303 at 8. Reliance on legal advice is no defense to the "clearly established" prong of qualified immunity. *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("The question of whether a right is 'clearly established' . . . is an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity."). The defendants therefore cannot rely on mistaken advice of counsel that Reynolds did not have a clearly established right to due process for the reasons articulated in greater detail above. With respect to the "objective reasonableness" prong, however, "the solicitation of legal advice informs the reasonableness inquiry." *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 n.3 (2d Cir. 2010).

Although I consider the defendants' reliance upon counsel in my determination regarding whether their conduct was objectively reasonable, that does not mean that reliance on attorney advice is an absolute defense. Here, I conclude that the statutory language of Section 18-10b was clear, so that even a layperson would understand that the commissioner was required to create a reclassification process, the reclassification process must be completed before determining whether to place an inmate in maximum security housing, and an annual review should be conducted to consider modifying the inmate's conditions of confinement. *See generally* Conn. Gen. Stat. § 18-10b. Moreover, Semple testified at trial that he had the statute virtually memorized. Semple Test., Doc. No. 289 at 88 ("18-10b was, you know, pretty much branded into my brain."). The defendants' conduct was thus in clear contradiction of plain instructions in the statute that a reasonable correctional official should understand without the aid of legal counsel.

96

Accordingly, the defendants were not objectively reasonable in implementing Section 18-10b because they did not comply with the plain language of the statute.

3. *Defendants are entitled to qualified immunity on equal protection claim*

The defendants also argue that they are entitled to qualified immunity on Reynolds' equal protection claim. Here, the defendants advance four arguments: that Santiago and Johnson were not similarly situated because they do not fall under the plain language of the statute, that the intent element was not met because the defendants do not know Santiago and Johnson, that the officials were following the state statute, and that the defendants were objectively reasonable in interpreting the statute. *See* Defs.' Mot. for a J. as a Matter of Law, Doc. No. 277 at 36-40.

The defendants do not dispute that Reynolds' equal protection claim was legally recognized. *See generally id.* Indeed, it was clearly established at the time of the violation that prisoners retain a Fourteenth Amendment right to equal protection. *Lee v. Washington*, 390 U.S. 333, 333-34 (1968) (per curiam). It was also clearly established that a "class of one" can bring an equal protection claim if he was treated differently than similarly situated individuals without a rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

a. Defendants' Arguments that Santiago and Johnson Were Not Similarly Situated and that Intent Element Was Not Met

Two of the defendants' arguments—their argument that Santiago and Johnson were not similarly situated to Reynolds, and their argument that the intent element was not met, challenge whether Reynolds established the *elements* of his equal protection claim. Defs.' Mot. for a J. as a Matter of Law, Doc. No. 277 at 36-38. Those arguments are distinguishable from the posture of qualified immunity. Qualified immunity "protects officials from damages liability." *Dorceant v. Aquino*, 2018 WL 3869891, at *2 (E.D.N.Y. Aug. 15, 2018). The "availability" of

the defense "does not turn on whether the defendants violated the plaintiff's rights." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995).

The Second Circuit has already held that Reynolds met the *elements* of his equal protection claim against the defendants. *See Reynolds v. Quiros*, 990 F.3d 286, 291, 300-01 (2d Cir. 2021). Reynolds was therefore under no obligation to present evidence at trial proving the elements of his equal protection claim. Nor can this court enter judgment as a matter of law reversing the Second Circuit's holding.[14] Thus, to the extent that the defendants seek judgment as a matter of law on the basis that Reynolds did not prove the *elements* of the equal protection claim, that request is denied.

b. Defendants' Argument that Defendants were Following State Statute or Were Objectively Reasonable in Interpreting State Statute

The defendants further argue that they should be granted qualified immunity because they were following Section 18-10b or, in the alternative, that they were objectively reasonable in their interpretation of that statute. Those arguments are unavailing.

Section 18-10b states, in relevant part:

(a) The Commissioner of Correction shall place an inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed under subsection (b) of this section, if (1) the inmate is convicted of the class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, and sentenced to a term of life imprisonment without the possibility of release, or (2) the inmate is in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the

---

[14] Moreover, the defendants' argument that, as a matter of law, the intent element of the equal protection claim has not been met because the defendants did not know Santiago and Johnson is without merit. Defs.' Mot. for a J. as a Matter of Law, Doc. No. 277 at 36-38. The intent requirement for a class of one claim is not so high a bar that it requires the defendants to know the inmates with other classifications by name. *See Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir. 2001) ("proof of subjective ill will" is not required to prevail on a "class of one" claim.).

possibility of release by a court of competent jurisdiction, or (B) commuted to a
sentence of life imprisonment without the possibility of release.

Conn. Gen. Stat. § 18-10b(a).[15]  The statute applied not only to Reynolds but also to Santiago.

Specifically, subsection (a)(2) applied to Santiago because Santiago was previously sentenced to

death for a Section 53a-54b capital felony committed prior to April 25, 2012.  *See State v.

Santiago*, 305 Conn. 101, 126, 141 (2012); *State v. Santiago*, 318 Conn. 1, 11-12 (2015).[16]   On

June 12, 2012, the Connecticut Supreme Court reversed Santiago's sentence of death and

remanded his case for a new penalty phase hearing.  *See State v. Santiago*, 318 Conn. at 10.

Then on August 25, 2015, the Connecticut Supreme Court abolished the retroactive imposition

of the death penalty, "revers[ing] the judgment of the trial court with respect to [Santiago's]

sentence of death on the capital felony count and remand[ing] the case to that court with

direction to sentence the defendant to life imprisonment without the possibility of release on that

---

[15] Murder with special circumstances is defined by Section 53a-54b:

> A person is guilty of murder with special circumstances who is convicted of any of the following
> and was eighteen years of age or older at the time of the offense: (1) Murder of a member of the
> Division of State Police within the Department of Emergency Services and Public Protection or of
> any local police department, a chief inspector or inspector in the Division of Criminal Justice, a state
> marshal who is exercising authority granted under any provision of the general statutes, a judicial
> marshal in performance of the duties of a judicial marshal, a constable who performs criminal law
> enforcement duties, a special policeman appointed under section 29-18, a conservation officer or
> special conservation officer appointed by the Commissioner of Energy and Environmental
> Protection under the provisions of section 26-5, an employee of the Department of Correction or a
> person providing services on behalf of said department when such employee or person is acting
> within the scope of such employee's or person's employment or duties in a correctional institution
> or facility and the actor is confined in such institution or facility, or any firefighter, while such victim
> was acting within the scope of such victim's duties; (2) murder committed by a defendant who is
> hired to commit the same for pecuniary gain or murder committed by one who is hired by the
> defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously
> been convicted of intentional murder or of murder committed in the course of commission of a
> felony; (4) murder committed by one who was, at the time of commission of the murder, under
> sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course
> of the kidnapping or before such person is able to return or be returned to safety; (6) murder
> committed in the course of the commission of sexual assault in the first degree; (7) murder of two
> or more persons at the same time or in the course of a single transaction; or (8) murder of a person
> under sixteen years of age.

Conn. Gen. Stat. § 53a-54b.

[16] I take judicial notice of the Connecticut Supreme Court's decisions.  *See Giraldo v. Kessler*, 694 F.3d 161, 164
(2d Cir. 2012) (court may "take judicial notice of relevant matters of public record.").

count." *Id.* at 11.  Accordingly, under the plain language of the statute, the defendants were not required to treat Reynolds and Santiago differently.  It therefore cannot be said that the defendants were following the statute in doing so.

Nor was the defendants' interpretation of the statute objectively reasonable.  As I set forth above, a reasonably competent official should have understood the plain language of Section 18-10b.  Adherence with the plain language of the statute does not require a prison official to "research[] case law."  *Cf. Amore v. Novarro*, 624 F.3d 522, 534 (2d Cir. 2010).  Furthermore, Semple, for example, testified at trial that he had virtually memorized Section 18-10b.  *See* Semple Test., Doc. No. 289 at 88.  Moreover, on at least one occasion, a court in our circuit has declined to grant qualified immunity to a defendant who claimed that he reasonably interpreted a statute, when "[n]othing in the plain language of [the statute] suggests that it operates as Defendant argues."  *Moore v. Newton*, 220 F. Supp. 3d 275, 287, 289 (E.D.N.Y. 2016).  I thus conclude that the defendants were not objectively reasonable in their interpretation that Section 18-10b required them to treat Reynolds and Santiago differently.

Qualified immunity on the equal protection claim is therefore denied.

## V.    Conclusion

For the reasons set forth above, I rule as follows:

The plaintiffs' motions for a new trial are **granted**.  Doc. Nos. 298, 337.  The plaintiff is granted a new trial on his due process claim for the 2010-2017 timeframe, as well as on his Eighth Amendment claim for the 2010-2019 timeframe.

The defendants' motion for judgment as a matter of law is **granted in part and denied in part**.  Doc. No. 277.  The defendants' motion is granted to the extent that the jury was

unreasonable in finding Maldonado personally involved in the due process violation from 2017

to 2019.  That motion is denied in all other respects.

     So ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2025.

                                 <u>/s/ STEFAN R. UNDERHILL</u>
                                 Stefan R. Underhill
                                 United States District Judge